```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2
                      CASE NO. 1:14-CR-20895-MGC-1
 3

 4   UNITED STATES OF AMERICA            Miami, Florida

 5          vs.                         Monday
                                        October 19, 2015
 6   RICKY JERMAINE ATKINS              Scheduled 9:30 a.m.
                                        10:21 a.m. to 5:26 p.m.
 7
                                        Day 1 of 10
 8                                      Pages 1 - 210
     _____
 9

10                           JURY TRIAL
               BEFORE THE HONORABLE MARCIA G. COOKE
11                 UNITED STATES DISTRICT JUDGE

12
     APPEARANCES:
13

14   FOR THE GOVERNMENT:        SETH M. SCHLESSINGER, ESQ.
                                 ELINA A. RUBIN-SMITH, ESQ.
15                               United States Attorney's Office
                                 99 N.E. 4th Street
16                               Miami, Florida  33132

17
     FOR THE DEFENDANT:         ALEXANDER JOHN MICHAELS, ESQ.
18                              999 Ponce de Leon Boulevard
                                Suite 750
19                              Coral Gables, Florida  33134

20


21
     STENOGRAPHICALLY
22   REPORTED BY:              GLENDA M. POWERS, FPR, CRR, FPR
                               Official Federal Court Reporter
23                             United States District Court
                               400 North Miami Avenue
24                             Miami, Florida 33128

25
```

```
 1                    I N D E X

 2                                                   PAGE

 3   PROSPECTIVE JURORS SWORN                         12

 4   OPENING INSTRUCTIONS TO PROSPECTIVE JURORS       13

 5   JURY VOIR DIRE

 6      By The Court                                  16

 7      By Mr. Schlessinger                           79

 8      By Mr. Michaels                               88

 9   CHALLENGES FOR CAUSE                            106

10   PREEMPTORY CHALLENGES                           112

11   JURY SELECTION                                  122

12   JURY PANEL SWORN                                153

13   GOVERNMENT'S OPENING STATEMENT

14      By Mr. Schlessinger                          157

15   DEFENDANT'S OPENING STATEMENT

16      By Mr. Michaels                              167

17

18

19   WITNESSES                                       PAGE

20                    GOVERNMENT'S EVIDENCE

21   BENJAMIN KEMMER

22      Direct Examination by Mr. Schlessinger       178

23      Cross-Examination by Mr. Michaels            192

24      Redirect Examination by Mr. Schlessinger     205

25
```

```
 1                        E X H I B I T S

 2

 3     EXHIBIT                                    PAGE RECEIVED

 4

 5     Government's Exhibit 1                          179

 6     Government's Exhibit 2                          184

 7     Government's Exhibit 3                          186

 8     Government's Exhibit 4                          189

 9     Government's Exhibit 5                          189

10     Government's Exhibit 6                          190

11     Government's Exhibit 6A                         190

12     Government's Exhibit 6B                         190

13     Government's Exhibit 7                          190

14

15

16

17

18

19

20

21

22

23

24

25
```

 1            (Call to the Order of the Court:)

 2        COURTROOM DEPUTY:  All rise.  Court is in session.

 3   Please come to order.

 4        THE COURT:  Good morning, everyone.  We're on the

 5   record in United States versus Atkins.

 6            For the record, appearing on behalf of the United

 7   States?

 8        MR. SCHLESSINGER:  Good morning, Your Honor.  Seth

 9   Schlessinger and Elina Rubin-Smith on behalf of the United

10   States, and we are joined at counsel table by Supervisory

11   Special Agent Amanda Detterline from the FBI.

12        THE COURT:  Thank you.

13            And appearing on behalf of Mr. Atkins.

14        MR. MICHAELS:  Good morning, Your Honor, Alexander

15   Michaels for Mr. Atkins, who stands present in front of this

16   Honorable Court.

17        THE COURT:  Thank you very much.  While the jury is on

18   its way up, why don't we sit down and take care of some

19   administrative matters?

20            Counsel, last week when I gave you the trial schedule,

21   I made a slight mistake and one of them has to do with not you

22   all, but my overlooking my calendar.  So, we will have trial

23   all day today, Wednesday afternoon and, again, starting, next

24   Wednesday afternoon, and the remainder of that week and into

25   the following week, if we needed it.  I wanted to let you know

1    as soon as possible, just in case it affected travel of

2    witnesses and things of that nature.

3            I thought Mr. Michaels, you had originally asked me for

4    a little extra time.  These days off will allow you to continue

5    to be prepared as we go forward, but I wanted you all to know

6    about the change in schedule, and I apologize that I kind of

7    goofed up last week.  All right.

8            MR. MICHAELS:  So, there's no tomorrow, Judge?  I'm

9    sorry to interrupt, make sure.

10           THE COURT:  I thought we were half a day tomorrow, but

11   it's pretty much all day tomorrow.

12           MR. MICHAELS:  Thank you, Judge.

13           THE COURT:  I won't be back at the courthouse until

14   probably 1:00.  We might be able to squeeze in some testimony

15   in the afternoon, but let's play it by ear, but I did want to

16   say definitely not the morning.  All right.  They're going to

17   be on their way up with the jury.

18           As I recall, Mr. Schlessinger, there were some pretrial

19   matters that we needed to take care of before we did opening

20   statements in this case, correct?

21           MR. SCHLESSINGER:  I believe there are, Your Honor.

22   There were several notices of Government's intent to introduce

23   evidence pursuant to Rule 404(b) and also inextricably

24   intertwined.  There was not a motion filed by Mr. Michaels,

25   although he did indicate that he would oppose it at the

1    calendar call last week.

2              THE COURT:  Okay.

3              MR. SCHLESSINGER:  There was also -- previously, there

4    was a motion in limine filed by the Government to exclude

5    evidence, prior acts of prostitution by any of the minor

6    victims in this case, and then we had discussed those at

7    calendar call.

8              What we had not discussed at calendar call, I was

9    informed by Mr. Michaels that this morning he actually filed a

10   motion to suppress -- I have not seen that because it was filed

11   this morning.

12             THE COURT:  Well, first of all, any motion to suppress

13   would be way out of time, Mr. Michaels.  We have been in this

14   trial and prepared to go for months; even last Wednesday when

15   we discussed this matter there was no mention of a motion to

16   suppress, and you know what the local rules are.

17             MR. MICHAELS:  Yes, I know.  But the problem was, I

18   asked to give me more time.  I hesitated to file it, I wasn't

19   sure that I want to file it, and I went back and forth in my

20   head.  I was not so much inclined to file it until I met with

21   my client and he kind of demanded if I file it.

22             THE COURT:  Well, a demand by your client doesn't make

23   it necessarily appropriate or legal.  That's why your client

24   has counsel, someone who, as we say, is learned in the law and

25   can advise him about the appropriate way to proceed.

1          Your client is not, however well-meaning, an attorney.

2          MR. MICHAELS:  Judge, he asked me to file -- I mean,

3    some other motions I refused to file, but this one was a

4    borderline, so I felt like --

5          THE COURT:  Your client -- I'm certain that you know

6    this, you are his third attorney.

7          MR. MICHAELS:  I know I'm his third attorney, and we

8    already have some issues that I'm not at liberty to talk about,

9    unless he complains about me and then attorney-client privilege

10   may not exist, but I --

11         THE COURT:  Well, that's one of the things you have to

12   iron out with your client about the representation that you

13   have with him.  But we're here, we're ready to go, and the

14   jurors are on their way upstairs.

15         THE DEFENDANT:  I want to say something.

16         THE COURT:  Sir, no.  You have a lawyer.  Speak through

17   your lawyer.

18         THE DEFENDANT:  But I want to talk to him about

19   suppressing all my stuff and bringing the case law up, but he

20   never did it.

21         THE COURT:  Sir, you have an attorney and you're now on

22   your third one.

23         THE DEFENDANT:  And the law betrayed me.

24         THE COURT:  Mr. Malone represented you.  Now, I said

25   this to you before.  You have to make a choice about listening,

1    and I'm going to let you know right now that any misbehavior in

2    front of this jury will be dealt with appropriately.

3         Do you understand, sir?

4         THE DEFENDANT:  Yes.

5         THE COURT:  All right.

6         THE DEFENDANT:  I just wanted to put on record that I

7    asked for my evidence for awhile and I never got it, my Brady

8    evidence and everything, and I know that something about Franks

9    versus Delaware (phonetic) could help me, but I been telling

10   Mr. Michaels but he --

11        THE COURT:  Well, I am certain -- and I'm going to ask

12   Mr. Schlessinger on the record right now.

13        Mr. Schlessinger, have you forwarded counsels in this

14   matter the discovery as pertains to this case?

15        MR. SCHLESSINGER:  Not only have we forwarded it long

16   ago, we've reviewed it personally with Mr. Atkins in the

17   presence of his counsel, as well as on various occasions with

18   all of his predecessor counsel, so yes.

19        THE DEFENDANT:  I asked for if I can have it, tangible,

20   if I can have for myself.  I never receive it.

21        THE COURT:  That's between you and your attorney.

22        MR. MICHAELS:  Judge, can I just briefly make the

23   record clear here?  I'm here to represent him to the best of my

24   ability.  Whatever feeling we had -- I practiced for 35 years,

25   I'll do exclusively criminal law for 35 years.

1          I tried, probably, and I dare say that, more cases, but

2    I never any in front of Your Honor, I tried probably more cases

3    than any other lawyer in Dade County.  I dare say that if not

4    to have three or five lawyers in terms of how many cases I go

5    to trial.

6          I never roll over, I never sold a client, and I intend

7    to fight for him as I fight for everybody else.  I have been on

8    contempt and put in jail for my representation of clients, and

9    obviously I don't intend to do that, I'm tired of seeing the

10   inside of a cell, but I intend to fight for him like for

11   anybody else.

12         He spent hours and hours with lawyer in my office, went

13   through every discovery, provided anything.

14         THE DEFENDANT:  Not everything.

15         MR. MICHAELS:  Whether or not we agree and see eye to

16   eye, it's not going to have any difference in how I'm going to

17   try to perform and I'll do the best I can for him.

18         THE COURT:  Ivan, are you ready with the jury?

19         COURTROOM DEPUTY:  Yes, I'll call them.

20         THE DEFENDANT:  Yes, I want to put on the record, too,

21   that I haven't got my search warrant since I've been here, I've

22   been here for ten months.  I haven't seen all the evidence that

23   they have against me.  They gave me what they want me to see.

24         THE COURT:  Do you understand, in Federal Court,

25   there's no requirement that they give you all the evidence?

1          THE DEFENDANT:  I thought Brady --

2          THE COURT:  If they feel that the evidence is

3    exculpatory, if they think that the evidence is exculpatory,

4    they're required to turn it over.

5          THE DEFENDANT:  And I just feel like --

6          THE COURT:  There is no requirement in Federal Court

7    although most prosecutors, because they are people of honor and

8    integrity, usually turn over the evidence that they're going to

9    use at trial.

10         THE DEFENDANT:  And I know that I don't think he's

11   prepared because me and him had a discussion, I seen him twice

12   since I had him, and he haven't prepared me for this.  I didn't

13   know I was going to trial.  So, it was about money, it's all

14   about money, basically.

15         THE COURT:  Mr. Atkins, you were in court -- you were

16   in court the date we set the trial date in this matter.

17         Two, you made the decision, not me, you hired

18   Mr. Michaels.

19         THE DEFENDANT:  Yes.

20         THE COURT:  Your other two attorneys were

21   court-appointed.  You hired Mr. Michaels, so your issues with

22   him are with him.  Do you understand that?

23         THE DEFENDANT:  Yeah, but the reason I hired

24   Mr. Michaels, because I'm alone with the information --

25         THE COURT:  I don't know the reason.  That's between

1    you and Mr. Michaels.

2            THE DEFENDANT:  -- that he supposed to give.

3            THE COURT:  That's between you and Mr. Michaels.

4            THE COURT:  All right.

5            MR. MICHAELS:  Judge, I need to make one comment,

6    please.

7            THE COURT:  I think we should move on.

8            MR. MICHAELS:  Just one brief comment, please.  Money

9    has nothing to do with how I try cases.  I told him that, and I

10   told him on Saturday, I told him not to bring the money.  I try

11   cases -- not for money, I try cases because I believe in the

12   American system and constitution, and I like to win every case

13   I try.

14           For him to say that, it's really annoying to me because

15   I told him on Saturday this has nothing to do with money.  I

16   don't do this profession for money.  Well, of course, I want to

17   make money, but I don't do it for money, let me make clear to

18   his everybody, including him and his mother, who avoided me for

19   three months.  Thank you.

20           THE COURT:  All right.  Ivan, is the jury ready?

21           COURTROOM DEPUTY:  The jurors are coming upstairs now.

22   They're being lined up by our jury people.

23           THE COURT:  Okay.  I need that side of the courtroom

24   free for the ladies and gentlemen of the jury, please.  We'll

25   be right back as soon as the jurors are here.

1            (Recess taken from 10:32 a.m. to 10:47 a.m.)

2            COURTROOM DEPUTY:  All rise.  Court is back in session.

3            THE COURT:  All right.  Our jury is ready.

4            COURTROOM DEPUTY:  Should I bring them in, Judge?

5            THE COURT:  Yes, please.

6            THE DEFENDANT:  Judge Cooke, I want to tell you sorry

7    for the way I acted.

8            THE COURT:  Apology accepted.

9            THE DEFENDANT:  The sergeant and guys, too.

10           THE COURT:  We will go through jury selection and then

11   go through challenges for cause.

12           MR. MICHAELS:  I have to let you know that I have a

13   medical condition and I have to take a break every hour for

14   five minutes.

15           THE COURT:  Well, let's see how we go before we get

16   there.

17           (Prospective jurors entered courtroom at 10:51 a.m.)

18           THE COURT:  Welcome ladies and gentlemen, please take

19   your seats.

20           Good morning.  Please take your seats.

21           Good morning.

22           COURTROOM DEPUTY:  Jurors remain standing and raise

23   your right hands to be sworn.

24           Do you swear or affirm that you will answer truthfully

25   all questions asked of you touching upon your qualifications to

1    serve as jurors before this Court so help you God?

2              PROSPECTIVE JURORS:  (Collectively.)  I do.

3              COURTROOM DEPUTY:  Thank you.  Please be seated.

4              THE COURT:  Good morning, ladies and gentlemen.  The

5    case on trial for this morning is United States versus Ricky

6    Jerome {sic} Atkins.  This is a criminal case.

7              For the record, appearing on behalf of the United

8    States, and would you introduce those seated with you at

9    counsel table?

10             MR. SCHLESSINGER:  Yes, Your Honor, thank you.

11             Ladies and gentlemen, good morning.  My name is Seth

12   Schlessinger.  I'm an assistant United States Attorney here in

13   the Southern District of Florida.

14             I'm here at counsel table with my co-counsel, Elina

15   Rubin-Smith, also an AUSA in the U.S. Attorney's Office here in

16   Miami, and we're joined at counsel table, as well, by

17   Special Agent Amanda Detterline of the FBI.

18             It's our privilege to represent the United States in

19   this courtroom.

20             THE COURT:  Thank you, Mr. Schlessinger.

21             And appearing on behalf of Mr. Atkins.

22             MR. MICHAELS:  Good morning, ladies and gentlemen.  My

23   name is Alexander Michaels, and I have the honor and privilege

24   to represent Mr. Atkins, who sits in front of you, presumed

25   innocent of all the charges.  Thank you.

1          THE COURT:  Ladies and gentlemen, I'm United States

2     District Judge Marcia Cooke, and I will be presiding over this

3     trial.

4          Now, ladies and gentlemen, the jury is one of our most

5     cherished and protected rights.  It's recognized in our

6     constitution and other than military service, it's one of the

7     most important things you can be called on to do as a United

8     States citizen.

9          Now, I'm aware that for some of you this may be your

10     first time coming into court.  Please don't be nervous.  We'll

11     do our best to put you at ease.

12          I also know, honestly, that none of you want to be

13     here, that you would rather be somewhere else.  So, on behalf

14     of the Court and the parties, I want to thank you for

15     responding to your jury summons and showing up today.

16          Now, before we begin trial and we begin asking you

17     certain questions, I want to introduce you to the members of

18     our court team who you may have an opportunity to see and work

19     with if you're selected as a juror in this case.

20          You have already met the courtroom deputy

21     Ivan Marchena.  He makes sure our trains run on time and if you

22     need anything while you're a juror, or even during the jury

23     selection process, please direct it to him.

24          In front of me with this fancy computer and machine is

25     our court reporter, Ms. Glenda Powers.  She makes sure that

1   everything that we say in court is taken down accurately.

2   That's why it's very important that when you're called upon you

3   speak up loudly and clearly so that we can all understand you.

4          Although Ms. Powers is taking down everything that's

5   being said in court, if you are selected as a juror in this

6   case, you should understand that there will be no transcript of

7   these proceedings made available to you.

8          We have two court security officers with us, we have

9   Mr. Blanford, who's in the front of the courtroom, and

10  Mr. Brody, who is in the rear of the courtroom.

11         Now, you should understand, whenever you're in court,

12  there is always a court security officer here in court with

13  you.  When you're deliberating as jurors, there's always a

14  court security officer outside the jury room.  If you ever have

15  any questions while you're here in court or on court property

16  about your safety or security, look for the individuals wearing

17  those blue blazers and they'll be happy to help you.  They make

18  sure we're safe whenever we're here in court.

19         Now over the next few minutes I'm going to be asking

20  you certain questions concerning your qualifications to sit as

21  jurors.

22         Now, ladies and gentlemen, I'm not trying to embarrass

23  you, intimidate you or harass you.  It is our effort to make

24  sure that we're seating a fair and impartial jury in this case,

25  and the fact that you are excused from this trial doesn't mean

1    that there won't be other trials that you will be seated on in

2    this case.

3           Counsel for the United States, before we begin, can you

4    read your witness list to the Ladies and Gentlemen of the Jury?

5           MR. SCHLESSINGER:  Yes, Your Honor.

6           Your Honor, at trial the Government may call the

7    following witnesses to testify on behalf of the prosecution:

8           Ben Kemmer of the Florida Keys Children's Shelter,

9    G.W., L.P., Commander Jose Alfonso of the Miami Police

10   Department, Detective Vince Weiner from the Monroe County

11   Sheriff's Officer, Special Agent Amanda Detterline of the FBI,

12   Sandra Simon, Jessica Howard, Anecia Luhan (phonetic), Shafik

13   Najm, and Special Agent David Magnuson of the FBI, as well as a

14   records custodian from T-Mobile.

15          THE COURT:  Thank you very much.  Now ladies and

16   gentlemen, I'm going to ask that you get out those little

17   pieces of paper.  If you're like me, you might need some

18   glasses, get those going to so that we can start going through

19   the jury at this time.

20          I'm going to start with Juror Number 1, it's Mr. Pavon.

21          Mr. Pavon, you're presently an electrical technician?

22          PROSPECTIVE JUROR:  Yes, ma'am, I am.

23          THE COURT:  Now, you served on a jury three times in

24   the past.

25          PROSPECTIVE JUROR:  Yes, ma'am, I have.

1           THE COURT:  Without telling us what those verdicts

2     were, were you able to reach a verdict in those cases?

3           PROSPECTIVE JUROR:  Yes, ma'am, we did.

4           THE COURT:  Is there anything from those experiences

5     that you think would prevent you from being a fair juror in

6     this case?

7           PROSPECTIVE JUROR:  No.

8           THE COURT:  Now, you mentioned in your answer to

9     question number ten, an incident involving your son.  Has that

10    matter now been resolved?

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  Anything about that experience that you

13    think would prevent you from being a fair juror here?

14          PROSPECTIVE JUROR:  No, but can I elaborate?

15          THE COURT:  Yes.

16          PROSPECTIVE JUROR:  I'm a little bit disappointed with

17    the DAs and the judges.  He was found guilty.

18          THE COURT:  Now, your son, was it here in Florida?

19          PROSPECTIVE JUROR:  Yes, it was.

20          THE COURT:  Now, you understand that the prosecutor in

21    this case and myself were not involved in your son's case?

22          PROSPECTIVE JUROR:  I understand that.

23          THE COURT:  Would that experience that you had with

24    your son, prevent you from being a fair juror to this

25    defendant?

1          PROSPECTIVE JUROR:  No, it would not.

2          THE COURT:  Now, you also mentioned in your answer to

3    question number fourteen that there may be certain cases that

4    you might find it hard to sit on.

5          What kind of cases would those be?

6          PROSPECTIVE JUROR:  I just gave you the reason for

7    that.

8          THE COURT:  Thank you very much for your honesty, sir.

9    I'm going to Juror Number 2, Ms. Martinez.

10          PROSPECTIVE JUROR:  Hello.

11          THE COURT: Good morning.  You are currently not

12    working?

13          PROSPECTIVE JUROR:  No.

14          THE COURT: Before you were unemployed, what kind of

15    work did do you?

16          PROSPECTIVE JUROR:  I used to work in a screen printing

17    company.

18          THE COURT:  And your current hobby is you collect

19    vintage clothes at thrift --

20          PROSPECTIVE JUROR:  Yeah, I like thrifting.

21          THE COURT:  Nothing wrong with that, everybody has a

22    hobby.

23          Have you ever served on a jury before?

24          PROSPECTIVE JUROR:  No, I have not.

25          THE COURT:  No friends or relatives who are police

1   officers or attorneys?

2          PROSPECTIVE JUROR:  No.

3          THE COURT:  Thank you very much.

4          PROSPECTIVE JUROR:  You're welcome.

5          THE COURT:  Could you pass the microphone to Mr.

6   Sanchez Juror Number 3.

7          PROSPECTIVE JUROR:  Good morning, Your Honor.

8          THE COURT: Good morning.  Sir, you've never served on a

9   jury before?

10         PROSPECTIVE JUROR:  No, ma'am.

11         THE COURT:  No friends or family in law enforcement.

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  All right.  Thank you very much.

14         PROSPECTIVE JUROR:  Thank you.

15         THE COURT:  If you pass the microphone to Juror

16   Number 4.  It's Ms. Borges?

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  Ms. Borges, you're due to start a new job.

19   Is it today or next Monday?

20         PROSPECTIVE JUROR:  I started actually last Tuesday.

21         THE COURT:  Oh, last Tuesday, and what kind of work are

22   you doing at your new job?

23         PROSPECTIVE JUROR:  Right now, I'm working in the

24   international department trying to get ill patients from

25   outside the U.S. to get service and basically recover from

1    whatever illness there is in the University of Miami.

2             THE COURT:  So, you're taking people who don't have the

3    kind the hospitals that we have, bringing them into this

4    country to receive medical care?

5             PROSPECTIVE JUROR:  Yes, ma'am.

6             THE COURT:  Have you ever served on a jury -- you've

7    been on a jury twice?

8             PROSPECTIVE JUROR:  Yeah, but I never got picked.

9             THE COURT:  Okay.  And no friends or family in law

10   enforcement?

11            PROSPECTIVE JUROR:  No, ma'am.

12            THE COURT:  All right.  Thank you very much.

13            PROSPECTIVE JUROR:  Good morning, Your Honor.

14            THE COURT:  Good morning, sir, Mr. Gutierrez.

15            PROSPECTIVE JUROR:  Yes.

16            THE COURT:  You are formerly vice president of sales.

17            PROSPECTIVE JUROR:  Yes, ma'am.

18            THE COURT:  What kind of company?

19            PROSPECTIVE JUROR:  It was a food distribution company.

20            THE COURT:  And you've never served on a jury before?

21            PROSPECTIVE JUROR:  No, ma'am.

22            THE COURT:  But you do have a cousin that's a

23   Metro-Dade police officer?

24            PROSPECTIVE JUROR:  Yes, I do.

25            THE COURT:  Do you know what kind of work he or she

1  does?

2          PROSPECTIVE JUROR:  He is an officer.  He has a dog.

3  He --

4          THE COURT: So you -- would it be fair to say that we

5  think because he's a police officer who works with a dog he

6  might be a K-9 officer.

7          PROSPECTIVE JUROR:  I would assume so, yes, ma'am.

8          THE COURT:  All right.  Anything about your experiences

9  with your cousin that you think might prevent you from being a

10  fair juror in this case?

11          PROSPECTIVE JUROR:  No, ma'am.

12          THE COURT:  Thank you very much.  If you would pass the

13  microphone to Juror Number 6 for me.  Is it Ms. Martinho?

14          PROSPECTIVE JUROR:  Martinho.

15          THE COURT:  You had an unfortunate incident with -- was

16  it you or your mom that had the purse stolen?

17          PROSPECTIVE JUROR:  My purse was stolen.

18          THE COURT:  Your purse was stolen.  Did the police

19  respond to you for that incident?

20          PROSPECTIVE JUROR:  Yes, they did.

21          THE COURT:  How do you feel that you were treated by

22  law enforcement in regard to that matter?

23          PROSPECTIVE JUROR:  I was treated fine.

24          THE COURT:  Anything about that experience that you

25  think might prevent you from being a fair juror in this case?

1            PROSPECTIVE JUROR:  No.

2            THE COURT:  Thank you very much.

3            If you'd pass the microphone to Juror Number 7 for me,

4    please.  Is it Ms. Bosworth?

5            PROSPECTIVE JUROR:  Yes.

6            THE COURT:  Ms. Bosworth, you work in public

7    accounting?

8            PROSPECTIVE JUROR:  Well, I work for a public company.

9            THE COURT:  And what's the name of your company?

10           PROSPECTIVE JUROR:  Norweigian Cruise Line.

11           THE COURT: And how long have you been employed by

12   Norweigian Cruise Line?

13           PROSPECTIVE JUROR:  Three years.

14           THE COURT:  Also in the accounting department?

15           PROSPECTIVE JUROR:  Yes.

16           THE COURT:  And have you never served on a jury before?

17           PROSPECTIVE JUROR:  No, I have not.

18           THE COURT: Any friends or family in law enforcement?

19           PROSPECTIVE JUROR:  No.

20           THE COURT:  You mentioned an unfortunate situation

21   involving your car in Miami Beach.  Did the police respond to

22   that incident?

23           PROSPECTIVE JUROR:  Yes.

24           THE COURT:  Anything about your experience with the

25   police officers at that time that you think would prevent you

1   from being a fair juror in this case?

2          PROSPECTIVE JUROR:  No.

3          THE COURT:  Thank you very much.  I'm going to Juror

4   Number 8, please, Ms. Cole.

5          PROSPECTIVE JUROR:  Good morning.

6          THE COURT:  Ms. Cole, you're presently an accountant?

7          PROSPECTIVE JUROR:  Yes, I am.

8          THE COURT:  Now, you were called to serve on a jury,

9   but you weren't selected?

10         PROSPECTIVE JUROR:  Correct.

11         THE COURT:  Now, you mentioned your answer to Question

12  Number 14 that you have no sympathy for anyone who breaks the

13  law.

14         PROSPECTIVE JUROR:  That's correct.

15         THE COURT:  Okay.  Wouldn't you say that most people

16  don't have any sympathy for people who break the law?

17         PROSPECTIVE JUROR:  I would say so.

18         THE COURT:  Okay.  So, that's all of us in society, we

19  don't want to live around people who break the law; correct?

20         PROSPECTIVE JUROR:  Right.

21         THE COURT:  Now, you understand that Mr. Atkins as he

22  sits here this morning is presumed to be innocent.

23         PROSPECTIVE JUROR:  Yes, I understand.

24         THE COURT:  And you understand that just because

25  someone is appearing in court today does not mean that they're

1    guilty of anything?

2            PROSPECTIVE JUROR:  Absolutely.

3            THE COURT:  Now, do you think that just because Mr.

4    Atkins is sitting here next to his attorney he must have done

5    something wrong?

6            PROSPECTIVE JUROR:  No, I don't.

7            THE COURT:  Okay.  Thank you very much.  If you'd pass

8    the microphone to Juror Number 9 for me.

9            Mr. McHale, good morning, sir.

10           PROSPECTIVE JUROR:  Good morning, Your Honor.

11           THE COURT:  Sir, you are an attorney?

12           PROSPECTIVE JUROR:  Yes, Your Honor.

13           THE COURT: Now, do you practice criminal law, Mr.

14   McHale?

15           PROSPECTIVE JUROR:  Only in the past, I don't presently

16   do.

17           THE COURT:  Now, do you recognize either

18   Mr. Schlessinger or Mr. Michaels from any of your past work in

19   the law?

20           PROSPECTIVE JUROR:  No, Your Honor.

21           THE COURT:  Now, sir, because you have a, let's say, a

22   little bit different knowledge than some of our other jurors,

23   if I were to give you an instruction on the law and you

24   disagreed with it, would you be able to follow my instruction?

25           PROSPECTIVE JUROR:  Yes, I would.

1          THE COURT:  Now, have you ever served on a jury before?

2          PROSPECTIVE JUROR:  No, I have not.

3          THE COURT:  Now, by virtue of the kind of work that you

4     do, you have some friends that have been in the State

5     Attorney's Office and you were once a former state attorney.

6          PROSPECTIVE JUROR:  That's correct, Judge.

7          THE COURT:  So you, on the state side, did what

8     Mr. Schlessinger and his colleague does?

9          PROSPECTIVE JUROR:  That's correct.

10         THE COURT:  Now, knowing the kind of work that you do,

11    would you still be able to keep an open mind, listen to the

12    prosecution and turn to this case before making up your mind?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  Now, you said you also had friends who were

15    still state attorneys.

16         PROSPECTIVE JUROR:  I'm not so sure if they still are.

17    It was a long time ago.

18         THE COURT:  All right.  Thank you very much.  If you

19    pass the microphone to Juror Number 10, Ms. Fonseca.

20         PROSPECTIVE JUROR:  Good morning.

21         THE COURT:  Good morning.  You review and code medical

22    records.

23         PROSPECTIVE JUROR:  That's correct.

24         THE COURT:  Now, do you do it for a private doctor or

25    hospital?

1          PROSPECTIVE JUROR:  I do it for a hospital, Mount Sinai

2     Medical Center.

3          THE COURT: Now, the incident that you described in

4     Question Number 10, has that now been resolved?

5          PROSPECTIVE JUROR:  Yes, it has.

6          THE COURT:  Now, in your answer to Number 14, you say

7     that you cannot judge people.

8          PROSPECTIVE JUROR:  That's correct.

9          THE COURT:  Now, you understand that when you are

10    called upon to serve on a jury, we're not asking you to judge

11    people?

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  You understand that what you will be doing

14    is listening to the evidence and making a determination about

15    whether or not a person is guilty or not guilty given the laws

16    of the United States?

17         PROSPECTIVE JUROR:  That's correct.

18         THE COURT:  Now, would you be able to keep an open mind

19    and listen to all the testimony and determine whether or not

20    Mr. Atkins violated the laws that are stated in the indictment

21    that I'm going to talk about in a minute?

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  Thank you very much, ma'am.  If you pass

24    the microphone, please, to Juror Number 11.

25         PROSPECTIVE JUROR:  Good morning.

```
 1          THE COURT:  Okay.  I'm going to try, Chackochan.

 2          PROSPECTIVE JUROR:  Chackochan.

 3          THE COURT:  I'm probably going to mess it up again this

 4     morning, so I'm going to apologize ahead of time.

 5          PROSPECTIVE JUROR:  Thanks.

 6          THE COURT:  You're a registered nurse at Jackson

 7     Hospital?

 8          PROSPECTIVE JUROR:  Correct.

 9          THE COURT:  Do you work at any specific division?

10          PROSPECTIVE JUROR:  I work in labor and delivery in

11     Jackson South Community Hospital.

12          THE COURT: Jackson South so that's the southern part of

13     the county, not right near the courthouse here.  How long have

14     you been doing that?

15          PROSPECTIVE JUROR:  Eight years.

16          THE COURT:  Now, you put in answer to Question Number

17     14 and then you crossed it out --

18          PROSPECTIVE JUROR:  I initially misunderstood, like.

19          THE COURT:  Thank you very much.  We may get back to

20     that soon, but I am going to go to Juror Number 12.

21          Good morning, ma'am.

22          PROSPECTIVE JUROR:  Good morning.

23          THE COURT: You presently work for Dade County Public

24     Schools?

25          PROSPECTIVE JUROR:  Yes, ma'am.
```

1            THE COURT:  You work in the Head Start program?

2            PROSPECTIVE JUROR:  Yes.

3            THE COURT:  So, that means you work with little, little

4    children?

5            PROSPECTIVE JUROR:  Three to five.

6            THE COURT:  Now, have you ever worked with teenagers or

7    people in high school or that area in middle school?

8            PROSPECTIVE JUROR:  No, in my church I volunteer with

9    the youth.

10           THE COURT:  Now tell me what kind of volunteer do you

11   do with the youth at church?

12           PROSPECTIVE JUROR:  Well, I talk to them and let them

13   know that they have to be safe, you know, stay out of troubles

14   with all the things going on around.

15           THE COURT:  So, you are basically a youth leader?

16           PROSPECTIVE JUROR:  A youth counselor.

17           THE COURT:  With your church.

18           PROSPECTIVE JUROR:  Yes.

19           THE COURT:  Now, have you ever had any incident with

20   any of your kids at your church who've gotten into trouble?

21           PROSPECTIVE JUROR:  No.

22           THE COURT:  So, everybody's doing fine?

23           PROSPECTIVE JUROR:  Yes.

24           THE COURT:  All right. Thank you very much.  I am going

25   to ask that -- oh, excuse me.  I want to ask a question for

1    Number 11, you've been the victim of identity theft.

2            PROSPECTIVE JUROR:  Yes, ma'am.

3            THE COURT:  Now, have you had an opportunity to talk to

4    law enforcement about that?

5            PROSPECTIVE JUROR:  I have.  They just gave me a

6    report, a police report, that was it.

7            THE COURT:  So, you've been dealing with it on your

8    own, trying to get --

9            PROSPECTIVE JUROR:  Yes.

10           THE COURT:  And that can be very frustrating.

11           PROSPECTIVE JUROR:  Sometimes, yes.

12           THE COURT:  Now, is there anything about that

13   experience that you think would prevent you from being a fair

14   juror here?

15           PROSPECTIVE JUROR:  No.

16           THE COURT:  Thank you very much.  If you'd pass the

17   microphone, please, to Juror Number 13.  Is it Mr. Ostolaza?

18           PROSPECTIVE JUROR:  Yes, Ostolaza.

19           THE COURT:  I'm probably going to mess that one up

20   again today, so I'm already apologizing.

21           You are a sales associate?

22           PROSPECTIVE JUROR:  Yes.

23           THE COURT:  Where and what kind of things do you sell?

24           PROSPECTIVE JUROR:  Old Navy.  I work at Old Navy --

25   not really helping them buy -- when they need to find

1    something.

2         THE COURT:  Now, you've never served on a jury before?

3         PROSPECTIVE JUROR:  No.

4         THE COURT: And never been a victim of a crime?

5         PROSPECTIVE JUROR:  No.

6         THE COURT:  No friends or family in law enforcement?

7         PROSPECTIVE JUROR:  No.

8         THE COURT:  Thank you very much.  If you pass the

9    microphone to Ms. Flanagan, who's Juror Number 14.  Good

10   morning.

11        PROSPECTIVE JUROR:  Good morning.

12        THE COURT:  Ms. Flanagan, you have the hardest job in

13   the world.

14        PROSPECTIVE JUROR:  I don't know about that.

15        THE COURT:  Well, if you're staying at home taking care

16   of a family, it's pretty hard.

17        Never been involved in the criminal justice system?

18        PROSPECTIVE JUROR:  No.

19        THE COURT:  No friends or family in law enforcement?

20        PROSPECTIVE JUROR:  No.

21        THE COURT:  Now, your spouse was the prior owner of a

22   food manufacturing company?

23        PROSPECTIVE JUROR:  In Wisconsin, yes.

24        THE COURT:  And anything down here in terms of the food

25   manufacturing business?

1           PROSPECTIVE JUROR:  No.

2           THE COURT:  All right.  Thank you very much.  If you

3    pass the microphone to Juror Number 15.

4           PROSPECTIVE JUROR:  Good morning.

5           THE COURT:  Good morning, Ms. Garcia.  You're presently

6    a full-time student?

7           PROSPECTIVE JUROR:  Yes.

8           THE COURT:  Are you missing a class to be here today?

9           PROSPECTIVE JUROR:  Yes, I am.

10          THE COURT:  What's your normal class schedule.

11          PROSPECTIVE JUROR:  Mondays and Thursdays, 2:00 to 4:00

12   and Wednesdays -- every other Wednesday 5:00 to 10:30.

13          THE COURT:  So, you go to school Monday and Thursday?

14          PROSPECTIVE JUROR:  And Wednesday.

15          THE COURT:  And Wednesday?

16          PROSPECTIVE JUROR:  Yeah.

17          THE COURT: Now, you've never served on a jury before?

18          PROSPECTIVE JUROR:  No.

19          THE COURT: Now, your work at your church, does that

20   involve any children or teenagers?

21          PROSPECTIVE JUROR:  Eight to ten.

22          THE COURT:  Eight to ten?

23          PROSPECTIVE JUROR:  Yeah.

24          THE COURT:  Thank you very much.  If you pass the

25   microphone to Juror Number 16.  Is it Ms. Greene?

    1            PROSPECTIVE JUROR:  Yes.  Good morning, Your Honor.

    2            THE COURT:  Ms. Greene, you're a substance abuse

    3   counselor?

    4            PROSPECTIVE JUROR:  Yes.

    5            THE COURT:  Are you at a particular facility?

    6            PROSPECTIVE JUROR:  Yes.

    7            THE COURT:  And what's the name of the place that you

    8   work?

    9            PROSPECTIVE JUROR:  I work for Jessie Trice Community

   10   Health Center.

   11            THE COURT: Jessie T-R-I-C-E?

   12            PROSPECTIVE JUROR:  Yes, ma'am.

   13            THE COURT:  Can you tell me the age of the people you

   14   work with?

   15            PROSPECTIVE JUROR:  Adults, anybody over the age of 18.

   16            THE COURT:  So have you ever worked with substance

   17   abuse people under 18?

   18            PROSPECTIVE JUROR:  Yeah, maybe about 15 years ago, I

   19   did work with the adolescent population for a short period of

   20   time.

   21            THE COURT:  But mostly your work has been with adults?

   22            PROSPECTIVE JUROR:  Yes.

   23            THE COURT:  Now, the matter in Question Number 10, has

   24   that now been resolved?

   25            PROSPECTIVE JUROR:  Oh, yes.

```
 1              THE COURT:  Anything about that experience that you
 2    think would prevent you from being a fair juror here?
 3              PROSPECTIVE JUROR:  No, ma'am, that experience is why I
 4    do what I do now.
 5              THE COURT:  All right.  Thank you very much.  If you
 6    pass the microphone to Mr. Blanford who's going to go to Juror
 7    Number 17, Mr. Piedra.
 8              PROSPECTIVE JUROR:  Yes.
 9              THE COURT:  Sir, what kind of work do you presently do?
10              PROSPECTIVE JUROR:  I work as a server at Texas de
11    Brazil in Dadeland Mall.
12              THE COURT:  You never served on a jury before?
13              PROSPECTIVE JUROR:  No.
14              THE COURT:  No friends and family in law enforcement?
15              PROSPECTIVE JUROR:  No, not to my knowledge.
16              THE COURT:  Thank you very much.  If you pass the
17    microphone to Juror Number 18, Ms. Diaz, good morning.
18              PROSPECTIVE JUROR:  Good morning.
19              THE COURT:  Now, ma'am, you're a full-time registered
20    nurse?
21              PROSPECTIVE JUROR:  Yes.
22              THE COURT:  You deal totally with adults?
23              PROSPECTIVE JUROR:  Mostly adults, but I do sometimes
24    see children.
25              THE COURT:  And you had an incident involving your
```

1    sister?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  Has that matter now been resolved?

4              PROSPECTIVE JUROR:  Yes.

5              THE COURT:  Anything about that experience that you

6    think would prevent you from being a fair juror in this case?

7              PROSPECTIVE JUROR:  I don't believe so.

8              THE COURT:  Now, you also talk about your

9    brother-in-law who works in law enforcement.

10             PROSPECTIVE JUROR:  Yes.

11             THE COURT:  Is he stationed here in Miami?

12             PROSPECTIVE JUROR:  No, in the state of Illinois.

13             THE COURT:  Do you ever talk to him about his work or

14   the kind of work that he does?

15             PROSPECTIVE JUROR:  No, his cases are private.

16             THE COURT:  So, you've never had any discussion with

17   him about what goes on?

18             PROSPECTIVE JUROR:  No, just that I know he goes out of

19   town, he just tells us he goes out of town for the cases.

20             THE COURT: Thank you very much.  If you pass the

21   microphone, please, to Juror Number 19 who I believe is

22   Ms. Troche?  Is that correct?  You once served on a federal

23   jury before?

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  And were you able to reach a verdict

1   without telling us what your verdict was?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Anything about that experience that you

4   think would prevent you from being a fair juror in this case?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Any friends or family in law enforcement?

7          PROSPECTIVE JUROR:  Acquaintance?  Prosecutor, federal

8   prosecutor.

9          THE COURT:  Here, in the Miami area?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  And that person's name would be?

12          PROSPECTIVE JUROR:  Mike Tukor (phonetic).

13          THE COURT:  Okay.  Now, your spouse is a professor?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  And what kind of things does he profess, he

16   or she profess?

17          PROSPECTIVE JUROR:  He works at the school of business,

18   he's a organizational psychologist.

19          THE COURT:  Thank you very much.  If you'd pass the

20   microphone, please, to Juror Number 20.

21          PROSPECTIVE JUROR:  Good morning, Your Honor.

22          THE COURT:  Good morning.  Ma'am, you're a paralegal in

23   a family law firm?

24          PROSPECTIVE JUROR:  Yes, and I also volunteer for in

25   the 11th Judicial Circuit in complex business litigation.

```
 1              THE COURT:  I need you to slow down so our court

 2   reporter can get everything.  I know that you're a paralegal.

 3   Now where do you volunteer?

 4              PROSPECTIVE JUROR:  In the 11th Judicial Circuit in

 5   complex litigation.

 6              THE COURT:  So, you also do volunteer work there?

 7              PROSPECTIVE JUROR:  Yes.

 8              THE COURT:  Now, family law, does that mean that you

 9   often deal with issues related to child custody?

10              PROSPECTIVE JUROR:  Yes.

11              THE COURT:  Divorce?

12              PROSPECTIVE JUROR:  Yes, Your Honor.

13              THE COURT:  And adolescent children?

14              PROSPECTIVE JUROR:  Yes, Your Honor.

15              THE COURT:  And do you ever have any dealings through

16   the clients with your firm with the Department of Children and

17   Families or anything of that nature?

18              PROSPECTIVE JUROR:  Well, just attorney that I work,

19   the attorneys that I have worked with, yes, they always have

20   these kind of issues.

21              THE COURT:  And you've never served on a jury before?

22              PROSPECTIVE JUROR:  No.

23              THE COURT:  Now, you describe a very unfortunate

24   situation involving your family back in Colombia.

25              PROSPECTIVE JUROR:  Yes.
```

```
1          THE COURT:  Has that matter now been resolved?
2          PROSPECTIVE JUROR:  Well, I guess, yes, I don't know.
3          THE COURT:  Anything about that experience that you
4    think would prevent you from being a fair juror in this case?
5          PROSPECTIVE JUROR:  No, Your Honor.
6          THE COURT:  Thank you very much.  If you could pass the
7    microphone, please, to Juror Number 21.
8          PROSPECTIVE JUROR:  Good morning.
9          THE COURT:  It's Ms. Yarbrough?
10          PROSPECTIVE JUROR:  Yes, ma'am.
11          THE COURT:  Ms. Yarbrough, you've never served on a
12   jury before?
13          PROSPECTIVE JUROR:  No, ma'am.
14          THE COURT:  No friends or family -- well, you have
15   someone that works at Broward Sheriff's Office?
16          PROSPECTIVE JUROR:  My friend.
17          THE COURT:  Anything about the experience or
18   relationship you've had with them that you think would prevent
19   you from being a fair juror in this case?
20          PROSPECTIVE JUROR:  No, ma'am.
21          THE COURT:  Thank you very much.  I'm going to Juror
22   Number 22, Ms. Fernandez.
23          PROSPECTIVE JUROR:  Good morning.
24          THE COURT: Good morning.  You're a certified public
25   accountant?
```

1            PROSPECTIVE JUROR:  Yes.

2            THE COURT:  Do you work for a particular company or

3    organization?

4            PROSPECTIVE JUROR:  I work with a public accounting

5    firm.

6            THE COURT:  And the name of the firm?

7            PROSPECTIVE JUROR:  Vizcaino Zomerfeld.

8            THE COURT:  Now, you also served on a jury in

9    Dade County?

10           PROSPECTIVE JUROR:  Yes, it was a DUI case.

11           THE COURT:  Now, without telling us what your verdict

12   was, were you able to reach a verdict in that case?

13           PROSPECTIVE JUROR:  Yes, we did.

14           THE COURT:  Anything about that experience that you

15   think would prevent you from being a fair juror here?

16           PROSPECTIVE JUROR:  I don't think so, no.

17           THE COURT:  Now, you described a situation in Question

18   Number 11.  Has that matter now been resolved?

19           PROSPECTIVE JUROR:  Oh, yes, this is many years ago.

20           THE COURT:  Anything about that experience that you

21   think would prevent you from being a fair juror here?

22           PROSPECTIVE JUROR:  I don't think so, Your Honor.

23           THE COURT:  Thank you very much.  If you pass the

24   microphone, please, to Juror Number 23.

25           PROSPECTIVE JUROR:  Good morning.

1          THE COURT:  Good morning, Ms. Chin.  Ms. Chin, you

2     presently work at a hospice care center?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  And you did mention that you did serve on a

5     trial in Federal Court a few years ago?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Without telling us what your verdict was,

8     were you able to reach a verdict?

9          PROSPECTIVE JUROR:  Yes.

10         THE COURT:  Now the incident that you described in

11    Question Number 11, how do you believe that you were treated by

12    law enforcement?

13         PROSPECTIVE JUROR:  They never came.

14         THE COURT:  They never came?

15         PROSPECTIVE JUROR:  No.  We handled it ourselves,

16    really.

17         THE COURT:  Anything about that experience -- there's

18    going to be law enforcement individuals that testify in this

19    case.  Anything about that experience that you think would

20    prevent you from being a fair juror in this case?

21         PROSPECTIVE JUROR:  No, I don't think so.

22         THE COURT:  Now, in your answer to Question Number 14,

23    you said, "I believe that criminals, if proven guilty, should

24    pay the price for their" -- is it their crimes?

25         PROSPECTIVE JUROR:  Guilt.

```
 1              THE COURT:  For their guilt?

 2              PROSPECTIVE JUROR:  Uh-huh.

 3              THE COURT:  So, you're just saying you want to make

 4    sure that if an individual is found guilty of the crime that

 5    they're punished accordingly?

 6              PROSPECTIVE JUROR:  Yes.

 7              THE COURT:  Now, do you understand that if you're

 8    chosen as a juror in this case, you would make the

 9    determination about whether or not the defendant was guilty or

10    not guilty?  Do you understand that?

11              PROSPECTIVE JUROR:  Yes.

12              THE COURT:  But do you also understand that any

13    determination of sentence is for me alone to decide?

14              PROSPECTIVE JUROR:  Right.

15              THE COURT:  You, as a juror, wouldn't be making that

16    decision?

17              PROSPECTIVE JUROR:  Right.

18              THE COURT:  Now, does that bother you that even if you

19    were to sit through the trial that you would not be the

20    individual making the determination about sentence if an

21    individual is found guilty of the charges here?

22              PROSPECTIVE JUROR:  No.

23              THE COURT:  Thank you very much.  If you would pass the

24    microphone, please, to Juror Number 24.

25              PROSPECTIVE JUROR:  Good morning.
```

1          THE COURT:  Give me have just a moment.  Juror Number

2     21, all right.  Can we just all stay in place and we're going

3     to wait for Juror Number 21 to come right back.

4          MR. MICHAELS:  Judge, I need also a few minutes.

5          THE COURT:  All right.  We're going to also stay in

6     place.

7          Thank you.

8          (Brief pause in the courtroom juror 21 and defense

9     counsel, Mr. Michaels, exited courtroom separately; juror 21

10    accompanied by Marshal.)

11         MR. MICHAELS:  Sorry.  Thank you.

12         THE COURT:  Thank you very much.  We're back on the

13    record with Juror Number 24.  Is it Ms. Picart?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  Good morning.

16         PROSPECTIVE JUROR:  Good morning.

17         THE COURT:  What kind of work do you do, you're at

18    Citrus Health Network?

19         PROSPECTIVE JUROR:  Yes.  I'm a social worker, and I

20    supervise the case management department for -- we provide help

21    and behavioral services to the homeless population who are

22    mentally ill.

23         THE COURT:  Do you ever work with teenagers?

24         PROSPECTIVE JUROR:  In Puerto Rico, yes.

25         THE COURT:  But have you ever here worked with

1    teenagers?

2          PROSPECTIVE JUROR:  No, only with adults.

3          THE COURT: Are people in shelters when you work with

4    them?

5          PROSPECTIVE JUROR:  They are referred from the shelter

6    to us in order to provide housing and behavioral health

7    services.

8          THE COURT:  So, you're used to working with people who

9    are in a shelter situation?

10         PROSPECTIVE JUROR:  Yes.

11         THE COURT:  And is the shelter situation something

12   temporary because of the illness or because of just chronic

13   mental illness they haven't been able to take care of

14   themselves and have a home?

15         PROSPECTIVE JUROR:  Well, once they are referred to us

16   from the shelter, you know, we start providing, you know,

17   health services and housing.

18         THE COURT:  Now, are you ever involved with individuals

19   at the shelter who may, for some reason, be involved in the

20   criminal justice system?

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  And what kind of cases are you familiar

23   with the individuals; all different types?

24         PROSPECTIVE JUROR:  All different kinds, yes.

25         THE COURT:  So have you had experience with working

1  with law enforcement, with the City of Miami, Miami-Dade and

2  things like that?

3         PROSPECTIVE JUROR:  The outreach worker, yes, the

4  City of Miami.

5         THE COURT:  Do you ever have to go to court?

6         PROSPECTIVE JUROR:  Say that again, I'm sorry.

7         THE COURT:  Do you ever have to go to court on behalf

8  of your client?

9         PROSPECTIVE JUROR:  No.

10        THE COURT:  Now, you have served on a jury before?

11        PROSPECTIVE JUROR:  Yes.

12        THE COURT:  Anything about those experiences that you

13 think would prevent you from being a fair juror in this case?

14        PROSPECTIVE JUROR:  No.

15        THE COURT:  All right.  Thank you very much.

16        Oh, I'm sorry, I wanted to go to Question Number 11.

17 Has that matter now been resolved with your husband?

18        PROSPECTIVE JUROR:  Yes, Your Honor.

19        THE COURT:  Anything about that experience with law

20 enforcement and his issue that would prevent you from being a

21 fair juror here?

22        PROSPECTIVE JUROR:  No, Your Honor.

23        THE COURT:  Thank you very much.  I'm going to Juror

24 Number 25.  Good morning, sir.

25        PROSPECTIVE JUROR:  Good morning.

1            THE COURT:  Sir, you work as a security guard?

2            PROSPECTIVE JUROR:  Yes, I am.

3            THE COURT:  Do you work at a particular place, the same

4     place all the time or different places?

5            PROSPECTIVE JUROR:  Different places.

6            THE COURT:  So can you describe for us the kind of

7     places where you've been a security guard?

8            PROSPECTIVE JUROR:  Yes, Your Honor.  In the morning

9     from 6:00 to 2:00, I work at Home Depot and I do everything, my

10    job is to check the security all the time, the customers in the

11    store so --

12           THE COURT:  So, you're the person that checks our

13    receipts and everything as we go out the door?

14           PROSPECTIVE JUROR:  Yes.

15           THE COURT:  All right and your other job?

16           PROSPECTIVE JUROR:  The other one is Publix Supermarket

17    in the afternoon, from 5:00 to midnight.

18           THE COURT:  And are you a security guard at Publix as

19    well?

20           PROSPECTIVE JUROR:  No.  At Publix, I work as a

21    stocker.

22           THE COURT:  Now, as a security guard at Home Depot, do

23    you ever have to go to court to testify about things you might

24    have seen?

25           PROSPECTIVE JUROR:  No.

 1          THE COURT:  Do you ever have to interact with police or

 2   law enforcement?

 3          PROSPECTIVE JUROR:  We have a group from loss

 4   prevention.

 5          THE COURT:  So loss prevention interacts with police?

 6          PROSPECTIVE JUROR:  Exactly.

 7          THE COURT:  And you've never served on a jury before?

 8          PROSPECTIVE JUROR:  No.  The first time.

 9          THE COURT:  Thank you very much.  If you'd pass the

10   microphone, please, to Juror Number 26.  Is it Mr. Long?

11          PROSPECTIVE JUROR:  That is correct, Your Honor.  Good

12   morning.

13          THE COURT:  Mr. Long, are you presently a member of the

14   Miami-Dade Police Department?

15          PROSPECTIVE JUROR:  Yes, I am.

16          THE COURT:  And how long have you served in that

17   capacity?

18          PROSPECTIVE JUROR:  Well, I just been back since April

19   and when I said "been back," I recently worked for them in

20   2006, I was laid off in 2010 and was called back in April.

21          So, I've recently been employed with them again since

22   April.

23          THE COURT:  And are you a sworn member of law

24   enforcement?

25          PROSPECTIVE JUROR:  No, I just work with the

1    department.

2           THE COURT:  Okay.  And what kind of work do you do with

3    the department?

4           PROSPECTIVE JUROR:  I'm a driver/messenger, work in the

5    mailroom, but always going to different departments, robbery,

6    homicide, warrants, and stuff like that, so I'm kind of, you

7    know, generally, you know, within the facility of all

8    departments.

9           THE COURT:  So have you been mostly working in and

10   around law enforcement for most of your adult career?

11          PROSPECTIVE JUROR:  Recently, I've gotten in it.  I was

12   with security, a security firm here in Miami, and then I left

13   Miami -- which I'm originally from Memphis, Tennessee, I left

14   Miami, went back to Memphis and I worked for the Federal

15   Government for the Internal Revenue Service in Memphis,

16   Tennessee.  Then I left Memphis, Tennessee and came back to

17   Miami, which I'm now employed with the Miami-Dade Police

18   Department.

19          THE COURT:  And you've never served on a jury before?

20          PROSPECTIVE JUROR:  No, I have not.

21          THE COURT:  Thank you very much, Mr. Long.  If you can

22   pass the microphone, please, to Juror Number 27, it's

23   Ms. Rojas?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  Ms. Rojas, you're a doctor?

```
1            PROSPECTIVE JUROR:  Yes.

2            THE COURT:  And what is your general area of practice?

3            PROSPECTIVE JUROR:  Well, I did family medicine, a

4    little bit of maternal child health at Jackson, I worked at the

5    breast clinic for five years, and a family health clinic called

6    Rosie Lee in South Miami for another five years; and then after

7    when things started getting crazy economically there, I decided

8    to seek another employment.

9            So I'm at CAC Florida in the geriatric mainly

10   population in east Hialeah.

11           THE COURT:  So, you mostly do healthcare for our older

12   citizens?

13           PROSPECTIVE JUROR:  Yes, currently, I do.

14           THE COURT:  Now, have you ever worked with young adult

15   patients or people in their teen years?

16           PROSPECTIVE JUROR:  Yes, I have.

17           THE COURT:  And in that area, have you ever had to

18   coordinate maybe their care with the Department of Children and

19   Families or law enforcement in any way?

20           PROSPECTIVE JUROR:  No, I haven't had any cases like

21   that.

22           THE COURT:  Now, you mentioned a situation for you

23   personally.

24           How long ago was that?

25           PROSPECTIVE JUROR:  That was when I was still at
```

1    Jackson in the urgent care.  That would be 1996 maybe.

2         THE COURT:  Has that matter been resolved, was someone

3    apprehended?

4         PROSPECTIVE JUROR:  I think so.  I don't recall.

5         THE COURT:  How do you believe -- I'm sorry.

6         PROSPECTIVE JUROR:  I know they found my purse, so, I

7    mean, that was it.

8         THE COURT:  How do you believe law enforcement

9    responded to you for that incident?

10        PROSPECTIVE JUROR:  They were fine.

11        THE COURT:  Anything about that experience that you

12   think would prevent you from being a fair juror?

13        PROSPECTIVE JUROR:  I don't believe so.

14        THE COURT:  Thank you very much, ma'am.  If you could

15   pass the microphone, please, to Juror Number 28.

16        Mr. Garcia.

17        PROSPECTIVE JUROR:  Good morning.

18        THE COURT:  Mr. Garcia, you're a fourth-year medical

19   student?

20        PROSPECTIVE JUROR:  Yes.

21        THE COURT:  So are you getting tips from your next door

22   neighbor about being a good doctor?  You're at the University

23   of Miami?

24        PROSPECTIVE JUROR:  No, I used to work there in the

25   laboratory.

```
 1            THE COURT:  And where are you in medical school now?
 2            PROSPECTIVE JUROR:  I'm at Barry University in the
 3   Podiatric School of Medicine.
 4            THE COURT:  Are you missing classes right now?
 5            PROSPECTIVE JUROR:  Yes.
 6            THE COURT:  What's your class schedule?
 7            PROSPECTIVE JUROR:  Well, right now, I'm on pretty much
 8   a month-long interview process, it's externships and visiting
 9   hospitals during the month.
10            THE COURT:  This decides where you will be once you get
11   a diploma?
12            PROSPECTIVE JUROR:  Yes.
13            THE COURT:  So where are you this month?
14            PROSPECTIVE JUROR:  Kendall Regional.
15            THE COURT:  What would your normal hours to be there if
16   you weren't here at jury duty today?
17            PROSPECTIVE JUROR:  We start at 9:00, and then it
18   depends on the number of patients we see if we get ER calls and
19   things like that.
20            THE COURT:  Now, do you ever have situations -- are you
21   on call when you're going through your externship.
22            PROSPECTIVE JUROR:  Sometimes.  Me and the other
23   externs kind of rotate through that, so...
24            THE COURT:  So, right now, if this trial were to be,
25   like, a one-week or ten-day trial, you would essentially miss
```

1    what you would consider to be ten days of school?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  All right.  Thank you very much.

4              PROSPECTIVE JUROR:  Thank you.

5              THE COURT: I'm going to Juror Number 29, is it

6    Ms. Vandam?

7              PROSPECTIVE JUROR:  Yes, Your Honor, good morning.

8              THE COURT:  Good morning.  Are you presently a state

9    attorney?

10             PROSPECTIVE JUROR:  No, Your Honor.

11             THE COURT:  But you were like Mr. McHale, a former

12   prosecutor?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  So, you were Mr. Schlessinger, although not

15   Mr. Schlessinger?

16             PROSPECTIVE JUROR:  Right.

17             THE COURT:  Okay.

18             PROSPECTIVE JUROR:  Exactly.

19             THE COURT:  Were you here in Miami-Dade County?

20             PROSPECTIVE JUROR:  No, Your Honor, in Broward.

21             THE COURT:  And what kind of cases did you prosecute?

22             PROSPECTIVE JUROR:  Mostly -- I was there for two

23   years, so mostly criminal -- misdemeanor cases, DUIs.

24             THE COURT:  And what kind of work are you doing now?

25             PROSPECTIVE JUROR:  I work the Dade Legal Aid.  I do

1    family law.

2          THE COURT:  So do you have cases that involve

3    juveniles, young people in their teen years?

4          PROSPECTIVE JUROR:  I don't come across that now, but I

5    used to be a DCF prosecutor as well, a DCF department attorney,

6    and I came across those cases while I was there.

7          THE COURT:  So tell me, what kind of cases would you

8    come across as a DCF attorney?

9          PROSPECTIVE JUROR:  Mostly cases involving abuse,

10   neglect, abandonment, dependency cases, termination of parental

11   rights.

12         THE COURT:  So, would you ever deal with individuals or

13   youth who were in some sort of shelter or a group home

14   situation?

15         PROSPECTIVE JUROR:  We -- if I worked mostly with the

16   social workers, so if they recommended that a juvenile be

17   committed to a particular facility or so forth, they'd come to

18   us.

19         THE COURT:  Now, like I asked our other attorney juror,

20   you understand that if you're selected as a juror in this case

21   you would follow -- have to follow the law as I give it to you

22   even if you think I'm wrong?

23         PROSPECTIVE JUROR:  Yes, Your Honor.

24         THE COURT:  And would you be able to do that as a

25   juror?

1                PROSPECTIVE JUROR:  I would be able to do so.

2                THE COURT:  Thank you very much.  If you pass the

3     microphone, please, to Juror Number 30.  Good morning.

4                PROSPECTIVE JUROR:  Good morning, Your Honor.

5                THE COURT:  Ms. Rodriguez, we've got all the nurses and

6     doctors here, we could set up our own clinic.

7                What kind of nursing do you do?

8                PROSPECTIVE JUROR:  I'm an ICU nurse.

9                THE COURT:  At what facility?

10               PROSPECTIVE JUROR:  Mount Sinai Medical Center.

11               THE COURT:  And are you involved with any kind of

12    specific type of patient care?

13               PROSPECTIVE JUROR:  ICU patients.

14               THE COURT:  So, the most sick?

15               PROSPECTIVE JUROR:  Yes.

16               THE COURT:  And how long have you been doing that?

17               PROSPECTIVE JUROR:  It's going to be a year on the

18    20th.

19               THE COURT:  And what kind of nursing did you do before

20    that?

21               PROSPECTIVE JUROR:  Telemetry, that's like a cardiac

22    unit.

23               THE COURT:  Now, you've never served on a jury before?

24               PROSPECTIVE JUROR:  No.

25               THE COURT:  No friends or family in law enforcement?

1            PROSPECTIVE JUROR:  No.

2            THE COURT:  Thank you very much.  If you'd pass the

3    microphone, please, to Juror Number 31, Ms. Pena.

4            PROSPECTIVE JUROR:  Yes, good morning.

5            THE COURT:  Good morning.  Ma'am, you've never served

6    on a jury before?

7            PROSPECTIVE JUROR:  I was called once but I never was

8    selected.

9            THE COURT:  Now I'm not sure I'm reading your

10   handwriting for Number 14 correctly.

11           PROSPECTIVE JUROR:  Well, I think that it has to be

12   like you have to see both cases and then make the fair decision

13   of the case.

14           THE COURT:  So, you understand that in a criminal case

15   the Government, Mr. Schlessinger and his colleague, have what

16   we call the burden of proof?  That's what the law is.  They

17   have to prove the defendant's guilt beyond a reasonable doubt.

18   Do you understand that?

19           PROSPECTIVE JUROR:  Yes.

20           THE COURT:  Do you also understand because in our

21   system the prosecution has the burden of proof, Mr. Atkins, all

22   he has to do every day is show up?  Do you understand that?

23           PROSPECTIVE JUROR:  Yes.

24           THE COURT:  That he's not required in our system to put

25   on any witnesses or any evidence or to prove his innocence.

1    You understand that?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  And do you understand when I say that

4    Mr. Schlessinger has the burden of proof, I mean that he must

5    prove Mr. Atkins' guilt beyond a reasonable doubt?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Now, if I were to give you that

8    instruction, which I suspect that I will, will you be able to

9    follow the instruction, one, that as he sits here this morning

10   Mr. Atkins is presumed to be innocent?  Would you be able to

11   follow that instruction?

12         PROSPECTIVE JUROR:  Yes, I will.

13         THE COURT:  And would you be able to hold the

14   Government to its burden of proof, which is proof beyond a

15   reasonable doubt?

16         PROSPECTIVE JUROR:  Yes.

17         THE COURT:  Thank you very much.  If you'd pass the

18   microphone, please, to Juror Number 32.  Good morning.

19         PROSPECTIVE JUROR:  Good morning.

20         THE COURT:  Ma'am, you've never served on a jury

21   before?

22         PROSPECTIVE JUROR:  No.

23         THE COURT:  No friends or family in law enforcement?

24         PROSPECTIVE JUROR:  My cousin's boyfriend, but I don't

25   really talk to him or see him.

```
 1              THE COURT:  You never talk to him about the kind of
 2     work that he does?
 3              PROSPECTIVE JUROR:  No, ma'am.
 4              THE COURT:  Thank you very much.  If you'd pass the
 5     microphone, please, to Juror Number 33, Ms. Gonzalez.
 6              Ms. Gonzalez, you're self-employed in real estate?
 7              PROSPECTIVE JUROR:  Yes.
 8              THE COURT:  Now, is your spouse in the corrections
 9     business?
10              PROSPECTIVE JUROR:  Retired.
11              THE COURT:  And what kind of work did they do for
12     corrections when they worked there?
13              PROSPECTIVE JUROR:  They did, I think director of
14     corrections.
15              THE COURT:  And was that for federal or for state?
16              PROSPECTIVE JUROR:  County.
17              THE COURT: County.  Okay.  And you have friends that
18     are in the police department of Coral Gables?
19              PROSPECTIVE JUROR:  Correct.
20              THE COURT:  Anything about those relationships that you
21     think would prevent you from being a fair juror in this case?
22              PROSPECTIVE JUROR:  No.
23              THE COURT:  Thank you very much.  If you'd pass the
24     microphone to Juror Number 34, Ms. Armstrong.
25              PROSPECTIVE JUROR:  Good morning.
```

1           THE COURT:  Good morning.  Ms. Armstrong, you're a

2     full-time mom?

3           PROSPECTIVE JUROR:  Yes.  I'm also studying, too.

4           THE COURT:  So, you're also going to school?

5           PROSPECTIVE JUROR:  Yes.

6           THE COURT:  What's your current class schedule?

7           PROSPECTIVE JUROR:  Tuesdays and Thursdays from 10:00

8     to 12:30?

9           THE COURT:  And your spouse is an attorney?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  What kind of work do they do?

12          PROSPECTIVE JUROR:  Workers' compensation.

13          THE COURT:  Workers' compensation?

14          PROSPECTIVE JUROR:  Yes, he also does real estate on

15    the side.

16          THE COURT:  Now, you were called for jury duty but not

17    selected; is that correct?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Thank you very much.  If you'd pass the

20    microphone, please, to Juror Number 35, Mr. Ewald.

21          PROSPECTIVE JUROR:  Good morning.

22          THE COURT:  Good morning.  Mr. Ewald, you presently

23    work for Miami-Dade County Parks?

24          PROSPECTIVE JUROR:  Yes, ma'am.

25          THE COURT:  And your spouse is a paralegal at Stuart

1    Grossman?

2         PROSPECTIVE JUROR:  Yes.

3         THE COURT:  Ever talk to your spouse about their work?

4         PROSPECTIVE JUROR:  It comes up on occasion.

5         THE COURT:  And I don't believe that firm does criminal

6    work.  Has your spouse ever been involved in criminal work?

7         PROSPECTIVE JUROR:  No.

8         THE COURT: Now, you run a community service program for

9    the police department at Tamiami Park?

10        PROSPECTIVE JUROR:  Yes, I work for the police

11   department, they send, you know, people that they've arrested

12   or got in trouble over to -- they have to do community service

13   hours.

14        THE COURT:  Now what's the age of the individuals that

15   you usually work with that do their community service hours

16   with you?

17        PROSPECTIVE JUROR:  Young teens up to mom and dads.

18        THE COURT:  Now, what kind of cases, if you know, are

19   the young teens usually involved in that brings them to you?

20        PROSPECTIVE JUROR:  Burglaries, you know, what it is,

21   is when they give me paperwork it pretty much tells you on

22   there, you know, what they're in for, not only all of them but

23   on some of them.

24        THE COURT:  Now, when a person does community service,

25   they don't come to you every day, they may come to you a few

1    hours a week, correct?

2            PROSPECTIVE JUROR:  It's up to them.  They have to do

3    the hours by a certain date, we just tell them when they have

4    to be at our facilities, what times.  They can work a variety

5    of hours, either three hours, five hours, eight hours.

6            THE COURT:  Now, does there ever come a time when you

7    might be called by the Court, a probation officer, or someone

8    to verify someone's community service hours?

9            PROSPECTIVE JUROR:  Yes.

10           THE COURT:  Have you ever had to testify in court?

11           PROSPECTIVE JUROR:  No.

12           THE COURT:  Do you ever work with law enforcement in

13   terms of verifying or working with people who've had to do

14   their community service hours?

15           PROSPECTIVE JUROR:  Yes.  We deal with the police

16   department pretty often at the park, different things that come

17   up.

18           THE COURT:  Now, I suspect that in this case there's

19   going to be certain law enforcement witnesses that testify,

20   whether from the state, county or Federal Government.

21           Given the relationships that you've had with members of

22   law enforcement, would you be able to listen to all the

23   testimony and keep an open mind until you've heard the entire

24   case?

25           PROSPECTIVE JUROR:  I don't know.

1          THE COURT:  And when you say you don't know, why is

2    that?

3          PROSPECTIVE JUROR:  Because I believe a lot of times

4    they're getting a raw deal, people prejudge them on who they

5    are --

6          THE COURT:  Prejudge the police?

7          PROSPECTIVE JUROR:  The police department, yeah, I

8    believe -- you know, it's just my belief that a lot of them --

9          THE COURT:  Well, I suppose what I'm asking is also a

10   prejudging question.  Would you believe someone's testimony

11   just because they were a police officer?

12         PROSPECTIVE JUROR:  No.  Because there's good and bad

13   in everyone.

14         THE COURT:  And would you disbelieve them, which I

15   think is sort of your statement, just because they're a police

16   officer?

17         PROSPECTIVE JUROR:  Disbelieve, I'm not sure --

18         THE COURT:  Like, you would say to yourself, that

19   person's a police officer so I'm not going to believe anything

20   they're going to say?

21         PROSPECTIVE JUROR:  No, I'm not going to do that, but I

22   do believe people do that very often.

23         THE COURT:  But I'm also asking you the reverse and,

24   that is, if a police officer testifies are you saying, "Yes,

25   they must be telling the truth because they're a member of law

1   enforcement"?

2          PROSPECTIVE JUROR:  No, because I'm telling you there's

3   good and bad in everyone.

4          THE COURT:  So, you're going to keep an open mind,

5   listen to who testifies and using my instructions and your

6   common sense and experience to determine who you think is

7   speaking truthfully?

8          PROSPECTIVE JUROR:  Yes, as far as that, yes.

9          THE COURT:  Now, are there any particular kind of cases

10  that you think you might have a hard time sitting on?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  And what was --

13         PROSPECTIVE JUROR:  Any type of drug case.

14         THE COURT:  And is that related to your personal

15  experience with your family?

16         PROSPECTIVE JUROR:  Yes, ma'am.

17         THE COURT:  So, you're willing to give it a stab but

18  anything that involves drugs, drug trafficking, that might be

19  hard for you?

20         PROSPECTIVE JUROR:  That would be very difficult.

21         THE COURT:  Okay.  Thank you very much, sir.

22         If you could pass the microphone to Juror Number 36 for

23  me.

24         PROSPECTIVE JUROR:  Good morning.

25         THE COURT: It's Mr. De la Cruz?

 1          PROSPECTIVE JUROR:  Yes, good morning.

 2          THE COURT:  Good morning.  Sir, you've never served on

 3    a jury before?

 4          PROSPECTIVE JUROR:  I've been called, but never

 5    selected.

 6          THE COURT:  And no friends or family in law

 7    enforcement?

 8          PROSPECTIVE JUROR:  I have a second cousin who just

 9    recently joined the Hialeah Police Department, I apologize for

10    not writing it, I really don't see him too often.

11          THE COURT:  What kind of work does your company do?

12          PROSPECTIVE JUROR:  It's a tutoring company.

13          THE COURT: And you help people getting ready for

14    standardized tests and things like that?

15          PROSPECTIVE JUROR:  It's mostly SAT, ACT and then

16    there's specific subjects, but we specialize in standardized

17    tests.

18          THE COURT:  How long have you been in that business?

19          PROSPECTIVE JUROR:  A little over a month.

20          THE COURT:  And what did you do before that?

21          PROSPECTIVE JUROR:  I worked at my dad's law firm and a

22    water treatment company in Texas for the oil field.

23          THE COURT:  Now, your father's law firm, did you ever

24    work criminal work with him?

25          PROSPECTIVE JUROR:  No, he's a real estate attorney, I

1    was just an assistant, did reception and things like that.

2              THE COURT:  Thank you very much.  If you would pass the

3    microphone, please, to Juror Number 37.  It's Ms. Rodriguez?

4              PROSPECTIVE JUROR:  Yes.

5              THE COURT: What kind of programs do you manage at FIU?

6              PROSPECTIVE JUROR:  The college of medicine.

7              THE COURT:  And you're presently working on your Ph.D.?

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Now, would being on jury duty interfere

10   with any of your class work?

11             PROSPECTIVE JUROR:  No.

12             THE COURT:  And it's your brother that works for the

13   border patrol in Texas?

14             PROSPECTIVE JUROR:  Yes.

15             THE COURT:  Do you ever talk to him about his work?

16             PROSPECTIVE JUROR:  Yes -- well, no, just like stories.

17             THE COURT:  Anything about that experience with your

18   brother that you would think prevent you from being a fair

19   juror in this case?

20             PROSPECTIVE JUROR:  No.

21             THE COURT:  Thank you very much.  Ms. Trudeau?

22             PROSPECTIVE JUROR:  Yes.

23             THE COURT:  You understand all too well about what Ms.

24   Powers is doing right now?

25             PROSPECTIVE JUROR:  Correct.

1          THE COURT:  I do.  Because in your other life you're a

2   court reporter.

3          PROSPECTIVE JUROR:  I am.

4          THE COURT:  And do you work for any particular court or

5   court reporter company.

6          PROSPECTIVE JUROR:  A court reporter company.

7          THE COURT:  So that means you probably heard civil,

8   criminal, the whole shebang of law?

9          PROSPECTIVE JUROR:  Everything.

10          THE COURT:  Anything about your experiences that you

11   think would prevent you from being a fair juror here?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  Would you be able to keep an open mind and

14   listen to all the testimony?

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Now, your husband is in corrections?

17          PROSPECTIVE JUROR:  He's retired, but yes.

18          THE COURT:  State or federal, in terms of corrections?

19          PROSPECTIVE JUROR:  County.

20          THE COURT:  Thank you very much.  If you would pass the

21   microphone, please, to Juror Number 39.  Mr. Morrow?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  You're a real estate agent?

24          PROSPECTIVE JUROR:  Yes, I am.

25          THE COURT:  And how long have you been doing that kind

1   of work?

2           PROSPECTIVE JUROR:  Five years.

3           THE COURT:  And before that?

4           PROSPECTIVE JUROR:  I owned a couple of sports

5   nutrition stores.

6           THE COURT:  Now, you served on both state, civil and

7   criminal juries?

8           PROSPECTIVE JUROR:  Correct.

9           THE COURT:  Without telling us what your verdicts were,

10  were you able to reach verdicts in those cases?

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  Anything about those experiences that you

13  think would prevent you from being a fair juror in this case?

14          PROSPECTIVE JUROR:  No.

15          THE COURT:  Thank you very much.  And I'm going to

16  Juror Number 40.  Is it Mr. Buford?

17          PROSPECTIVE JUROR:  Yes.  Good morning.

18          THE COURT:  You're an international education

19  consultant?

20          PROSPECTIVE JUROR:  Correct.

21          THE COURT:  Can you tell me a little bit about what

22  that is?

23          PROSPECTIVE JUROR:  I always get asked that.  What we

24  do as a company is we get international education credentials,

25  like a study abroad, and we translate them into U.S. terms for

1    universities, Government agencies.

2         THE COURT:  So, you're the person that helps someone

3    figure out what an international degree or high school

4    education means for the United States credit system?

5         PROSPECTIVE JUROR:  Correct, yes.  I'm a senior

6    director there.

7         THE COURT:  Now, do you work with specific

8    universities?

9         PROSPECTIVE JUROR:  No.

10        THE COURT:  How do I find you?

11        PROSPECTIVE JUROR:  We're in the Yellow Pages.  We're

12   also on websites.

13        Usually, with the specialization that we do, we --

14   people find us.  We don't really recruit or advertise or

15   anything like that.

16        THE COURT:  Now, you once served on a Federal Grand

17   Jury?

18        PROSPECTIVE JUROR:  Correct.

19        THE COURT:  Was it here in this courthouse complex?

20        PROSPECTIVE JUROR:  Yes.

21        THE COURT: You don't recognize Mr. Schlessinger, do

22   you?

23        PROSPECTIVE JUROR:  No, I do not.

24        THE COURT:  How long ago was it that you were on Grand

25   Jury duty?

1          PROSPECTIVE JUROR:  Almost ten years ago now.

2          THE COURT:  I'm not sure Mr. Schlessinger was born yet

3     but --

4          PROSPECTIVE JUROR:  He was just a kid then, Your Honor.

5          THE COURT:  Now, your car situation back in 1990 has

6     that now been resolved?

7          PROSPECTIVE JUROR:  It was resolved, yeah.

8          THE COURT:  Anything about that experience that you

9     think would prevent you from being a fair juror here?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  Now is your brother still working in

12     security or was that a past job?

13          PROSPECTIVE JUROR:  Past job.

14          THE COURT:  Anything about the experiences that he had

15     in security that you think would prevent you from being a fair

16     juror in this case?

17          PROSPECTIVE JUROR:  No.

18          THE COURT:  All right.  Thank you very much.  If you

19     would hand the microphone to Mr. Blanford.  Thank you very

20     much.

21          Ladies and gentlemen, let me tell you, which I have not

22     done at this time, a little bit about this case.

23          Counsel, would you approach for one moment, please?

24          (Sidebar discussion held as follows:)

25          THE COURT:  I was just looking, is Count 3 still a

1    viable count in this case?

2            MR. SCHLESSINGER:  Yes, Your Honor.

3            THE COURT:  Because I think I was looking at the jury

4    instructions because I just usually look at them when I tell

5    the jurors about the crime.  And I see -- oh, Count 2 and 3 is

6    the same thing, sex trafficking.

7            MR. SCHLESSINGER:  Exactly, because it's the same

8    charge just as to different victims, I just combined them into

9    the one instruction.

10           THE COURT:  Just so I make sure, I just didn't want to

11   make sure something got dismissed and I blew it.

12           MR. MICHAELS:  Judge, since I'm here, I forgot to

13   mention, I have a 2:00 in front of Judge McAllister to take a

14   plea.  Maybe your chambers can call.

15           THE COURT:  When we take our morning break.

16           MR. MICHAELS:  It's 2:00, I will take a look at my

17   calendar.

18           THE COURT:  Let's see if we can try to plow through

19   this, all right?

20           MR. MICHAELS:  Okay.  Thank you.

21    (Sidebar concluded, proceedings continued in open court:)

22           THE COURT:  Ladies and gentlemen, the defendant in this

23   case is charged in three counts.  In Count 1 he is charged with

24   conspiracy to engage in child sex trafficking.  In Counts 2 and

25   3, he's charged with sex trafficking of children.

1           Prior to today, ladies and gentlemen, have any of you

2    ever heard anything about this defendant or this case?  If you

3    have, please raise your hand.

4           Now, ladies and gentlemen, as I told you before, that

5    in this case if this -- if you're chosen as a juror, the

6    Government has the burden of proof, and by that I mean the

7    Government must prove the defendant's guilty beyond a

8    reasonable doubt.

9           Now, do you understand that in a criminal case the

10   Government has the burden of proof?  If you understand that,

11   please raise your hand.

12          Now, do you also understand that as Mr. Atkins sits

13   here this morning, he is presumed to be innocent.  If you

14   understand that, please raise your hand.

15          Thank you very much.

16          Is there anyone who thinks, you know, Judge, I know

17   you're telling me that Mr. Atkins is presumed to be innocent,

18   but I don't think he would be in court if he wasn't guilty of a

19   crime?

20          Is there anyone who thinks that just because Mr. Atkins

21   is here in court he must be guilty of a crime?

22          If you think that, please raise your hand.

23          Juror Number 19.  Juror Number 19, do you understand

24   that as Mr. Atkins is sitting here in court today, he's

25   presumed innocent?

 1          PROSPECTIVE JUROR:  Yes, I do.

 2          THE COURT:  And you understand that you cannot find him

 3     guilty unless Mr. Schlessinger proves his guilt beyond a

 4     reasonable doubt?

 5          PROSPECTIVE JUROR:  Yes.

 6          THE COURT:  Thank you very much.

 7          If we can go, Mr. Blanford, Juror Number 8, back row

 8     there, Ms. Cole.

 9          Ms. Cole, do you understand that as Mr. Atkins sits

10     here this morning he's presumed to be innocent?

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  And do you understand that you cannot find

13     him guilty unless Mr. Schlessinger, on behalf of the United

14     States, proves his guilt beyond a reasonable doubt?

15          PROSPECTIVE JUROR:  Correct.

16          THE COURT:  Now, ladies and gentlemen, I did have an

17     opportunity to read to you the charge in this case.

18          Now, is there anyone who feels that just by the nature

19     of what I read to you in the charge that you could not be a

20     fair juror in this case?  If you think so, please raise your

21     hand.  All right.  Let's go in the back.  I see some hands.

22          Ma'am, if you could tell me your name and number.

23          PROSPECTIVE JUROR:  My name is Elva Diaz.  I'm

24     Number 18.

25          THE COURT:  When I read you the charge, did that cause

1    you some concern?

2         PROSPECTIVE JUROR:  Yes, I have three little girls

3    myself.

4         THE COURT:  Do you understand, as I said before, and

5    everyone with children I'm certain is concerned when you hear

6    nature of this crime, that as Mr. Atkins sits here today, he's

7    presumed to be innocent?

8         PROSPECTIVE JUROR:  I do, but it's hard.

9         THE COURT:  And it's hard because you have children?

10        PROSPECTIVE JUROR:  Yes, I do.

11        THE COURT:  So, you think it would be really hard for

12   you to put your own family situation aside and only listen to

13   the evidence in this case?

14        PROSPECTIVE JUROR:  It would be hard to listen to the

15   evidence, yes.

16        THE COURT:  So do you think that just because of what I

17   said, Mr. Atkins must be guilty?

18        PROSPECTIVE JUROR:  No.  But, I mean, there's a reason

19   he's here.  So I know we have to prove him guilty but he's

20   here.

21        THE COURT:  So what if I had told you that instead of

22   being charged with the crime I just read that I said that Mr.

23   Atkins was charged with mortgage fraud?  Would you have felt

24   differently with the case then?

25        PROSPECTIVE JUROR:  Yes.

 1            THE COURT:  And would you have been able to keep an

 2   open mind if I had told you that Mr. Atkins was a person who

 3   was charged with defrauding a bank or real estate company?

 4            PROSPECTIVE JUROR:  Maybe, yes.

 5            THE COURT:  Thank you for your honesty.  I believe I

 6   saw another juror behind you.

 7            Ma'am, could you tell me your name and juror number?

 8            PROSPECTIVE JUROR:  Yes, Arlene Chin.

 9            THE COURT:  Ms. Chin, do you think it would be hard for

10   you just because of the nature -- you haven't heard any facts.

11            PROSPECTIVE JUROR:  I know.

12            THE COURT:  All I did was read to you the title in the

13   indictment.  Would that prevent you from being a fair juror in

14   this case?

15            PROSPECTIVE JUROR:  I think it would, I have a 12-year-

16   old son, I've been a nurse for 20 years, I worked in the school

17   system for seven, and I had to deal with a lot of domestic

18   violence and abuse cases and it was very, very difficult for

19   me.  It's hard, this case, description.

20            THE COURT: I'm sorry, I didn't mean to interrupt you

21   ma'am.

22            PROSPECTIVE JUROR:  That's okay.

23            THE COURT:  But you understand as Mr. Atkins sits here

24   this afternoon he's presumed to be innocent of the crimes that

25   I've just read you?

```
 1              PROSPECTIVE JUROR:  I do.

 2              THE COURT:  I'm sorry.

 3              PROSPECTIVE JUROR:  I just don't think I can listen to

 4    the evidence.  I think it would disturb me.  I'm not sure

 5    what's going to be said but it would be --

 6              THE COURT:  But once I said those charges, that made

 7    you concerned?

 8              PROSPECTIVE JUROR:  Very.

 9              THE COURT:  Okay.  Thank you very much for your

10    truthfulness.

11              Anyone else?  I'm going all the way to the back of the

12    courtroom, I see a hand.  Yes, ma'am.  Your name and juror

13    number, please, for the record.

14              PROSPECTIVE JUROR:  Mary Trudeau, 38.  Before when you

15    said do you recognize the case, and I'm not sure that I do, but

16    because of the Monroe County, I think I read something and if

17    it's that case then I have a problem.  If it's not, then no.

18              THE COURT:  And it would because you think you may have

19    heard about this case before you got here today?

20              PROSPECTIVE JUROR:  Yes.  And if it's the one I'm

21    thinking of, I have a -- my daughter's friend, something sort

22    of similar and so...

23              THE COURT:  So, you think you might?

24              MR. MICHAELS:  Judge, I'm sorry.

25              PROSPECTIVE JUROR:  I'm not going to say.
```

1          MR. MICHAELS:  I would like to raise an objection and

2    just, maybe, talk sidebar.

3          THE COURT:  So, you think you might be aware of this

4    case outside of the courtroom?

5          PROSPECTIVE JUROR:  Correct.

6          THE COURT:  Thank you very much.  That's what I believe

7    the juror was trying to tell me, Mr. Michaels.

8          Thank you very much, ladies and gentlemen for your

9    honesty.

10         Now, ladies and gentlemen, I spoke about this with some

11   of the jurors before, but you all have to understand that if

12   you're selected as a juror in this case, you must follow my

13   instructions even if you think I'm wrong.  You must follow my

14   instructions even if you think I'm wrong.

15         Ms. Greene, we're going to be all the way in front,

16   that's Juror Number 16.

17         Ms. Greene --

18         PROSPECTIVE JUROR:  Yes, ma'am.

19         THE COURT:  -- would you be able to follow my

20   instructions even if you think I'm wrong?

21         PROSPECTIVE JUROR:  Without a doubt.

22         THE COURT:  Thank you very much.  If you could pass the

23   microphone to, I believe it's your left, Ms. Flanagan.

24         Ms. Flanagan, would you be able to follow my

25   instructions even if you think I'm wrong?

1            PROSPECTIVE JUROR:  Yes, I would.

2            THE COURT:  Thank you very much.  If you could pass the

3    microphone down in front of you to Mr. Gutierrez, Juror Number

4    5.

5            Mr. Gutierrez, would you be able to follow my

6    instructions even if you think I'm wrong?

7            PROSPECTIVE JUROR:  Absolutely.

8            THE COURT:  All right. Thank you very much.

9            Now, ladies and gentlemen, as I mentioned to you

10   before, that in a criminal case there's certain things you must

11   always keep in mind.

12           We've talked about the presumption of innocence that as

13   Mr. Atkins sits here this afternoon he's presumed to be

14   innocent.   We talked about the fact that the Government, the

15   United States, has the burden of proof.  That means they must

16   approve the defendant's guilt beyond a reasonable doubt, and

17   there's a third thing that you must also keep in mind whenever

18   we're talking about a criminal case, and that's the right that

19   we have in this country to remain silent.  The right that we

20   have in this country to remain silent.

21           So I need you all, first of all, to understand that in

22   a criminal case the defendant does not have to testify.

23           Do you all understand, the defendant in this case does

24   not have to testify?  Please raise your hand.

25           That's the easy part.

1          Now, do you also understand that if Mr. Atkins chooses

2    not to testify in this case you cannot hold it against him in

3    your deliberations?  Do you all understand that?  Please raise

4    your hand.  I'm going to go to the back of the courtroom,

5    please, Mr. Blanford.

6          Juror Number 24.  Juror Number 24.

7          Ma'am, do you understand that Mr. Atkins does not have

8    to take the stand in this case?

9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  It's his constitutional right?

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  And do you also understand that if he

13    chooses not to take the stand you cannot hold it against him in

14    your deliberations if you're selected as a juror?

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Would you be able to do that?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  Would you pass the microphone, please, to

19    Juror Number 31, Ms. Pena.

20          Ms. Pena, do you understand that Mr. Atkins has a right

21    not to take the stand in this case?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  And would you hold it against him, which

24    you are not supposed to do in this case, if he chose not to

25    take the stand in this case?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Thank you very much.  If you would pass the

3   microphone to Mr. Blanford, we're coming to the front of the

4   courtroom, please.  I would like to talk to Juror Number 11.

5   Juror Number 11.

6          Ma'am, do you understand that in a criminal case the

7   defendant does not have to take the stand?

8          PROSPECTIVE JUROR:  I do not understand these terms

9   so...

10         THE COURT:  Let me explain.  In the United States

11  constitution you have a right to remain silent.

12         PROSPECTIVE JUROR:  Okay.

13         THE COURT:  So, you probably seen that on TV where a

14  defendant says, "I don't want to talk to you."  He can continue

15  that right through trial.  Do you understand that?

16         PROSPECTIVE JUROR:  I understand.

17         THE COURT:  And do you understand if a defendant

18  chooses, which he has a constitutional right to do, not to take

19  the stand, if you're selected as a juror in this case, during

20  the deliberations you can't hold it against him.  Do you

21  understand that?

22         PROSPECTIVE JUROR:  I understand.

23         THE COURT:  Would you be able to follow my instructions

24  that you cannot -- I'm going to give you instructions at the

25  conclusion of the case to tell you how you're going to listen

1   to the evidence, the credibility of witnesses and things likes

2   that.  We don't just throw you in the jury room, we give you

3   rules to follow.  Would you be able to follow my instructions

4   that you cannot hold it against Mr. Atkins if he choses not to

5   testify?

6              PROSPECTIVE JUROR:  I hope so.

7              THE COURT:  Thank you very much.  If you pass the

8   microphone to your next door neighbor to your left, please.

9              Ma'am, do you understand that Mr. Atkins has the right

10   not to take the stand in this case?

11              PROSPECTIVE JUROR:  Yes, I understand.

12              THE COURT:  And would you hold it against him in your

13   deliberations if he chose not to take the stand?

14              PROSPECTIVE JUROR:  No.

15              THE COURT:  Thank you very much.

16              And now I'm going to go down to your right, one more.

17   Do you understand, ma'am, that the defendant has a right not to

18   take the stand in this case?

19              PROSPECTIVE JUROR:  Yes.

20              THE COURT:  And would you hold it against him if he

21   chose not to take the stand?

22              PROSPECTIVE JUROR:  No.

23              THE COURT:  Thank you very much.  All right.

24              Ladies and gentlemen, we're going to take a brief

25   comfort break in this case, a brief comfort break for everyone,

1   for everyone.

2          I'm going to ask that you be outside the door ready to

3   start in ten minutes.

4          Now, before we break, I want you to look around the

5   courtroom, you see the people seated at counsel table, for the

6   prosecution, you see the people seated at counsel table for the

7   defense.  If they see you in the hallway they're going to

8   ignore you.  And it's not because they have bad manners, or

9   they weren't trained properly by their moms and dads, they just

10  know they're not supposed to have any conversation with you

11  except in this courtroom.

12         So, I'm going to ask that you remain on the floor.  The

13  court security officers will show you where the restroom

14  facilities are and we'll be back in ten minutes.  Back in ten

15  minutes.

16         COURT SECURITY OFFICER:  All rise.

17         THE COURT:  Please follow Mr. Blanford out, please,

18  he'll show you.  Mr. Brody will show you where the facilities

19  are.

20         (Prospective jurors exited the courtroom at 12:08 p.m.)

21         THE COURT:  Counsel, while our jury's out, I'm going to

22  ask if you need to use the facilities to please use the floor

23  above or the floor below.

24         MR. SCHLESSINGER:  Yes, Your Honor.

25         THE COURT:  We will be back in ten minutes.

1          (Recess taken from 12:09 p.m. to 12:27 p.m.)

2          COURTROOM DEPUTY:  All rise.

3          THE COURT:  Mr. Blanford, we're good?

4          COURT SECURITY OFFICER:  Yes.

5          THE COURT:  When they come back, Mr. Schlessinger, you

6     will have 15 minutes.

7          MR. SCHLESSINGER:  Thank you, Your Honor.

8        (Prospective jurors entered the courtroom at 12:27 p.m.)

9          THE COURT:  Welcome back, ladies and gentlemen, please

10    take your same seats.  Please take your same seats.

11         Thank you, ladies and gentlemen.  You may be seated.

12    Mr. Schlessinger, you may inquire.

13         MR. SCHLESSINGER:  Thank you, Your Honor.

14         Ladies and gentlemen, good afternoon.  My name is Seth

15    Schlessinger and together with my co-counsel, Elina

16    Rubin-Smith, we're the prosecutors here to represent the United

17    States in this case today, and I have the opportunity now to

18    follow-up with some of Her Honor's, Judge Cooke's questions

19    just for a few minutes with a few additional additions.  I may

20    ask some questions to all of you collectively and I may have

21    some questions for some of you individually as well.  If I do

22    call you on you individually, I'm not trying to embarrass you

23    or anything, as Judge Cooke mentioned, I'm trying to follow up

24    on something.  By the same token, if I don't call on you, it's

25    not that I'm not interested or don't want to hear what you have

1    to say, we sort of have limited time for this process.

2         The first question I wanted to pose to all of you is

3    about some of the types of witnesses that may testify in this

4    case.

5         As Judge Cooke mentioned, there are going to be law

6    enforcement officers of various -- with various enforcement

7    agencies that testify in the case.  There's also going to be

8    just regular citizens from the community, just regular people

9    who happen to have some connection of the case, some knowledge

10   about something that happened in the case that are going to

11   testify.

12        You're also going to here testimony from some minor

13   children in this case who were, unfortunately, directly

14   connected with the events that gave rise to this case.

15        You're going to hear that some of those minors, number

16   one, have some very, very difficult backgrounds, and had some

17   difficult experiences in the past.

18        And then, also, in connection with what they're going

19   to be testifying about in this case, they've experienced some

20   very adult things long before they were adults.

21        MR. MICHAELS:  Your Honor, object.  Going into the

22   facts.

23        THE COURT:  Overruled.

24        MR. SCHLESSINGER:  The reason I mention that is, you

25   may notice, you may see, I don't know for sure, but you may, as

1    a result of that, those witnesses they may present themselves

2    in a certain way.  They may speak in a certain way, they may

3    dress in a certain way, they may have certain mannerisms.

4          My question is this:  You're going to have the

5    opportunity to observe all those things about those witnesses

6    when they take that witness stand right there and testify in

7    front of you, so you'll observe those things, but my question

8    to all of the members of the jury pool together is, is there

9    any member of the jury pool who's going to say to himself or to

10   herself, if I don't like the way a witness presents herself in

11   that way, I'm just not going to listen to the content of

12   anything that that witness says?

13         Is there anybody who says that?

14         And I don't mean to suggest you can't take any of those

15   things into account, but can we all agree that the content

16   what's being said, the testimony that's being given by those

17   witnesses is worthy of consideration as well?

18         Do we all agree on that?  Okay.

19         MR. MICHAELS:  I object to that statement, too.

20   Substantive.

21         THE COURT:  Objection's overruled.

22         MR. SCHLESSINGER:  In addition to those kind of

23   witnesses I want to ask you about, really, kind of a different

24   category of witness, because you may also hear from a witness

25   in this case who is involved in a criminally culpable way in

1    the crimes that are charged in this case.

2         You may hear from a witness who has pled guilty to her

3    role in the case and is testifying as part of a plea agreement

4    with the Government.

5         Is there anybody -- well, the jurors who are selected

6    will be instructed when Her Honor gives the final instructions

7    that that kind of plea bargaining is expressly lawful and it is

8    proper, it is provided for by the rules of the court, but is

9    there anybody who says -- and there is no right or wrong

10   answer, it's fine to answer yes, if it is the case -- but is

11   there anybody who says to himself or herself, you know, I don't

12   think the Government should call anybody as a witness in the

13   case who was involved herself in the case?

14        Raise your hand if anybody says that.

15        Okay.  So can we all agree that as jurors you'll

16   consider all of the circumstances of a witness's testimony, but

17   you would also be able to consider the content of the testimony

18   of a witness who was, herself, involved in the criminal events

19   that this case is about; can we all agree to that?  Okay.

20        Does anybody disagree with that or have any problem

21   with that?  Okay.  I want to ask you, too, about shifting away

22   now from witnesses and the types of witnesses that may testify

23   in court.  I want to ask you now about sort of the difference

24   between testimony, which is evidence in the case, and

25   attorneys' questions and attorneys' comments which were not

1    evidence in the case.

2        Can we pass the microphone, here?  I'm sorry, sir, not

3    to pick on you, because you're right in front of me,

4    Mr. Sanchez.  Just let me just ask you this:

5        Let's say, obviously nothing to do with this case, but

6    let's say the issue is whether the traffic light was green or

7    red, okay?  That's the only issue in the case, was it a green

8    light or a red light, and the attorney asked the witness,

9    "Well, was the light green or red."

10       And the witness answers, was the light red -- or excuse

11   me, the witness answers, "It was red."  What's the evidence in

12   the case?

13           PROSPECTIVE JUROR:  The light was either red or green.

14           MR. SCHLESSINGER:  The question was, was the light

15   green or red and the witness answers the light was red.

16           PROSPECTIVE JUROR:  The witness said the light was red.

17           MR. SCHLESSINGER:  The witness's testimony the light

18   was red, right?

19           PROSPECTIVE JUROR:  Yes.

20           MR. SCHLESSINGER:  There was no testimony outside of

21   that, that the light was green.

22           PROSPECTIVE JUROR:  Exactly.

23           MR. SCHLESSINGER:  Right?  Even though the attorney

24   asked the question, was it green or red, since the answer was

25   it was red, that's the only evidence in the case.

1             PROSPECTIVE JUROR:  Exactly.

2             MR. SCHLESSINGER:  Now let me ask it this way:  What if

3    the attorney asked the question a different way?  The attorney

4    may say, "You know, that light was green, wasn't it?"  And the

5    witness responds, "No, it was red."

6             What's the evidence in the case.

7             PROSPECTIVE JUROR:  In this case it would be saying, I

8    guess, in my perspective it would be green, it's not -- it's

9    neutral, it's just what you're saying, so in this case it would

10   just be up to the witness whatever the witness would say,

11   because the one who has preference I guess -- not preference,

12   more of like the word and said it.

13            MR. SCHLESSINGER:  So, your view, and I appreciate your

14   answer, Mr. Sanchez, your view is if the attorney asks in that

15   way, "It was green, wasn't it," but the answer is, "No, it was

16   red," then would you say, based on that, that there's a

17   conflict in the evidence?

18            PROSPECTIVE JUROR:  There's a conflict but I also

19   believe that the witness can have a -- they should have the

20   say, you know, what they want to say green or red, so it should

21   be answered truthfully either way.

22            MR. SCHLESSINGER:  Mr. Sanchez, thank you very much.

23   Is there anybody who feels sort of along the same line as

24   Mr. Sanchez that there could be a conflict in the evidence in

25   that situation where the lawyer says, "It was green, wasn't

1    it," and the witness says, "No, it was red," who else feels

2    that there may be a conflict in the evidence because of that,

3    by a show of hands?

4         So maybe I misunderstood Mr. Sanchez's answer, but do

5    we all agree that the lawyers' questions are not evidence in

6    the case?  Do we all understand that, that the evidence in the

7    case is limited to the sworn testimony that comes out from the

8    witness stand no matter how the question is phrased?

9         Do we all understand?

10        Does anybody have any questions about that?  The

11   question can be answered -- can be asked any way that it can be

12   asked, it can be posed multiple times, but the only thing that

13   counts in the evidence is the answer.

14        Do we all agree with that?  Okay.

15        I want to follow up with a few jurors individually

16   about a couple of answers that I think you may have given on

17   your questionnaires, and I wanted to pass the microphone first

18   to Juror Number 4, Ms. Borges.

19        Ma'am, I just wanted to ask you, I noticed as to

20   Question Number 14, I believe, as to whether there was anything

21   not specifically inquired about that could prevent you from

22   being fair and impartial in the case, and I think you answered

23   yes, although you didn't elaborate on that.  Do you mind if I

24   ask you now to spell that out a little bit for us.

25        PROSPECTIVE JUROR:  That I could be biased.

1          MR. SCHLESSINGER:  And biased in what way?

2          PROSPECTIVE JUROR:  Depending on the topic.

3          THE COURT:  Now that Judge Cooke has read to you, I

4    guess, what the charges are in the case, does that touch on one

5    of the areas in which you might be biased or is that not one of

6    those problem areas?

7          PROSPECTIVE JUROR:  I mean, the topic that's making me

8    feel a little bit uncomfortable, but I don't know how I would

9    react, I guess, like in a certain situation with maybe like

10   a -- like someone who comes and testifies.

11         MR. SCHLESSINGER:  Well, Judge Cooke's explained to you

12   how important it is that we follow the procedure, the fact that

13   the defendant is presumed innocent, the fact that the

14   Government has the burden of proof and that the defendant

15   should be found not guilty unless the Government proves his

16   guilt beyond a reasonable doubt, and I know Judge Cooke talked

17   to everybody about how important that is.

18         Do you think if you served as a juror on the case you

19   could follow those instructions including those already

20   discussed by the Court and also the instructions to be given to

21   you later?

22         PROSPECTIVE JUROR:  With this topic, no.

23         MR. SCHLESSINGER:  All right.  Thank you very much.  I

24   appreciate your honesty.

25         PROSPECTIVE JUROR:  You're welcome.

1          MR. SCHLESSINGER:  Can we pass the microphone to Ms.

2    Picart, Juror Number 24.  I apologize if I pronounce your name

3    incorrectly.

4          PROSPECTIVE JUROR:  Yes, that's fine.

5          MR. SCHLESSINGER:  But I think you answered to that

6    same question I don't know.  Could you explain that a little

7    bit.

8          PROSPECTIVE JUROR:  I think I was in a rush to answer

9    that question when I finished the questionnaire, so that's why

10   I answered that.

11         MR. SCHLESSINGER:  Hearing what we have gone over with

12   the other jurors, a little bit about what the charges are and,

13   of course, some of the important legal principles that you have

14   to apply in this case, apply in every case, do you think that

15   you could follow those instructions and apply those principles

16   and be fair to both sides of the case?

17         PROSPECTIVE JUROR:  Yes.

18         MR. SCHLESSINGER:  Ladies and gentlemen, that's almost

19   all of the questions that I have.

20         Really, the last kind of pair of questions that I have

21   really, in a sense, reiterate something that the Court has

22   already gone over but in a sense is really so important that

23   it's worth going over again.

24         Judge Cooke already mentioned, that Mr. Atkins is

25   presumed to be innocent.  He has no burden to prove or provide

1   any evidence at all.  The burden of proof to prove Mr. Atkins

2   guilty is one hundred percent here on this table.

3         So if the Government, and certainly we agree as much as

4   anybody, if the Government does not produce evidence that

5   proves Mr. Atkins' guilt beyond a reasonable doubt, then the

6   jury that's selected in this case should return a verdict of

7   not guilty.  Do we all agree on that?

8         Is there anybody sort of thinking about themselves and

9   their own ideas and attitudes and things, you know, there's a

10  risk that even if the Government does not prove the defendant

11  guilty beyond a reasonable doubt, I still might return a

12  verdict of guilty?  Is there anybody who thinks that?

13        That's good.  I see no hands raised.

14        Now by the same token, of course, if the Government

15  does produce evidence proving the defendant guilty beyond a

16  reasonable doubt, then it is the jury's duty to return a

17  verdict of guilty in the case.  Does everybody agree with that?

18        Is there anybody who thinks, you know, even if the

19  Government does prove Mr. Atkins guilty beyond a reasonable

20  doubt, I still think I might return a verdict of not guilty for

21  some other reason?  Is there anybody who thinks that?

22        Thank you very much.  Those are all my questions.

23        THE COURT:  Thank you.  Counsel for Mr. Atkins, do you

24  have any questions of the jury?

25        MR. MICHAELS:  Yes, Your Honor.  I do.  May it please

1    the Court, Counsel.

2          Good afternoon.

3          I would like you -- let me re-introduce myself.  My

4    name is Alexander Michaels, I'm Mr. Atkins, his attorney.  I

5    represent him.  As I said when I introduced myself, I'm very

6    proud to represent Mr. Atkins, who stands here presumed

7    innocent before the charges.

8          Now, I'd like you to take five to ten seconds I'm not

9    going to talk, which is very difficult for me, and I want you

10   to look at my client for the next five to seven seconds.

11         Now, my question is this:  Besides Ms. Chin, I know you

12   already expressed your feeling and I appreciate your honesty, I

13   want all of you, now that you have a chance to think about,

14   maybe sink in what's going on here, is anybody here who cannot

15   presume -- assume that Mr. Atkins is not guilty of the charges

16   against him?  Anybody here who feels that -- I believe some of

17   you said, Ms. Diaz said, "Well, he must be here for a reason,"

18   the whole principle or the whole saying what is smoke must be a

19   fire, is there anybody who feels that he cannot a hundred

20   percent believe and assume my client presumed innocent?

21         By the way, this will be your ticket out.  No?

22         Okay.  The Court mentioned several major principles,

23   and I'd like in the next few minutes to go through them again

24   and make sure you are all on the same page.

25         You will be hearing again, and hear it again, and

1    you're going to hear it again and again, that Mr. Atkins is

2    presumed innocent; and also that the Government, not

3    Mr. Schlessinger personally, this is not a personal contest

4    between me and him, because obviously he's much handsomer and

5    younger and smarter than me, I don't stand a chance, this is

6    the Government, not me or Mr. Schlessinger, who has to prove

7    the case beyond a reasonable doubt and to the exclusion of a

8    reasonable doubt.  You all understand and agree?  Yes?

9        Okay.  Some of you been jurors in a civil case, I

10   believe, right?  Raise your hand was a juror in a civil case,

11   right.  You're Mr. --

12       PROSPECTIVE JUROR:  Morrow.

13       MR. MICHAELS:  Right.  Sorry.

14       I don't know if you recall, Mr. Morrow, when the case

15   went to court to you, jury, the judge, gave you the instruction

16   and told you that the plaintiff has to prove its case by a

17   preponderance of evidence.  Do you remember that?

18       PROSPECTIVE JUROR:  Yes.

19       MR. MICHAELS:  And basically, basically, you recall

20   what the Court told you is that preponderance of evidence is

21   not beyond a reasonable doubt, it's just which, if one side you

22   imagine the scale of justice, if you see in your mind the scale

23   of justice, the plaintiff in a civil case has to tip the scale

24   of justice in their favor and they will win.  That's the

25   preponderance of evidence.  Correct?

 1              PROSPECTIVE JUROR:  Correct.

 2              THE COURT:  Now, in a criminal case, the standard, it's

 3    not preponderance of evidence, but it's proof beyond and to the

 4    exclusion of every reasonable doubt.  The scale is not enough

 5    to tip it, preponderance, see, the plaintiff in a criminal

 6    case, which is, of course, the Government has to push the scale

 7    of justice beyond and to the exclusion of reasonable doubt, a

 8    much higher understand, right?

 9              PROSPECTIVE JUROR:  I understand that.

10              MR. MICHAELS:  Do you all agree and understand that?

11    What was the case in the civil case?  What was the case about,

12    money?

13              PROSPECTIVE JUROR:  Correct.

14              MR. MICHAELS:  Someone wanted to win money from someone

15    else?

16              PROSPECTIVE JUROR:  Yes.

17              MR. MICHAELS:  What is at stake in the criminal case is

18    freedom and liberty, right?

19              PROSPECTIVE JUROR:  Right.

20              MR. MICHAELS:  There is no amount of money that we can

21    put on freedom and liberty, do you all agree?  Yes?  That's why

22    the constitution and our country requires the Government to

23    prove beyond and to the exclusion of every reasonable doubt.

24    If anybody has an issue with that concept, please raise your

25    hand.

1          Okay.  And finally -- thank you, sir, thank you,

2    Mr. Morrow.

3          Finally, another major concept which, by the Court is

4    the fact that Mr. Atkins has an absolute right to remain

5    silent; he doesn't have to testify, he doesn't have to bring

6    evidence.  Basically, myself and Mr. Atkins can sit there and

7    play chess all trial long.  Of course, we're not going to do

8    that, but the point is that to prove nothing means just that,

9    prove nothing.

10          I don't have to do anything.  I don't even have to

11    cross-examine, bring evidence, nothing; because why?  Because

12    if the Government fails to convince you beyond and to the

13    exclusion of reasonable that he's guilty you can only return a

14    verdict of not guilty; correct?  Yes?  Okay.

15          However, when the Court told you -- and I know no one

16    raised their hand, and I always make this version myself, that

17    when I rephrase the question, most of you are going to raise

18    your hand, and my question is the following:

19          And just as the Government told you, one of the few

20    things we agree, there are no wrong or right answers, please

21    feel free to answer -- I only have 15 minutes, the only time

22    that we can talk to each other, okay.

23          If I ask you how many of you would like to hear his

24    side of the story?  Yeah, here we go.  Okay.

25          DEFENDANT'S SISTER:  Thank you, Jesus.

1          MR. MICHAELS:  I'm sorry?  Can I have a sidebar?

2          THE COURT:  No, just -- I'm just going to remind people

3    that you're not to have any open outbursts in the courtroom, or

4    I'll ask you to be removed.

5          Mr. Michaels, you may continue.

6          MR. MICHAELS:  Thank you, Your Honor.

7          Right.  As I said, I want my burden here, that's the

8    only one, when I win, by the way.  All you raise your hands,

9    because it's natural, it's human nature.  If I'm sitting in the

10   chair, I want to say my side of the story, right?  Yes?

11         That's why you raised your hand.  But guess what,

12   folks, he doesn't have to tell you his side of the story.  Why?

13   Because he has an absolute right in our country that we're all

14   so proud of, our constitution that we all love, he has the

15   right to stay silent and not say anything.

16         And the question is, would you be able to set aside

17   your feelings, your rightful reaction, you want to hear what he

18   has to say, set it aside and follow the Court's instruction

19   that you don't have to speculate about it, you cannot talk in

20   the jury room about it, the fact that he doesn't testify, you

21   can't hold it against him.

22         Is there anybody who cannot overcome their feelings

23   that, well, I don't care what you guys lawyer talk here, mumbo-

24   jumbo, if I will be in the chair I will say something?

25         Is there anybody that cannot pause that and someway,

1    somehow, hold it against Mr. Atkins if he doesn't take the

2    stand?  Anyone?  Okay.  All right.  So let me have him.  Thank

3    you.

4              You're Mr. Fernandez; right?  -- Sanchez, sorry.

5              PROSPECTIVE JUROR:  Sanchez.  It's simple.

6              MR. MICHAELS:  I'm sorry, because Sanchez --

7              PROSPECTIVE JUROR:  Just if anybody else, if anybody

8    were to be sitting on the other side, if you would like to

9    yourself be free and we do have a right to remain silent, but

10   if you would like to fight for yourself and would like, you

11   know, to maybe hear your side of the story just like anybody

12   else.  You know, it's always good to hear two sides like that.

13   We can chose which way the balance goes.

14             I understand the fact of, you know, it's our

15   constitutional right but if you, yourself, would like to fight

16   for yourself it would be more -- it would possibly be better if

17   you speak for yourself.

18             MR. MICHAELS:  Do you understand that he already spoke

19   to you?

20             PROSPECTIVE JUROR:  I didn't understand that.

21             MR. MICHAELS:  He did spoke.  He said, "I am not

22   guilty.  Take me to a jury."

23             PROSPECTIVE JUROR:  Okay.

24             MR. MICHAELS:  That's what he said already.  That means

25   he already talked, in my opinion.

1           PROSPECTIVE JUROR:  No, that's a reasonable opinion.

2           MR. MICHAELS:  And you understand that the defendant,

3    while when the defendant makes the decisions, he does it

4    through his lawyer and I can advise him, maybe, maybe not to

5    testify or not for a lot of reasons I can't get into, or maybe

6    have a speech impediment or maybe he's nervous or maybe I feel

7    the Government didn't prove the case and I tell him, "Why take

8    the stand?  They failed."

9           PROSPECTIVE JUROR:  Sure, right.

10          MR. MICHAELS:  So my question is, and I appreciate you

11   raising your hand and saying what you said.  Can you now that

12   we talked a little bit, if you can, if not, that's fine, follow

13   the Court's instruction eventually and say, "Do you know what?

14   They told me not to hold it against him.  I would like to hear,

15   if I don't hear so be it.  I'll judge the case on its merits"?

16          PROSPECTIVE JUROR:  Yeah, either way if he speaks or

17   not.

18          MR. MICHAELS:  Thank you, sir.

19          Ms. Fernandez, you are Ms. Fernandez, right?  Okay.

20   Same question, do you think you can do that?

21          PROSPECTIVE JUROR:  Well --

22          MR. MICHAELS:  Or what you would like to hear from him?

23          PROSPECTIVE JUROR:  I would like -- I know it's the

24   constitutional right to remain silent and you cannot -- are not

25   compelled to testify against yourself, but I would feel better

1    if the person took the stand and testified, you know,

2    prejudged.

3            MR. MICHAELS:  I understand.  There's nothing wrong

4    with the way you feel.  It's okay you feel that.  But if the

5    Court tells you, do you know what?  You are the juror and I

6    were to tell you not to fault against him, if he doesn't

7    testify you cannot do anything about it, you cannot speculate,

8    the whole business, can you do that; yes or no?

9            PROSPECTIVE JUROR:  No.

10           MR. MICHAELS:  Thank you, ma'am.  I appreciate that.

11           The Government talked to you very briefly type of

12   witnesses and they start talking with you about children who

13   have difficult lives and they also start bringing the violence,

14   that's why I objected.  All I'm asking you not to prejudge this

15   case.  This fight between us may be minor, doesn't mean they

16   are children, I would like you to listen to the evidence.

17           Would you promise to do that; yes or no?

18           Can you do that and not let yourself influenced by the

19   Government, start with little children who suffer, because you

20   will find probably a different scenario when I'm with my

21   cross-examination, and when you listen to both sides of the

22   case, you may found out differently.

23           Would you be able to -- my question is, can you keep an

24   open mind and judge for yourself what's going on?  Yes, you

25   promise to do that?

```
 1              PROSPECTIVE JUROR:  Yes.

 2              MR. MICHAELS:  Whatever conclusion you reach, I will

 3     live with it, but I'd like to you keep an open mind, and

 4     there's some words that are used to influence you to ignore and

 5     listen to the facts.  Can you do that?  Yes or no?

 6              Okay.  From that part, anybody yes or no, then?

 7              THE COURT:  Two minutes remaining, Counsel.

 8              MR. MICHAELS:  How many minutes?

 9              THE COURT:  Two.

10              MR. MICHAELS:  All of them, Judge.

11              THE COURT:  All of them.

12              MR. MICHAELS:  All right, Judge.

13              I'm going to try to -- all I'm asking basically is the

14     Government also talk about witnesses' credibility and the

15     example he gave you something about the traffic light is red

16     and the witness said, it's red, oh, it's red, I won, I won

17     because there's no other evidence.  No, no, no, no, not so

18     fast, Mr. Schlessinger, not so fast.

19              You, and only you, decide if the witness is credible,

20     if he has the ability to see, if he has the ability to observe,

21     if he could be mistaken, if there is any other evidence that

22     they refuse to present.  There is a lot to a criminal case.

23     It's not about the traffic light, okay?  You all understand

24     that?  Yes?

25              And you understand that at the end of the day -- and
```

1    I'm going to end with this -- I have some personal questions

2    but I guess I will ask them next year -- at the end of the day,

3    it's you and only you, not this Honorable Court, not me, not

4    this prosecutors and the FBI agents and all the witnesses, none

5    of them who can decide if Mr. Atkins is guilty or not.

6              You and only you, following the facts and make a

7    decision based on the law and the facts as you view them and

8    judge them; right?

9              That's why we live in this country, right?  Well, I

10   mean, some are born -- someone like me chose to be here but

11   that's one reason, because I want you to tell me if I'm guilty

12   or not.  I don't want the Government to tell me; right?

13             PROSPECTIVE JUROR:  Yes.

14             MR. MICHAELS:  Thank you, Your Honor.

15             THE COURT:  Thank you very much, Mr. Michaels.

16             Now, ladies and gentlemen, I told you a little bit

17   about the schedule before we broke, but let me tell what you I

18   think our schedule will be this week.

19             Now, I expect that this case will conclude around

20   November 2nd.  Now, before everybody freaks out and thinks this

21   means you're going to be here every day until November 2nd, it

22   won't.  Just because of some irregularities that don't

23   necessarily happen with a trial, this is what your schedule

24   will be.

25             For the remainder of this week, you will not have court

1    tomorrow, if you are selected as a juror.

2            You will be here Wednesday afternoon from,

3    approximately, 1:00 to 5:00.

4            Next week, you will be here Wednesday again, no Monday

5    or Tuesday, approximately 1:00 to 5:00.  Thursday and Friday

6    will be full days.

7            Now, the reason why I say November 2nd, is that I think

8    because of our shortened days this trial will probably spill

9    over until Monday or Tuesday the next week; so remember, the

10   only day this week after this day is Wednesday, and next week

11   it's Wednesday, a half day and full day Thursdays and Fridays.

12           Now, given that schedule, I need to know specific

13   reasons why you cannot be on jury duty.  So, I'm going to wait

14   and start up front, Mr. Blanford, with the microphone.

15   Specific reasons up front why you cannot be on jury duty.

16           Any juror in the front row?  Let's go to the back row.

17   Tell me your name and juror number, please.

18           PROSPECTIVE JUROR:  My name is Alexander Ostolaza.  I'm

19   Juror Number 13.  I'm a part-time student in Miami-Dade

20   College.

21           THE COURT:  And what is, sir, your school hours?

22           PROSPECTIVE JUROR:  From 4:00 to 8:00, Monday, Tuesday

23   and Wednesdays.

24           THE COURT:  4:00 to 8:00 you go to school, Monday,

25   Tuesday and Wednesdays?

1          PROSPECTIVE JUROR:  Tuesday and Wednesday, uh-huh.

2          THE COURT:  Thank you very much.

3          MR. MICHAELS:  I'm sorry, Judge, that was Number 13?

4          THE COURT:  Number 13.

5          MR. MICHAELS:  Thank you.

6          PROSPECTIVE JUROR:  Hi, Cristina Martinho, Juror Number

7    6 I actually had pre-advised before I signed up for jury duty

8    that I'm not available most of the week next week, and I was

9    excused, so I'm traveling for business.

10         THE COURT:  So, what are the days that you're not

11   available next week?

12         PROSPECTIVE JUROR:  Tuesday through Friday.

13         THE COURT:  Thank you.

14         Anyone else up front?  Juror Number 5, Mr. Gutierrez?

15         PROSPECTIVE JUROR:  Yes.  I have a job interview

16   tomorrow at 3:00 p.m.

17         THE COURT:  So, you have a job interview tomorrow?

18   Well, we won't have court tomorrow, so you will be good for

19   your job interview.  Good luck to you.

20         PROSPECTIVE JUROR:  All right.

21         THE COURT:  Juror Number 4.

22         PROSPECTIVE JUROR:  Yeah, I know that I won't get fired

23   or anything for being here in jury duty, but me being here

24   would delay the process of getting other patients from outside

25   the U.S. to get their treated matters.

```
 1              THE COURT:  Thank you very much.

 2              PROSPECTIVE JUROR:  Thank you.

 3              THE COURT:  We can go in the back now, jurors in the

 4    rear of the courtroom.  Jurors in the rear of the courtroom.

 5              PROSPECTIVE JUROR:  I'm Number 18.  I live really far

 6    from here.  It took me two-and-a-half hours to get here, and I

 7    am a caretaker of three little girls.  Before care doesn't

 8    start until 7:00 and after care ends at 6:00.

 9              THE COURT:  So, let's start, so you can start before

10    care at 8:00?

11              PROSPECTIVE JUROR:  At 7:00 in the morning, I have to

12    pay for the whole month, it doesn't just give me one or two

13    days, I have to pay for -- I leave them until 6:00, after care,

14    they go to school ten minutes from my job.  So I'm --

15              THE COURT:  How long does it take you to get from

16    downtown Miami to your after care?

17              PROSPECTIVE JUROR:  It took me this morning

18    two-and-a-half hours to get here, so I'm presume two-and-a-half

19    hours to get them back.

20              THE COURT:  How did you come this morning?

21              PROSPECTIVE JUROR:  I drove.

22              THE COURT:  From?

23              PROSPECTIVE JUROR:  Homestead, all the way 344th

24    Street.  Last exit on the Turnpike.

25              THE COURT:  All right.  Thank you very much.
```

1          PROSPECTIVE JUROR:  And I'm also a diabetic educator,

2     so I'm the only one that does this at my job so patients aren't

3     being seen because I'm not there.

4          THE COURT:  Where do you work again?

5          PROSPECTIVE JUROR:  Homestead Hospital.

6          THE COURT:  Thank you very much.

7          PROSPECTIVE JUROR:  Yes, Your Honor.

8          THE COURT:  You're juror number?

9          PROSPECTIVE JUROR:  Maylen Rodriguez and I'm Number 30.

10         THE COURT:  Thank you, Number 30.

11         PROSPECTIVE JUROR:  I'm scheduled to work Tuesday,

12    which is tomorrow, right?  It's tomorrow?

13         THE COURT:  Yes.

14         PROSPECTIVE JUROR:  Tomorrow, and I work night shift

15    meaning that I will be coming out of work Wednesday morning,

16    which if I get picked up, I will be required to be here; and

17    Wednesday I'm working at night, too, and the following

18    Wednesday I will be working.  Right now my unit is very short,

19    meaning that we're working mainly with seven nurses serving 21

20    patients.  If I get selected my unit will be having six nurses,

21    so that might be a problem.

22         THE COURT:  Thank you.

23         PROSPECTIVE JUROR:  Your Honor, Number 26.

24         THE COURT:  That's Mr. Long.

25         PROSPECTIVE JUROR:  Yes.  If I'm looking at the days

1   correctly, you said next Thursday and Friday would be full

2   days?

3          THE COURT:  Yes, a full day for us is 9:30 until 5:00.

4          PROSPECTIVE JUROR:  My wife has a scheduled surgery

5   appointment for the 29th that she's already rescheduled, and

6   this one she has to have a driver because she's sedated and I

7   have to take off of work to do that, even though I'm losing

8   money because I'm still under probationary period on my job, so

9   this is something that I have to do because I don't have anyone

10  else to do.

11         THE COURT:  Okay.  Thank you very much.

12         PROSPECTIVE JUROR:  Thank you.

13         PROSPECTIVE JUROR:  Juror 35.

14         THE COURT:  Yes, Mr. Ewald.

15         PROSPECTIVE JUROR:  Yes, ma'am, next -- the 27th and

16  the 28th, those I have doctor's appointment and I called a week

17  and a half or two weeks ago and let them know.

18         THE COURT:  The 27th we don't have court.  What time

19  are your appointments on the 28th?

20         PROSPECTIVE JUROR:  They're at 2:00 in the afternoon

21  right after their lunch.

22         THE COURT:  Thank you.

23         PROSPECTIVE JUROR:  Juror 33, I have a doctor's

24  appointment on the 29th at 2:30, I could try to reschedule it

25  but I don't -- I'm not sure if I can.

1          THE COURT:  All right.  Thank you very much.

2          All right, ladies and gentlemen, I'm going to give you

3     another brief break.  I'm sorry, I missed someone.

4          PROSPECTIVE JUROR:  Juror 34, I have class on

5     Thursdays.  I don't know.

6          THE COURT:  What time is your class on Thursdays?

7          PROSPECTIVE JUROR:  From 10:00 to 12:30.

8          THE COURT:  Thank you.  I see another hand.

9          PROSPECTIVE JUROR:  Juror 25.  Like I said, I work

10    almost every day.  The first one from Home Depot and the second

11    one at Publix, the only day I don't is Saturday, so I don't

12    mind, if Government might chose me, to do my best.

13         THE COURT:  Thank you.  All right.

14         Ladies and gentlemen, I'm going to ask that you step

15    out in the hallway for me, please.  Once again, Mr. Blanford

16    will show you where the restrooms are and we'll be back in

17    about 15 minutes.

18         COURT SECURITY OFFICER:  All rise.

19         (Prospective jurors exited the courtroom at 1:09 p.m.)

20         THE COURT:  Everyone take a seat for me, please.  I'm

21    going to ask the -- ma'am, you're wearing the blue shirt, blue

22    and white shirt, in the back of the courtroom, wearing the blue

23    and white shirt.  Yes, you, ma'am.

24         Ma'am, right here.  Would you stand up for me, please?

25    Are you related to the defendant?

 1            DEFENDANT'S SISTER:  Yes, I am, ma'am.

 2            THE COURT:  How are you related to the defendant?

 3            DEFENDANT'S SISTER:  That's my older brother.

 4            THE COURT:  Now, do you understand if you continue to

 5     have these outbursts from the courtroom, I'm going to have you

 6     removed?

 7            DEFENDANT'S SISTER:  Yes, ma'am, I do.

 8            THE COURT:  So, if you want to stay and support your

 9     brother, you have to behave.

10            DEFENDANT'S SISTER:  Yes, ma'am.

11            THE COURT:  Now, also it means no talking while the

12     trial is going on with him and no trying to communicate with

13     his attorney unless we're on a break.  Do you understand that?

14            DEFENDANT'S SISTER:  Yes, ma'am.

15            THE COURT:  Now, if you feel you can't abide by these

16     rules, or anybody else in your family can't abide by these

17     rules, then you don't need to come to court every day.

18            Do you understand that?

19            DEFENDANT'S SISTER:  Yes, ma'am.

20            THE COURT:  Thank you very much.  You may take your

21     seat.

22            DEFENDANT'S SISTER:  Thank you, ma'am.

23            THE COURT:  Counsel, if you have a seat, please, we're

24     going to first do the challenges for cause.

25            MR. MICHAELS:  Judge, may I remind you about my 2:00.

 1    My client is out of custody, so it's not a big deal to reset.

 2              Ivan, take the number and take a moment and take the --

 3              MR. MICHAELS:  No, Judge, I'm supposed to be in Federal

 4    Court for a change of plea in front of Magistrate Judge

 5    McAliley.

 6              THE COURT:  I thought you said --

 7              COURTROOM DEPUTY:  At 2:00 he has to be there?

 8              MR. MICHAELS:  2:00 today, Judge McAliley.  My client

 9    is out of custody, so it's not really a big deal.

10              THE COURT:  Mr. Marchena is going to take care of it.

11    Maybe we can get it done on the lunch break.

12              MR. MICHAELS:  That's fine, too, I don't mind.  I don't

13    eat lunch.

14              THE COURT:  Mr. Schlessinger, do you have challenges

15    for cause?

16              MR. SCHLESSINGER:  Yes, Your Honor.  Should I list them

17    all or one at a time?

18              THE COURT:  Why don't we go one at a time?

19              MR. SCHLESSINGER:  Your Honor, the first challenge for

20    cause was as to Juror Number 4, Ms. Borges.  She said that she

21    couldn't be fair, and I even followed up with her and she just

22    stuck to that, that she couldn't be fair.

23              MR. MICHAELS:  I agree.

24              THE COURT:  Any other challenges, Mr. Schlessinger?

25              MR. SCHLESSINGER:  Yes, Your Honor.  Juror Number 18,

1  similarly she said she could not be fair.  I believe she later

2  said had a child care issue.

3          THE COURT:  That's Ms. Diaz?

4          MR. SCHLESSINGER:  Yes, Your Honor.

5          THE COURT:  All right.  Anyone else?

6          MR. SCHLESSINGER:  The other one would be Juror Number

7  38, Ms. Trudeau who indicated she may, depending on whether

8  it's the case she's read about, have some personal connection

9  to the case.

10          THE COURT:  Anyone else?

11          MR. SCHLESSINGER:  Those are all the Government's

12  challenges for cause, Your Honor.

13          THE COURT:  Counsel for Mr. Atkins, do you have

14  challenges for cause?

15          MR. MICHAELS:  First I join in the Government on all

16  three challenges for cause.

17          THE COURT:  So, you agree with Numbers 4, 18 and 38?

18          MR. MICHAELS:  That's correct.

19          THE COURT:  Do you have any additional challenges for

20  cause?

21          MR. MICHAELS:  Yes, I do.  Ms. -- Juror Number 22 --

22          THE COURT:  Ms. Fernandez.

23          MR. MICHAELS:  -- Ms. Fernandez, in spite of everything

24  I tried to do, she ended up saying that no matter what the

25  Court instruction is going to be, she's still going to like to

1    hear from my client.

2         THE COURT:  Anyone else?

3         MR. MICHAELS:  Yes.  23.

4         THE COURT:  Which is Chin?

5         MR. MICHAELS:  That's correct, she and Ms. Diaz, I

6    assume the Government kept Ms. Chin by accident, they both

7    stood up and said the same thing about being fair, they cannot,

8    based on each of the -- if you recall, she stood up the same

9    time Number 18 did, Diaz, and they all had the same position.

10        THE COURT:  Okay.  Who else?

11        MR. MICHAELS:  I don't know 24, her response or her

12   answer, so I'm really confused about Number 24.  24, no, I'm

13   wrong.  Hold on, Judge.  I apologize.  For some reason, I have

14   Number 24 on my list.  So I'm going to ask for Number 24 as

15   well.

16        THE COURT:  Well, I have nothing in my notes about

17   Number 24.

18        MR. MICHAELS:  Okay.

19        THE COURT:  There's some of them I might agree or

20   disagree, but I have nothing in my notes about -- that's Ms.

21   Picart, Juror Number 24.

22        MR. MICHAELS:  That's correct.  In all fairness and in

23   good faith, I don't know why I wrote that, so I have nothing on

24   my notes either, so I'm going to withdraw that for cause.

25        No. 28 -- no, 27, I do not believe that she can be fair

1    and impartial based on her answer, and the fact that she was a

2    victim of a crime and that affected her to the point she can't

3    drive in certain neighborhoods, and I think we all know what

4    kind of neighborhoods those are and, obviously, for the

5    record --

6              THE COURT:  I specifically asked her about that and

7    would that incident affect her in terms of being a fair juror

8    in this case; and she said it would not.

9              MR. MICHAELS:  I am very much aware of that, her

10   answer, I don't think her answer was honest, and I believe that

11   the written answer was just a time to think without being or

12   maybe without feeling pressured or being in front of this

13   Honorable Court.

14             The fact that she mentioned a certain neighborhood and

15   my client for the record, Afro-American, I don't think it takes

16   a scientist to figure out what neighborhood she's afraid to

17   drive through.  That, to me, indicates that she has a problem

18   with Afro-American people and I'm asking her to be excused for

19   cause based on that.

20             THE COURT:  Anyone other than Juror Number 27?

21             MR. MICHAELS:  Number 28, the same, she gave an answer

22   that --

23             THE COURT:  I have 28 as being male, am I wrong?

24             MR. SCHLESSINGER:  That's correct, Your Honor.

25             MR. MICHAELS:  28, Jesus Garcia.

1          THE COURT:  Yes.

2          MR. MICHAELS:  I apologize, he's not sure if he can be

3     fair.  He does what kind of trial it is, he needs to wait

4     before he decides if it's fair for not.  I hope he doesn't have

5     to wait until after the verdict, so I'm moving for a cause on

6     him, too.

7          THE COURT:  Sir, anything else?

8          MR. MICHAELS:  I have two more, I believe.  Number 29,

9     she gave the right answer, she works for DCF, former

10    prosecutor, a medical appointment, which I'm not sure what date

11    it is.

12         THE COURT:  Who has a medical appointment?

13         MR. MICHAELS:  29, Ms. Henry.

14         THE COURT:  Did I miss Ms. Henry having a medical

15    appointment?

16         MR. MICHAELS:  Well, you -- yes, you did when you asked

17    her the question but she didn't raise her hand and it's very

18    confusing because it says tomorrow, 10-21.  As far as I know,

19    tomorrow is 10-20, but it's says Wednesday and it's very

20    important.

21         THE COURT:  Well, maybe it's that given the time

22    schedule she's able to work around the appointment.  Remember

23    tomorrow we have no class, no school.

24         MR. MICHAELS:  The other juror mentioned that.  She,

25    surprisingly enough, she did not raise her hand, the last

1    question you asked about the time, but she wrote down that she

2    came in with a doctor appointment, but then she put down two

3    informational contradictory to each other.  It says tomorrow,

4    the 21st.  Tomorrow is 20th.  21st is Wednesday, when they do

5    have to report.  I don't know if you want to ask her --

6              THE COURT:  Who else?

7              MR. MICHAELS:  And, finally, I believe Mr. -- she's

8    already there.

9              THE COURT:  Mr. Blanford, can you get Juror Number 27,

10   not 27, 29 for me, please, for just a minute?

11             COURT SECURITY OFFICER:  Yes.

12             (Prospective Juror 29, Yolanda Henry Vandam entered

13   courtroom at 1:23 p.m.)

14             THE COURT:  Good afternoon, ma'am.  I just wanted a

15   clarification because in Question Number 14 you said you had an

16   appointment on October 21st.  October 21st is Wednesday.

17             PROSPECTIVE JUROR:  I'm sorry, Your Honor, I meant

18   tomorrow, so it's October 20th.

19             THE COURT:  Thank you very much.  That's what I wanted

20   to know.

21             (Prospective Juror 29, Yolanda Henry Vandam exited the

22   courtroom at 1:23 p.m.)

23             THE COURT:  I will thank and excuse the following

24   jurors:

25             Juror Number 4, no one mentioned Juror Number 6 but

1    she's out of town on business Tuesday and Friday of next week.

2            MR. MICHAELS:  I did not address any -- with the time

3    issue I did not think -- I guess I should have.

4            THE COURT:  Juror Number 13, also.  He's the gentleman

5    that's in school Monday, Tuesday and Wednesday, and Wednesday

6    seems to be our best days.

7            MR. MICHAELS:  I'm sorry, are you excusing them now?

8            THE COURT:  Yes.

9            MR. MICHAELS:  Okay, I just wanted to know.

10           THE COURT:  Juror Number 18, Juror Number 23, Juror

11   Number 26, and Juror Number 34.  Oh, Juror Number 35, he had to

12   reschedule a doctor's appointment, twice.

13           Now we can do our preemptory challenges.  Starting with

14   counsel for the United States, Juror Number 1, accept or

15   reject?

16           MR. SCHLESSINGER:  Reject, Juror Number 1.

17           THE COURT:  Counsel for the defendant, Juror Number 2,

18   accept or reject.

19           MR. MICHAELS:  You said we have no backstrike; right?

20           THE COURT:  No backstriking.

21           MR. MICHAELS:  Yes, we accept.

22           THE COURT:  Juror Number 2, Schlessinger, accept or

23   reject?

24           MR. SCHLESSINGER:  Accept Juror Number 2.

25           THE COURT:  That's Juror Number 1.

1               Juror Number 3, Mr. Schlessinger, accept or reject?

2               MR. SCHLESSINGER:  Reject.

3               THE COURT:  Mr. Michaels, Juror Number 5, 5, accept or

4     reject?  Mr. Gutierrez, accept or reject?

5               MR. MICHAELS:  Reject.

6               THE COURT:  Mr. Schlessinger, Juror Number 7, accept or

7     reject?

8               MR. SCHLESSINGER:  Accept.

9               THE COURT:  Juror Number 7, accept or reject, for the

10    defense?

11              MR. MICHAELS:  We're going to accept.

12              THE COURT:  Juror Number 7 is Juror Number 2.

13              Mr. Michaels, Juror Number 8, Ms. Cole, accept or

14    reject?

15              MR. MICHAELS:  I can't strike for cause anymore; right?

16              THE COURT:  We are passed for cause.

17              MR. MICHAELS:  You won't allow me to reopen for cause?

18              THE COURT:  No.

19              MR. MICHAELS:  Okay.  Then I strike.

20              THE COURT:  Mr. McHale, Mr. Schlessinger, accept or

21    reject?

22              MR. MICHAELS:  No, I strike him.

23              THE COURT:  I know.  Mr. McHale.

24              MR. SCHLESSINGER:  The Government accepts Mr. McHale.

25              MR. MICHAELS:  Sorry, Judge.

```
 1              THE COURT:  Juror Number 9, accept or reject
 2   Mr. McHale, to the defense?
 3              MR. MICHAELS:  I'm going to reject.
 4              THE COURT:  Mr. Schlessinger, Juror 10, Fonseca, accept
 5   or reject?
 6              MR. SCHLESSINGER:  Reject.
 7              THE COURT:  Juror 11, accept or reject?
 8              MR. SCHLESSINGER:  Accept.
 9              THE COURT:  I'm sorry, I was ahead of the game there,
10   that should have gone first to Mr. Michaels for Juror
11   Number 11, accept or reject?
12              MR. MICHAELS:  Judge, you're too fast for me.  I'm a
13   very slow guy.  Fonseca state strike, right?  Government
14   strike?
15              THE COURT:  Yes, you're now up on 11.
16              Number 11, accept or reject?
17              MR. MICHAELS:  We're going to accept.
18              THE COURT:  That's Juror Number 3.
19              I'm sorry, are you still accepting Mr. Schlessinger?
20              MR. SCHLESSINGER:  Yes, Your Honor, we do.
21              THE COURT:  Mr. Schlessinger, we're at Juror Number 12.
22              MR. SCHLESSINGER:  Accept.
23              THE COURT:  Juror Number 12, accept or reject, that
24   would be Juror Number 4.
25              MR. MICHAELS:  Accept.
```

```
1            THE COURT:  Mr. Schlessinger, Juror Number 14,
2   Ms. Flanagan, accept or reject?
3            MR. SCHLESSINGER:  Accept.
4            THE COURT:  Juror Number 14, accept or reject?
5            MR. MICHAELS:  We're going to reject.
6            THE COURT:  You're rejecting 14?
7            MR. MICHAELS:  Yes, Your Honor.
8            THE COURT:  How many challenges does the defense have
9   remaining, Ivan?
10           MR. MICHAELS:  Four.
11           COURTROOM DEPUTY:  They've used four, so they have six
12   left.
13           MR. MICHAELS:  That's correct.
14           THE COURT:  Juror Number 15, accept or reject,
15   Mr. Michaels?  Juror Number 15, accept or reject, Daisy Garcia?
16   Daisy Garcia?
17           MR. MICHAELS:  We will accept.
18           THE COURT:  Daisy Garcia, Mr. Schlessinger, accept or
19   reject?
20           MR. SCHLESSINGER:  Accept.
21           THE COURT:  That's Juror Number 5.
22           Mr. Schlessinger, Juror Number 16, Ms. Greene, accept
23   or reject?
24           MR. SCHLESSINGER:  Accept.
25           MR. MICHAELS:  Judge, I'm sorry, I made a mistake.
```

1    It's not a big strike.  I just made a mistake.  I meant to say

2    reject on Garcia.

3              THE COURT:  That's backstriking.

4              MR. MICHAELS:  Well, it just happened.  I mean, my

5    client told me 14, 15 -- what?

6              Sorry, Judge, we'll move on.

7              THE COURT:  Ms. Greene, accept or reject Ms. Greene,

8    Juror Number 16?

9              MR. MICHAELS:  Accept.

10             THE COURT:  Mr. Schlessinger, have you accepted Ms.

11   Greene?

12             MR. SCHLESSINGER:  Yes, Your Honor.

13             THE COURT:  That's Juror Number 6.

14             Mr. Schlessinger, Juror Number 17, accept or reject?

15             MR. SCHLESSINGER:  Accept.

16             THE COURT:  Mr. Michaels, Juror 17, accept or reject?

17   Mr. Piedra.

18             Waiter at Texas de Brazil, never been on a jury before

19   and he's not married.

20             MR. MICHAELS:  We're going to accept.

21             THE COURT:  That's Juror Number 7.  You accepted Mr.

22   Piedra, correct, Mr. Schlessinger?

23             MR. SCHLESSINGER:  Yes, Your Honor.

24             Mr. Michaels, Juror Number 19, Ms. Troche?  That would

25   be Juror Number 8.  Juror Number 8.

1        MR. MICHAELS:  Strike.

2        THE COURT:  Mr. Schlessinger, Juror Number 20, Ms.

3   Salas Osoria, accept or reject?

4        MR. SCHLESSINGER:  Accept.

5        THE COURT:  Mr. Michaels, Juror Number 20, accept or

6   reject?  She would be Juror Number 8.

7        MR. MICHAELS:  Reject.

8        THE COURT:  Mr. Michaels, Juror Number 21,

9   Ms. Yarbrough, that would be Juror Number 8 again.

10       MR. MICHAELS:  Yeah, I accept.

11       THE COURT:  Ms. Yarbrough, Mr. Schlessinger, she will

12   be Juror Number 8.

13       MR. SCHLESSINGER:  Accept.

14       THE COURT:  22, Mr. Schlessinger, accept or reject?

15       MR. SCHLESSINGER:  Accept.

16       THE COURT:  22, Mr. Michaels, accept or reject.

17       MR. MICHAELS:  Judge, I have to renew, with all due

18   respect, my cause.  She's the one who refused to acknowledge my

19   client's right to remain silent and is not going to set aside

20   her feelings.  If my client decides not to testify I'm up a

21   creek without a paddle, so to speak.  I have to renew my cause

22   because I'm running out of challenges, I don't see how it can

23   be cured.

24       THE COURT:  Wait, just a moment.  Let me think through

25   this.

1        MR. MICHAELS:  Sure.

2        THE COURT:  Mr. Schlessinger, do you care to speak on

3   Juror Number 22?

4        MR. SCHLESSINGER:  Just to say, Your Honor, I don't

5   object to your ruling for cause if the Court is so inclined.

6        THE COURT:  I'm pulling out 22.  Let's go to 24, accept

7   or reject, Mr. Michaels?

8        MR. MICHAELS:  You struck for cause?

9        THE COURT:  I struck for cause.

10        MR. MICHAELS:  Thank you.

11        THE COURT:  Mr. 24, Picart, Juror Number 9, accept or

12   reject?

13        MR. MICHAELS:  Reject.

14        THE COURT:  Mr. Schlessinger, Juror Number 25, accept

15   or reject?

16        MR. SCHLESSINGER:  Accept.

17        THE COURT:  Juror Number 25, accept or reject?

18        MR. MICHAELS:  Accept.

19        THE COURT:  That's Juror Number 9.

20        Ms. Rojas, Juror 27, Mr. Schlessinger, accept or

21   reject?

22        MR. SCHLESSINGER:  Accept.

23        THE COURT:  Number 9, Ms. Rojas accept or reject?

24        MR. MICHAELS:  Reject.

25        THE COURT:  Juror Number 28, Mr. Michaels, accept or

1    reject, it would be Juror Number 10.

2              MR. MICHAELS:  Reject.

3              THE COURT:  Mr. Schlessinger, Juror Number 29, accept

4    or reject?

5              MR. SCHLESSINGER:  Accept.

6              THE COURT:  Juror Number 29, accept or reject?

7              MR. MICHAELS:  Reject, that's my last challenge.

8              THE COURT:  Mr. Schlessinger, do you accept or reject

9    Ms. Rodriguez?

10             MR. SCHLESSINGER:  Your Honor, the Government rejects

11   Ms. Rodriguez.

12             MR. MICHAELS:  Why?

13             THE COURT:  That's why they call them peremptories,

14   Mr. Michaels.

15             Do you accept or reject Juror Number 31, Ms. Pena?

16             MR. SCHLESSINGER:  The Government rejects Ms. Pena as

17   well.

18             MR. MICHAELS:  Thank you.

19             THE COURT:  Ms. Dentone, accept or reject?

20             COURTROOM DEPUTY:  Judge, Ms. Pena was rejected.

21             THE COURT:  Yes, sir, that's Juror Number 31.

22             COURTROOM DEPUTY:  All right.

23             THE COURT:  How many challenges does Mr. Schlessinger

24   have remaining?

25             COURTROOM DEPUTY:  Judge, he's used five, got one more.

1          MR. MICHAELS:  Used five.

2          THE COURT:  One more Mr. Schlessinger, Juror Number 32?

3          MR. SCHLESSINGER:  We'll accept Juror Number 32.

4          THE COURT:  That's Juror Number 10.

5          MR. SCHLESSINGER:  We will accept Juror Number 33.

6          THE COURT:  Why do I have a note about 10:30?

7          MR. MICHAELS:  10:30 doctor's appointment.

8          MR. SCHLESSINGER:  Ms. Gonzalez, Juror Number 33, said

9    she had a doctor's appointment next Thursday at 2:30 p.m., but

10   she might be able to reschedule it.

11         THE COURT:  So, I will leave her.

12         MR. MICHAELS:  May or may not.  What happens if she's

13   not?

14         THE COURT:  We'll see, cross that bridge when we come

15   to it.

16         So she would be Juror Number 11.

17         MR. MICHAELS:  Please explain, Judge, if I may, in

18   order to be consistent, with all due respect, I'm asking the

19   Court to consider striking Number 33 since we strike everybody

20   else has a time issue.  I don't see --

21         THE COURT:  No, I haven't.  I left Ms. Rodriguez who

22   was the night shift nurse, she was a peremptory challenge.

23         Mr. Blanford, do me a favor and get Number 33 for me,

24   please.

25         COURT SECURITY OFFICER:  All right.

1          (Prospective Juror Number 33, Maria Gonzalez, entered

2     courtroom at 1:42 p.m.)

3          THE COURT:  Good afternoon, Ms. Gonzalez.  You

4     mentioned to us that you had a doctor's appointment for the

5     29th?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Is that something that's capable of being

8     rescheduled?

9          PROSPECTIVE JUROR:  I probably should have tried while

10    I was out there, I can try, I can't say for sure.

11         THE COURT:  I guess what I'm asking is if you have to

12    reschedule it, it's not something that's life-threatening

13    that's happening to you right now?

14         PROSPECTIVE JUROR:  Not life-threatening, no.

15         THE COURT:  Thank you very much.

16         (Prospective Juror Number 33, Maria Gonzalez, exited

17    courtroom at 1:42 p.m.)

18         THE COURT:  I'm leaving 33, she's 11.

19         MR. MICHAELS:  Judge, with all due respect --

20         THE COURT:  Your objection is noted for the record.

21         MR. MICHAELS:  She smiled at Mr. Schlessinger when she

22    left.

23         THE COURT:  She's just a nice lady.

24         Juror Number 36 will be Juror Number 12.  That's Mr. --

25         COURT SECURITY OFFICER:  He's still got one.

1          THE COURT:  You have one more, I'm sorry.

2          MR. SCHLESSINGER:  Yes, Your Honor, with the Court's

3     permission, we would excuse Juror 36 with our last challenge.

4          THE COURT:  Okay.  So, that means Juror Number 12 would

5     be Ms. Rodriguez.

6          MR. MICHAELS:  I move for cause.  Her brother is a

7     police officer.

8          THE COURT:  All right.  Here's our challenge.  I

9     believe Ms. Trudeau is the juror who said she thinks she may

10    have heard this case.

11         MR. MICHAELS:  You already excused her for case.

12         THE COURT:  That means no challenges.  Jurors Numbers

13    39 and 40 would be our alternates.

14         MR. MICHAELS:  I have no objection.

15         THE COURT:  Any objection?

16         MR. SCHLESSINGER:  No, Your Honor.

17         COURTROOM DEPUTY:  So Jessica Rodriguez is 12, right,

18    Judge?

19         THE COURT:  Jessica Rodriguez is 12.  Here's what I

20    have.  Just make sure everyone's notes are on the same sheet of

21    music.

22         Juror Number 1 is Ms. Martinez; Juror Number 2 is Ms.

23    Bosworth; Juror Number 3 is Ms. Chackochan; Juror Number 4 is

24    Ms. Desalines; Juror Number 5 is Ms. Garcia; Juror Number 6 is

25    Ms. Greene; Juror Number 7 is Mr.  Piedra; Juror Number 8 is

1   Ms. Yarbrough; Juror Number 9 is Mr. Presendieu, Juror Number

2   10 is Ms. Dentone; Juror Number 11 is Ms. Gonzalez; Juror

3   Number 12 is Ms. Rodriguez; Juror Number 13 is Mr. Morrow; and

4   Juror Number 14 is Mr. Buford.

5        All right.  Here's what I am going to do.  I am going

6   to bring them back.  I am going to send them to lunch until

7   3:15.  I will ask that you all by back for motions here at

8   3:15.  That gives you all time to do lunch, do your plea in

9   front of Magistrate Judge McAliley, and be here back at 3:00,

10  and we will do opening statements today.

11       All right.  Jurors, please, Mr. Blanford.

12       COURT SECURITY OFFICER:  Yes, Your Honor.

13       (Prospective jurors entered courtroom at 1:46 p.m.)

14       THE COURT:  Welcome back, ladies and gentlemen.

15  Welcome back, please, thank you for your patience.

16       Believe it or not after this, there is a lunch break.

17       Ladies and gentlemen, you may be seated.  When I call

18  your juror number, when I call your juror number, please stand.

19       Juror Number 2; Juror Number 7; Juror Number 11; Juror

20  Number 12; Juror Number 12; Juror Number 15; Juror Number 16;

21  17; 21; 25; 32; 33; 37; 39; 40.

22       If I did not call your number, if I did not call your

23  number, please return to the jury assembly room.  Please return

24  to the jury assembly room.

25       COURTROOM DEPUTY:  Take the elevators to the fifth

1    floor.

2         (Prospective juror exited courtroom at 1:49 p.m.)

3         COURT SECURITY OFFICER:  Jessica Bosworth, Juror 2;

4    Leela Chackochan, Juror 3; the third seat here; Desalines,

5    Juror 4; Daisy Garcia, Juror Number 5, take this seat; Tina

6    Greene Juror Number 6, take that seat in the front; Jorge

7    Piedra, Juror 7, take the last seat here in the first row; Ms.

8    Yarbrough, Juror Number 8, first seat in the second row; Mr.

9    Presendieu, you're Number 9, Diane Dentone, you're Juror Number

10   10; Ms. Gonzalez, Juror 11; Jessica Rodriguez, Juror 12; okay,

11   Michael Morrow, 13; and Mr. Buford, Number 14.

12        THE COURT:  Thank you very much, ladies and gentlemen,

13   we have our jury.

14        We have our jury.

15        Now, ladies and gentlemen, as I said, I was standing

16   between you and food, and I've learned not to do that.  So,

17   we're going to take a lunch break for you to have an

18   opportunity to get some food, and for the lawyers, and I to

19   finish up some work before I start.  Here are some words of

20   caution to you:

21        Whenever you're on the courthouse premises, you should

22   wear your jury tags.  The reason why that's important is that

23   everybody in the courtroom and all the lawyers know they're not

24   to have any conversation with anyone having that juror tag.

25        Now, if you go outside for lunch, just stick that in

1    your pocket or purse, and just remember to put it back on when

2    you're back in the building.  Now, once again, I want you to

3    look at the individuals seated at counsel table.  Like I said,

4    you might see them in the snack bar or the elevator or

5    something, they're going to ignore you.  They know they're not

6    supposed to have any contact with you except here in the

7    courtroom.

8          Also, if anyone outside of this courtroom tries to

9    approach you to discuss this case, please bring it to my

10   attention immediately.

11         Some other words of caution.

12         Other than telling your family or friends that you're

13   going to be on jury duty for the next few days, you're not to

14   discuss this case with anyone.

15         And by "discussing," I mean no Facebooking about it, no

16   Snapchat about it, no something that I haven't figured out what

17   it is yet that people post on the internet about cases, you are

18   not do to it.  So, everybody understands that, everything you

19   need to know about this case you'll learn in this courtroom.

20         I'm going to release you for the next hour and 15

21   minutes.  Mr. Blanford and Ivan will show you back to the jury

22   room, so you will know where to come and I will see you all

23   back.

24         Thank you very much, ladies and gentlemen, for your

25   service and I will see you in an hour and 15 minutes.  Excuse

1    me for just a moment.

2         Thank you.

3         (Jury exited courtroom at 1:53 p.m.)

4    THE COURT:  Counsel, if we stay on our timeline, we

5    should be able to get through our opening statements today.  We

6    will do your first Wednesday on witness, Mr. Schlessinger.

7    MR. SCHLESSINGER:  Your Honor, first witness drove up

8    about two hours from the Keys to be here so if it is at all

9    possible.

10   THE COURT:  Let's start it, let's start some of it.

11   MR. SCHLESSINGER:  Thank you, Your Honor.

12   THE COURT:  We will back at 3:00 to hear the motions.

13        (Lunch recess taken from 1:54 p.m. to 3:11 p.m.)

14

15   THE COURT:  Mr. Michaels, we were supposed to start at

16   3:00.

17   MR. MICHAELS:  I know, Judge.  I cannot walk.  I have a

18   hard time walking.  I went to the wrong building and then I

19   went to the right building, and I just finished the plea right

20   now.  I apologize.  I got surgery.  I apologize.

21   THE COURT:  Mr. Schlessinger, do you want to start with

22   the motions that you have under consideration?

23   MR. SCHLESSINGER:  Yes, Your Honor.

24   THE COURT:  You have one under seal.

25   MR. SCHLESSINGER:  That's correct, Your Honor.

1        We have one motion under seal, and we also have a

2    404(b) notice filed under seal.

3        THE COURT:  All right.  You may proceed.

4        MR. SCHLESSINGER:  Your Honor, with respect to the

5    motion in limine the Government's filed under seal, it's a

6    motion to exclude evidence of prior acts of -- or other acts of

7    prostitution by the minor victims in this case and also to

8    exclude evidence of other -- of their conduct that's not really

9    related to any of the acts that are at issue in the case, and

10   specifically any evidence related to their behavior, or their

11   behavioral record, or poor attitude, or things of that nature;

12   so, taking each of those things in turn:

13       First, the evidence of other acts of prostitution, that

14   is barred by Rule 412, which is the Rape Shield Statute.  Rule

15   412 -- well, it actually bars evidence of other acts of any

16   sexual behavior by a victim, subject to a few narrow

17   exceptions, none of which are applicable here.

18       The first exception is of a victim's behavior, if it's

19   offered to prove that someone besides the defendant is the

20   source of some sort of physical evidence, such as semen, or

21   physical injury, in a rape case, there's not going to be any

22   evidence of any physical evidence from the defendant, so it's

23   not applicable here.

24       The second exception will be evidence.  Evidence of

25   specific instances of a victim's sexual behavior with respect

1  to the person accused, in this case, Mr. Atkins, if it's

2  offered to prove the victim's consent.

3       So, in other words, in a case where consent is the

4  defense, the defense may be permitted to introduce evidence

5  that he had a relationship with the victim to prove that, even

6  if the sexual act occurred, it was consensual, but that's

7  applicable here because we're talking about minor victims.

8       And the third exception is just a catch-all exception

9  allowing admission of evidence of other sexual conduct by a

10 victim if that evidence -- if there be a violation of the

11 defendant's constitutional rights, if that evidence were

12 excluded.

13      THE COURT:  Here's my concern, and maybe I'm

14 overstating the case, Mr. Schlessinger.

15      The issue here is that this defendant procured these

16 individuals in order to engage in illegal sexual conduct;

17 correct?

18      MR. SCHLESSINGER:  Yes, Your Honor.

19      THE COURT:  What if, based upon -- no matter how I say

20 this, this is not going to come out right because these are

21 minors -- these are individuals who are already familiar with

22 this trade?

23      MR. SCHLESSINGER:  That's correct, Your Honor.

24      THE COURT:  That they are free to act on their own and

25 what the Government encountered was their own freelance

1   activities that had nothing to do with the defendant?

2           MR. SCHLESSINGER:  Your Honor, certainly, I think any

3   evidence that the minor victims in this case acted on their

4   own, or of their own volition, in this case would be admissible

5   for the reasons that the Court just stated.

6           THE COURT:  But if that victim was already familiar

7   with this industry -- do you understand what I'm saying?

8           MR. SCHLESSINGER:  Yes, I do, Your Honor.

9           THE COURT:  So it is not as if this person -- it's just

10  very hard to discuss this and not be insensitive.  But what if

11  you had a person, that's what they did --

12          MR. SCHLESSINGER:  Sure.

13          THE COURT:  -- they were engaged in the active business

14  of being a prostitute, whether or not they're a minor, and in

15  order to show what happened on the days and dates in the

16  indictment you have to show they were in the continuing

17  business of being a prostitute, and it had nothing to do with

18  Mr. Atkins?

19          MR. SCHLESSINGER:  Absolutely, Your Honor.  And I think

20  if this were a case in which force were charged, which is

21  sometimes charged along with these cases --

22          THE COURT:  See, I think this -- and I'm not degrading

23  the statute, but I think this statute is designed for what we

24  think of as traditional sexual offense shield laws.

25          A victim who may have a prior sexual history

1   unconnected with the defendant, meaning that person engaged in

2   sexual activities with other people in a consensual nature.  I

3   agree, that is not probative of anything.

4        What we have here, where Mr. Atkins is charged with

5   trafficking these individuals for the purpose of engaging in

6   sexual conduct; and what if these individuals were in their own

7   business, they were engaging in their business of their own

8   volition and it had nothing to do with Mr. Atkins?

9        So showing that negates the specific intent crime

10  necessary for Mr. Atkins.  Because if you view question

11  number -- Part C, "Evidence whose exclusion would violate the

12  defendant's constitutional rights."

13       And one of the constitutional rights here is the

14  Government has to prove his specific intent in order to -- in

15  order to sustain their burden of proof.  But if he wants to

16  rebut the fact that you haven't proved it, if you present this

17  case in a silo that only what happened on the days in question

18  in this indictment, then Mr. Atkins has no ability to rebut the

19  Government's specific intent nature of this crime.

20       So what I'm trying to figure out is how do you fashion

21  a way for an effective - either presentation by your case in

22  chief or by the defense on cross - for these individuals who

23  were already actively engaged in the business of prostitution,

24  and it had nothing to do with Mr. Michaels -- I mean, not

25  Mr. Michaels -- Mr. Atkins on that day --

1            MR. MICHAELS:  That's okay, Judge.

2            THE COURT:  -- their paths just happened to cross while

3    they were already in this business?

4            MR. SCHLESSINGER:  I understand the Court's position

5    entirely.  I think the evidence, if it were to come in on some

6    of the other acts of prostitution are going to be not sort of

7    continuous with the acts in this case, there are other

8    completely discreet and separate-in-time acts that have really

9    nothing to do with the acts charged in this case.

10           THE COURT:  So how do we make that distinction?  How do

11   we get a distinction where Mr. Atkins is allowed full and

12   complete cross-examination, but we don't have a blame the

13   victim scenario, which is what I think this rule was originally

14   designed for?

15           The mere fact that you have a sexual past does not

16   prevent you from being involved in non-consensual sexual

17   contact.  So here, we may have individuals who were already

18   engaged in this business whose paths just crossed with Mr.

19   Atkins.  So how do we do this?

20           MR. SCHLESSINGER:  Your Honor, I think that it would be

21   certainly permissible and within the scope of the rule to limit

22   Mr. Atkins' cross-examination about prostitution by the victims

23   to the time period that's alleged in the indictment.

24           THE COURT:  So the time period in the indictment is

25   from on or around July 2014 to September 2014?

1          MR. SCHLESSINGER:  Yes, Your Honor.  That's the period

2     in which Mr. Atkins is alleged to have trafficked the minor

3     victims in the case, and so certainly he can ask about anything

4     that --

5          THE COURT:  So what if in June -- May and June they

6     were already engaged in this, this was their business, like I

7     said, I know it's hard to discuss this when we're talking about

8     individuals of this age, but they're already engaged in this

9     business.  They're engaged in it in May, they're engaged in it

10    in July, they're engaged in it in September, and Mr. Atkins

11    crosses paths with these individuals at the time that they're

12    already -- I mean, if you think of it in terms of normal

13    conspiracy law, I just happen to rent a hotel room to a person

14    for a drug deal.  It doesn't mean I'm the drug dealer.  My life

15    and their conspiracy just happened to cross, but I agree that

16    just some wholesale exploration of this victim's sexual past is

17    inappropriate.

18         MR. SCHLESSINGER:  What I highlight for the Court to

19    point out is even if it really -- I don't think it's necessary

20    to protect the defendant's constitutional rights, it's not even

21    an offense to the charges in the indictment, if the victims or

22    one of the victims or any of them were engaged in prostitution

23    previously or subsequently --

24         THE COURT:  And I don't know all the facts.  These

25    young ladies were staying at a facility where Mr. Atkins

1    worked; correct?

2          MR. SCHLESSINGER:  Yes, Your Honor.  And at some point

3    in time they left and went some other place in order to engage

4    in prostitution?

5          MR. SCHLESSINGER:  That's correct, Your Honor, yes.

6          THE COURT:  And I am assuming the Government's theory

7    is that Mr. Atkins encouraged them or facilitated them being

8    able to be engaged in this business.

9          MR. SCHLESSINGER:  Yes, Your Honor.

10         THE COURT:  So, let's say they are already engaged in

11   this action, this is what they were doing, regardless of age,

12   let's just say it like that, Mr. Atkins gives A or B a ride to

13   someplace.  So, he didn't facilitate, he might be wrong in some

14   sort of regulatory way with his job, but he didn't facilitate

15   them in the act of prostitution.

16         Yes, I'm wrong for taking people who were supposed to

17   be under my care and letting them run away, that's a bad job,

18   that might be another crime.  But did he take them from the

19   facility in order to engage them in prostitution?

20         MR. SCHLESSINGER:  Well, Your Honor certainly is

21   correct, if he did not know that they would be cooperative or

22   at least recklessly disregard the possibility that they would

23   be called to engage in prostitution, then that would be a

24   defense, and Mr. Atkins is certainly free to argue that he did

25   not know they would be caused to engage in prosecution.

1          But even mounting that defense, to say he did not know

2     that was the purpose of his transportation of them in no way

3     requires him to produce evidence of the fact that the victims

4     at some other times engaged in prostitution.

5          In fact, it would actually counteract his defense

6     because to the extent that they did engage in prostitution at

7     some other time, it could only serve to put them on --

8          THE COURT:  No, no.  What the jury is, is they are

9     going to get a picture -- I'm trying so hard not to be

10    insensitive -- they're going to get a picture of someone who

11    they might perceive of as the typical young lady this age.

12         So, you say to yourself, this is all the stuff that

13    happened, but that's not.  So, that somehow in -- Mr. Michaels?

14         MR. MICHAELS:  Judge, I believe, if I may, you framed

15    the issue correctly, you nailed it.  The Government cannot have

16    its cake and eat it, too.  These girls are prostitutes, that's

17    what they are, regardless of their age, they're prostitute

18    before.

19         By the way, I've tried these type of cases before, and

20    I believe, based on previous rulings I got from different

21    courts, that you're right also in the fact that the sex -- the

22    rule that he's talking about, the victims' prior sexual

23    activity, that's in the context of sex battery.

24         The law was in the context of not human trafficking.

25    The law was made in the context is just because I have sex with

1    20 guys before I meet you doesn't mean that gives you the right

2    to rape me.

3            Just because I am loose with my morals or I go out

4    every night and get -- I get -- I have sex with different

5    people, minor or not, it doesn't matter, doesn't give you, the

6    defendant, the right to come and rape me.  That's the purpose

7    of the law.  That's why they call it "shield," to protect the

8    victim of sex battery, of violent sexual acts, from putting

9    them on trial, for humiliating them and bringing their sexual

10   past.

11           But that's not the charge here.

12           The Government claimed that my client is in human

13   trafficking.  I cannot mount a defense -- I cannot represent my

14   client without being allowed to tell this jury the truth about

15   these little prostitutes.  That's what they are.  And they're

16   engaged in prostitution before.

17           You may -- I'm not going to be nice to them, I can tell

18   you right now.  Because they're lying, they're prostitutes and

19   my only defense to this case is just that.  My client have no

20   connection, did not encourage them because they are already

21   doing prostitution.  He did not know that they were doing

22   prostitution before, he doesn't know if they're doing

23   prostitution after.

24           Is the co-defendant -- does the Government went to bed

25   with Sandra Simon, who was already prosecuted in State Court

1   for human trafficking, who was already convicted of human

2   trafficking, he's on probation at the time of this crime and

3   she's the one who takes these girls from motel to motel to

4   motel and prostitute them, and then they end up with two other

5   pimps in Tampa.

6        My client has nothing to do with this.  This case

7   should not go as far as it went.  My client had one meeting

8   with them, he dropped them where they were told -- and like you

9   said yourself, and that's exactly what I'm going to advise to

10  the jury, maybe it violate some kind of statute or rule --

11  maybe you're supposed to take them back, maybe a smarter man

12  than my client would have called the police, maybe, because

13  they've run away.  These victims are victims of a society of

14  their upbringing, and what they are doing here is finding a

15  scapegoat, and that's wrong.

16       The scapegoat, it doesn't modify the society who lives

17  in the drugs, the lack of education, the socioeconomic

18  condition that these girls are raised in.  That's what the

19  focus of the Government should be, not on prosecuting this guy

20  who matters one time only, and they prostituted for months

21  before and after.

22       The only reason that they're prosecuting him is because

23  he happened to work there, and that's the only reason.  And he

24  had the chance to -- what, bring them back to the shelter, then

25  they're to run the next day.  The shelter is not mandatory, the

1   shelter cannot lock these people up.  They have the right to

2   walk in and out of the shelter.  According to my investigation,

3   this is not a locked facility.  They are free to do whatever

4   they want.

5        And that's what they did.  That's all.

6        But if I cannot bring to the -- these girls are in this

7   position and they're already engaged in prostitution before

8   they met my client.  They don't need encouragement.  They don't

9   need my client to show them the path to perdition.  They

10  already doing what the Government tried to say my client teach

11  them to do, which is not true.  I have to be allowed to

12  cross-examine them.

13       In the past, I always was allowed to cross-examine

14  these alleged victims for their prostitution past; not sexual

15  activity.  I don't care who they slept with and how they sleep

16  and what their sexual preferences are, that's not I'm going to

17  cross-examine on.

18       And like I said before, the law protects victim of sex

19  battery, they do not charge that, the statute is human

20  trafficking, and not allowing me to argue that you might as

21  well find my client guilty now, because without a defense I

22  have no defense.

23       THE COURT:  Hold on for just a second, please.  The

24  language talks about, and I'm talking about (b)(1)(c):

25       "Evidence of specific instances of conduct may not be

1    excluded if the result would be to deny the criminal defendant

2    the protections afforded by the constitution.

3         "For example, statements in which the victim has

4    expressed an interest to have sex with the first person

5    encountered on a particular occasion might not be excluded

6    without violating the due process right of a rape victim

7    seeking to prove consent.

8         "Recognition of the basic principle was expressed in

9    (b)(1) of the original rule where the United States Supreme

10   Court has recognized in various circumstances a defendant may

11   have the right to introduce evidence otherwise precluded by an

12   evidence rule under the confrontation clause.

13        "The balancing test requires the proponent of the

14   evidence to convince the Court that the probative value of the

15   evidence substantially outweighs the danger of harm to any

16   victim and of unfair prejudice to any party."

17        Mr. Schlessinger, what is the time period involved

18   where the individual witnesses in this case were engaged in

19   prostitution prior to the acts alleged in the indictment?

20        MR. SCHLESSINGER:  As to the minor victims, it's only

21   one of the two minor victims; the other minor victim was not

22   involved in prostitution before or afterwards.

23        With respect to the minor victim who was involved in

24   prostitution --

25        THE COURT:  Well, any acts of prostitution, if the

1    victim was not engaged in prostitution before this time and

2    they are engaged in prostitution now, my ruling would be that's

3    inadmissible.

4          MR. MICHAELS:  Admissible.

5          THE COURT:  If there was no evidence that an individual

6    witness was engaged in prostitution before July 2014, the fact

7    that they're engaged in prostitution after September 10th would

8    not be admissible.

9          MR. SCHLESSINGER:  As to this victim, Your Honor, there

10   would be evidence --

11         MR. MICHAELS:  Well, September 9th, Judge, my client

12   was taken into custody, and assuming for a second --

13         THE COURT:  Okay, what I'm saying is, you have that

14   period in September.  If they were not engaged in prostitution

15   as of July 2014 --

16         MR. MICHAELS:  My position is that they were, both of

17   them.

18         THE COURT:  Wait.  Would you let me finish?

19         MR. MICHAELS:  Okay.  I'm sorry.

20         THE COURT:  If there was evidence that they were not

21   engaged in prostitution prior to July 10th -- excuse me -- July

22   2014, the fact that they're engaged in prostitution afterwards

23   is inadmissible.  He's in custody, he has nothing to do with

24   it, they're traveling their own path by that time.

25         So unless there's some evidence showing before July,

1    anything after September is inadmissible.

2          MR. MICHAELS:  My position is this:

3          The Government already agrees that one of the two minor

4    was engaged in prostitution prior.  They denied that the second

5    one, the 15-year-old, was not until much later.  I'm not

6    agreeing with that.  I take the stipulation under one --

7          THE COURT:  If you have evidence that we can take up

8    outside the presence of the jury to show that Mr. Schlessinger

9    is incorrect, I will hear you out.

10          MR. MICHAELS:  I have the right -- my position is this,

11    Judge, with all due respect on behalf of my client.

12          THE COURT:  Normally, you can -- wait, wait.

13          MR. MICHAELS:  But I have to cross-examine, I have to

14    cross-examine them, Judge.

15          THE COURT:  You need to tell me before you ask one of

16    these young ladies this question that you have a good faith

17    basis for asking it.  If this was a different subject, I would

18    allow you total free reign, but I'm going to require you to

19    tell me why you think they were engaged in prostitution prior

20    to July 2014.

21          MR. MICHAELS:  One of them was engaged --

22          THE COURT:  Where Mr. Schlessinger has not already told

23    you.  He has already admitted as to one of the victims --

24          MR. MICHAELS:  Right.

25          THE COURT:  -- that that individual was.

1          MR. MICHAELS:  Right.

2          THE COURT:  I will allow you certain inquiry as to that

3     victim, you already know it.

4          MR. MICHAELS:  Right.

5          THE COURT:  For victim -- the person I'm just calling

6     victim number two, before you go down that path with that

7     victim, outside the presence of the jury, you need to give me a

8     foundation.

9          MR. MICHAELS:  I'll try to find this.

10         THE COURT:  All right.

11         MR. MICHAELS:  Now the problem is the following:

12    She -- victim number two, call her, which is the 15-year-old,

13    there is victim number one, is a 16-year-old so everybody's

14    clear, I believe for clarification.  Victim number two would be

15    the 15-year-old.  She was arrested prostituting in Tampa while

16    my client is in custody here.  She obviously is doing that on

17    her own.  Why am I not allowed to show the jury that this --

18         THE COURT:  It's after.

19         MR. MICHAELS:  But she's the prostitute.  Whenever she

20    started, it's irrelevant.  The point is that he is not

21    benefitting from the prostitution.  He's charged for a month's

22    prostitution.  He's in custody.

23         THE COURT:  Unless you can show for the time period

24    before that she was engaged in prostitution, it's excluded.

25         MR. MICHAELS:  I object to that, obviously, because

1    I --

2          THE COURT:  Well, I think that the period before your

3    client encounters her and I'm just using your scenario, I'm not

4    agreeing with either side, that he encounters these young

5    women, unbeknownst to him who's engaged in this lifestyle.

6          MR. MICHAELS:  That's correct.

7          THE COURT:  He may transport her, he may give her some

8    aid or assistance that he shouldn't be doing.

9          MR. MICHAELS:  Why not --

10         THE COURT:  But wait, not for purposes of having her go

11   into prostitution.  She was already in that business.

12         MR. MICHAELS:  But she -- but why not help her, let her

13   in the middle of the night on U.S. 1 to get raped?

14         THE COURT:  That's why I'm saying that that is

15   admissible, before.  But anything that she's done after for a

16   person that you have no known idea about what she was doing or

17   no evidence, that's out.

18         MR. MICHAELS:  The only problem -- I'm not going to

19   argue.  I want to make a point.  My -- I don't have the

20   indictment in front of me, I need to find it somewhere here.

21   My client is charged with a month, I believe -- thank you --

22         THE COURT:  July through September.

23         MR. MICHAELS:  Okay.  July through September.

24         Okay.  Yeah, yeah.  July through September.  Right,

25   right.

1          THE COURT:  So, anything before July that's

2     prostitution, but after he's in custody he has no relation to

3     her.

4          MR. MICHAELS:  Can I have a second, please?

5          (Brief pause).

6          MR. MICHAELS:  That's not what she's talking about now,

7     I don't think you understand.

8          THE COURT:  So everybody understands what I'm talking

9     about?

10         MR. MICHAELS:  So you're not going to allow me to

11    mention the fact that she's running as a prostitute --

12         THE COURT:  Now?

13         MR. MICHAELS:  -- after September 10th?

14         THE COURT:  No, because it's not connected to him.

15    It's irrelevant to this.  If she was doing it before -- if you

16    got evidence that she was engaged --

17         MR. MICHAELS:  Before July.

18         THE COURT:  -- in this lifestyle before July 2014 on

19    her own --

20         MR. MICHAELS:  Okay.  All right.

21         THE COURT:  -- or with some other conspirator, but --

22         MR. MICHAELS:  But I can do with other one who was

23    obviously involved before.

24         THE COURT:  If you -- Mr. Schlessinger has said there

25    is one that he believes there is no good faith basis for asking

1    that question.

2              Before you can ask her in front of the jury, you need

3    to lay a foundation with me.  All right.

4              What's the next one, Mr. Schlessinger?

5              MR. SCHLESSINGER:  Well, the Government has also

6    filed --

7              THE COURT:  So as to the Government's motion in limine

8    to exclude evidence of victims' unrelated acts of prostitution,

9    it's granted in part and denied in part.

10             MR. SCHLESSINGER:  I understand, Your Honor.  Thank

11   you.

12             The Government's also filed 404(b), an inextricably

13   intertwined notice with respect to really kind of two other

14   categories of evidence.  One, it pertains to the defendant

15   actually engaging in sex acts with the minor victims in the

16   case, and the other pertains to the defendant also trafficking

17   other victims, one of whom who were not charged victims because

18   by the time they were working as prostitutes for Mr. Atkins

19   they had turned 18, but one of whom the defendant also met at

20   the Florida Keys Children Shelter, as he did the two minor

21   victims.

22             THE COURT:  So are you saying that you want to

23   introduce evidence of him having sexual relations with one of

24   the witnesses or another person?

25             MR. SCHLESSINGER:  Yes.  With four of -- with all four

1    of the victims in this case.

2           MR. MICHAELS:  So, she's sexually active, that means he

3    needs to be hanged?  I don't get it.  What in the world does

4    that to do with the trafficking?  Nothing.

5           The 404(b) have nothing to do with the crime charged,

6    zero.  He has sex with four ladies, maybe he has sex with 40 of

7    them, big deal.  So, he's a -- whatever he is, I don't know,

8    Casanova, whatever, what makes the difference?  How is this

9    relevant to trafficking, the 404?

10          THE COURT:  Wait, wait, wait.  Let me ask this question

11   of Mr. Schlessinger.

12          Mr. Schlessinger, at the time that these sex acts

13   occurred is your client in the position -- not your client --

14   is the defendant in the position that he was in July, August

15   and September?

16          MR. SCHLESSINGER:  Yes.

17          THE COURT:  So he knew that the ladies that he was

18   having sexual relationships with were underage?

19          MR. SCHLESSINGER:  Yes.

20          MR. MICHAELS:  So what?  That's a different crime.

21   That's an L&L, lewd and lascivious act.  That's proof of bad

22   character.

23          THE COURT:  Mr. Michaels, slow down.

24          MR. MICHAELS:  I'm sorry, Judge.  I'm sorry, I'm trying

25   to --

1          THE COURT:  I understand that you're vigorously

2    representing your client, but calm down.

3          MR. MICHAELS:  Okay.

4          THE COURT:  All right.  Mr. Schlessinger, what does

5    that prove?  He's a bad person, he shouldn't be having sex with

6    underage girls?

7          MR. SCHLESSINGER:  No.

8          THE COURT:  And how old are the girls at the time?

9          MR. SCHLESSINGER:  Fifteen and 16.

10         THE COURT:  How old was Mr. Atkins at the time?

11         MR. SCHLESSINGER:  Almost 28, just shy of 28.

12         THE COURT:  Now, the facility that Mr. Atkins was

13   involved with, was it specifically for the purpose of housing

14   minors?

15         MR. SCHLESSINGER:  Yes.  Eighteen is the maximum age.

16   You age out at 18.

17         MR. MICHAELS:  First of all, he did not have sex with

18   any minor, that's our position.  But, let's assuming arguendo

19   that he did.  The 404(b) alleged another crime which is lewd

20   and lascivious, the state attorney already arrested him for

21   different charges, and they let him go.  They dropped all the

22   charges.  The statute of limitations didn't run.

23         THE COURT:  Would it be fair to say, Mr. Schlessinger,

24   that your introduction of the other sexual activities is almost

25   what is considered in this area of the law as grooming?

1            MR. SCHLESSINGER:  As grooming?

2            THE COURT:  Meaning, I now have a person who is

3     emotionally, as well as physically attached to me so that when

4     I ask them to continue to engage in this other conduct, it is

5     the person who is doing it as part of our relationship?

6            MR. SCHLESSINGER:  Yes, and, in fact, to give some

7     factual -- a little bit of additional factual context to this,

8     the sex acts that we're talking about occurred on the night of

9     Mr. Atkins' picking up the girls from the shelter.  As to one

10    of the girls, he told the minor that she would be tested and it

11    was part of a testing process by where she had to pass the test

12    in order to qualify to work for him as a prostitute.

13           So it really -- it's not even an other sex act, it

14    really could not possibly be more inextricably intertwined,

15    it's happening literally while the defendant is spiriting them

16    away from the shelter to --

17           THE COURT:  That I will allow.  Anything else?

18           MR. MICHAELS:  That has nothing to do with 404(b), that

19    has to do with the victim.

20           THE COURT:  He said inextricably intertwined.

21           MR. MICHAELS:  No, he's talking now about one of

22    the victim -- he's talking about victim number two who's going

23    to come and testify to that.

24           THE COURT:  Right, and he does not want that excluded.

25           MR. MICHAELS:  I didn't think that should be excluded

1    either.

2              THE COURT:  So, you're on the same sheet of music.

3              MR. MICHAELS:  But I don't like it, but that's not

4    404(b).  I'm not sure what he's talking about.  Now I'm lost.

5              THE COURT:  What's the next thing, Mr. Schlessinger?

6              MR. SCHLESSINGER:  In addition to that, the 15-year-old

7    victim also engaged in sexual activity with Mr. Atkins sometime

8    prior to being taken away from the shelter and certainly --

9              THE COURT:  Is it during this period of the conspiracy?

10             MR. MICHAELS:  They don't know.  They have no idea.

11             THE COURT:  Well, let's see if we can find out,

12   Mr. Michaels.

13             MR. SCHLESSINGER:  Your Honor, it is going to be within

14   the period of the conspiracy which begins in July.  I don't

15   know if anybody's recorded an exact date when that occurred,

16   but it is going to be within --

17             THE COURT:  Put that on your sidebar and notes to give

18   me an answer to that before I make a definitive ruling as to

19   that contact.

20             MR. MICHAELS:  That's objectionable --

21             THE COURT:  I just said I'm holding it.

22             MR. MICHAELS:  All right.

23             THE COURT:  What's next, Mr. Schlessinger?

24             MR. SCHLESSINGER:  There's also going to be evidence of

25   sexual contact between Mr. Atkins and another victim, a

1    child -- another child who he met at the children's shelter

2    when she was 17 with whom he engaged in sex at the shelter when

3    she was 17, but who very shortly later turned 18 and then also

4    began working for Mr. Atkins as a prostitute, in the course of

5    which Mr. Atkins engaged in forcible sex with her.

6          THE COURT:  And is this during the time period of the

7    conspiracy?

8          MR. SCHLESSINGER:  It's in exactly the same time that

9    Mr. Atkins is prostituting the minors, in the same area and

10   involving some of the same people, including, for example, the

11   co-defendant, Ms. Simon.

12         MR. MICHAELS:  What?

13         THE COURT:  Basically, what he's saying is, he's

14   introducing this information to show not that your client acted

15   in conformity, but to show with these other incidents, he knows

16   better.  Absence of mistake, plan, the typical 404 bad acts

17   type of testimony is what he's saying he wants to introduce

18   here; that this is showing intent.  He's using it to show

19   intent.  Your client was involved in other activities with

20   minors, therefore, he knows this is wrong.  This was not by

21   accident.

22         MR. MICHAELS:  His 404(b), which is written, a written

23   motion, which I read, doesn't mention anything about

24   prostitution.  He's making this up as he goes along because he

25   feels that the rulings are going against him.  His 404(b) --

 1            THE COURT:  Can you tell me what page in your motion,

 2    Mr. Schlessinger, where you discuss this?

 3            MR. MICHAELS:  Thank you.

 4            MR. SCHLESSINGER:  Yes, Your Honor.  The bottom of

 5    page five of the sealed filing filed September 22, 2015.

 6    Similarly, the evidence of the defendant's prostitution of J.H.

 7    and N.L., two adult victims, J.H. is the victim who Mr. Atkins

 8    met at the shelter that I just described, is admissible as

 9    inextricably intertwined, and it goes on from there.  It's the

10    bottom of the page five.

11            MR. MICHAELS:  Adult victims, not minor.

12            THE COURT:  But they started when they were children.

13            MR. MICHAELS:  That's not what they put in the motion.

14            THE COURT:  That portion --

15            MR. SCHLESSINGER:  J.H. did not start when they were --

16    J.H. met Mr. Atkins when she was a child and had sex with him

17    when she was a child.  Shortly after she became 18, they

18    maintained a relationship, she and N.L. started working for him

19    as prostitutes.

20            MR. MICHAELS:  Even if you believe that, even I went

21    assuming that these are true facts, which they're not, but

22    assuming that they are, he just told you, Mr. Schlessinger just

23    mentioned he did not try to prostitute them while they were

24    minors.

25            If anything, but I don't want to argue that to the

1   jury, if anything it shows that he doesn't want to prostitute

2   minors.  How is this proof of not by accident?

3          If he was having sex -- my client --

4          THE COURT:  He's having sex with these individuals.

5          MR. MICHAELS:  With a minor, but doesn't try to

6   prostitute her, denies exactly the argument, the fact that she

7   become an adult, assuming what they say is true because I have

8   letters from her showing different stories, but assuming that

9   what she said is true, he prostitute her allegedly when she

10  became an adult because he did not want to prostitute her when

11  she was a minor and he could have, so, if anything, it's

12  exactly the opposite effect of what they're trying to achieve,

13  but the indicia --

14          THE COURT:  Mr. Schlessinger, I am going to allow that

15  as to that individual victim.

16          MR. SCHLESSINGER:  Thank you, Your Honor.  It's

17  actually -- there's actually a fourth adult victim whom the

18  defendant met through that victim who came with that third

19  victim and prostituted with them and we would --

20          THE COURT:  Was she an adult at the time?

21          MR. SCHLESSINGER:  She was.  Yeah, she was.

22          THE COURT:  But he did not meet her while she was a

23  minor?

24          MR. SCHLESSINGER:  No.

25          THE COURT:  That one I will exclude.  All right.  You

1    can talk about what goes, that they met and they end up

2    somewhere else, but -- all right.  Anything else,

3    Mr. Schlessinger?

4         MR. SCHLESSINGER:  That's all from the Government.  I

5    know that Mr. Michaels this morning filed a motion to suppress,

6    and I don't know if that's still pending or not.

7         THE COURT:  Well, I do have Mr. Michaels' motion to

8    suppress that was filed this morning, way out of time, for

9    which there is no reason for, and as I said this morning, I'm

10   going to strike it.

11        We've had plenty of time, including last week at

12   calendar call, for Mr. Michaels to say, Judge, give me a

13   hearing on this, give me a head's up.

14        MR. MICHAELS:  Okay, Judge.  I got it.

15        THE COURT:  All right.  Can we bring our jury in,

16   please?

17        COURT SECURITY OFFICER:  All rise.

18        MR. SCHLESSINGER:  I'm sorry, Judge, we would like to

19   invoke the rule at this time.

20        THE COURT:  That's right.  Anyone that's going to

21   testify in this case, if you are going to testify, you need to

22   step outside the courtroom now.  If you fail to do so, your

23   testimony may be excluded at a later date.

24        (Jury entered courtroom at 3:51 p.m.)

25        MR. MICHAELS:  Can I have a second, please, Judge?

1          THE COURT:  Welcome back, ladies and gentlemen.  Please

2   remain standing.

3          COURTROOM DEPUTY:  Jurors, I'm going to ask you to

4   please raise your right hands to be sworn.

5          Do you swear or affirm that you will well and truly try

6   the issues in the case before this Court and render a true

7   verdict according to the law and the evidence given to you by

8   this Court, so help you God?

9          THE JURY:  (Collectively) I do.

10          COURTROOM DEPUTY:  Thank you.

11          THE COURT:  Thank you very much, ladies and gentlemen.

12   You may be seated.

13          Members of the jury, now that you have been sworn, I

14   will give you some preliminary instructions to guide you as we

15   go through this trial.

16          It will be your duty to decide what the evidence is in

17   this case -- the facts from the evidence in this case.

18          You, and you alone, will be the judges of the facts.

19   You will then have to apply to those facts the law that I will

20   give you later in the case.  Those are called your

21   instructions.

22          Nothing that I say during the course of the trial is

23   indicated or be taking to you as indicating what your verdict

24   should be.  The evidence from which you will find the facts

25   will consist of the testimony of witnesses, documents and other

1    things received into the record as exhibits, and any facts the

2    lawyers agree on or that I instruct you to find.

3           Now, certain things are not evidence and must not be

4    considered by you.  The statements, arguments and questions by

5    the attorneys aren't evidence.  Objections to the questions

6    aren't evidence.  The lawyers have an obligation and a right to

7    make objections to the evidence that they believe is improper.

8           You should not be influenced by the objection or my

9    ruling on it.  So if I "sustain" an objection, that means you

10   are to ignore the question.  If I "overrule" the question, you

11   are to treat the answer to that question like any other.

12          If you are instructed that some portion of evidence is

13   introduced for a limited purpose, you must follow that

14   instruction.

15          The testimony that I have told you to exclude for some

16   reason, you must follow that instruction.

17          And as I told you earlier, anything you see or hear

18   outside of this courtroom is excluded.

19          Now, there are two kinds of evidence; direct and

20   circumstantial evidence.  Direct evidence is direct proof of a

21   fact, such as the testimony of an eyewitness.

22          Circumstantial evidence is proof of facts from which

23   you may infer or conclude that something else exists.  Now I'll

24   give you further instructions on this alone.

25          So, for example, if you don't see that it's raining but

1    you go outside in the morning and the lawn is wet and the

2    sidewalk is wet, that would be circumstantial evidence that it

3    had rained.

4         Now, it will be up to you to decide which witnesses to

5    believe, which witnesses not to believe and how much of any

6    witness's testimony to accept or reject, and I'll give some

7    guidelines for that before you begin your deliberations.

8         Now, as I told you early on, this is a criminal case

9    and there are certain things you must keep in mind.  First, the

10   defendant sits here today and starts out presumed to be

11   innocent.

12        The indictment or information against the defendant is

13   only an accusation, nothing more.  The defendant, therefore,

14   starts out and sits here this afternoon with a clean slate.

15        Second, the burden of proof is on the Government until

16   the very end of the case.  The defendant has no burden to prove

17   his or her innocence or to present any evidence or to testify.

18        And since the defendant has a right to remain silent,

19   the law prohibits you from arriving at your verdict by

20   considering whether or not the defendant testified.

21        And third, the Government must prove the defendant's

22   guilt beyond a reasonable doubt and I will also give you some

23   instructions on that later on in the case.

24        Now, ladies and gentlemen, as I told you before, this

25   defendant is charged with the following crimes:

1       First, with conspiracy to engage in child sex

2  trafficking.

3       The Government must prove that two or more persons in

4  some way or manner agreed or tried to accomplish a common and

5  unlawful plan to recruit an individual who had not attained the

6  age of 18, and would be a cause to engage in commercial sex

7  acts as described further in the indictment.

8       Now, as to Counts 2 and 3, sex trafficking of children,

9  the Government must prove the following:

10      That the defendant knowingly recruited, enticed

11 harbored or transported a person named in the count or in the

12 indictment to engage in a sex act before they attained the age

13 of 18.

14      Those are the crimes that the defendant is charged with

15 in this case, and I will give you further instructions on that

16 later.

17      Now, ladies and gentlemen, this will be the order of

18 trial.  First, the Government will have an opportunity to

19 present their opening statement.

20      Now, the opening statement isn't evidence.

21      It's the opportunity for the Government to give you an

22 outline of what this case is about.

23      Second, if the defendant chooses, remember, he has no

24 burden in this case, he may give an opening statement through

25 his attorney.

1          After the opening statements, counsel for the United

2     States will call their first witness and the defendant may

3     cross-examine that witness.

4          At the conclusion of that -- at the conclusion of the

5     Government's case, we may or may not go to your deliberations

6     depending on what else happens in the trial.

7          Remember, and I caution you throughout, as the

8     defendant sits here today, he starts out and sits with a clean

9     slate.

10         Counsel for the United States, your opening statement,

11    please.

12         MR. SCHLESSINGER:  Thank you, Your Honor.

13         May I use the hand-held microphone?

14         THE COURT:  You may.  Let me just make sure that I have

15    turned it on.  It should be on, Mr. Blanford.

16              OPENING STATEMENT BY THE GOVERNMENT

17         MR. SCHLESSINGER:  May it please the Court and counsel

18    for the defendant, Mr. Atkins.

19         Ladies and gentlemen, this is a case about trust.  It's

20    about a trust that was placed in this man, the defendant, Ricky

21    Jermaine Atkins.  A man who worked for years as a staff member

22    at the Florida Keys Children's Shelter.  It's a residential

23    facility for troubled and vulnerable children under 18.  It's

24    about the most basic and fundamental responsibility that this

25    man had to those children as an employee of that children's

1    shelter.

2           A man who was a mentor, a staff mentor at the time of

3    these events leading to this indictment working, the night

4    shift at the children's center, and it's about Mr. Atkins'

5    calculated decision to flagrantly violate and abuse that trust

6    by providing children --

7           MR. MICHAELS:  Objection, Your Honor.  That's a

8    closing.

9           THE COURT:  Objection overruled.

10          MR. SCHLESSINGER:  -- by providing children from the

11   children's shelter, girls with whose safety and security he was

12   entrusted, for commercial sex.

13          His decision to rent out the bodies of those children

14   to anybody who would pay.

15          You're going to hear that in August of last year, while

16   Mr. Atkins was at work at the children's shelter, he spoke to

17   two girls who were roommates at the shelter.  The girls are

18   G.W., who was 15 years old at that time, and L.P., who was 16

19   years old at that time, and he talked to them, although he was

20   a staff member, about running away from the shelter.  And what

21   Mr. Atkins told them was that they should run away and they

22   should run away at night on a Friday night when he wasn't

23   working.

24          After they ran away, they should call Mr. Atkins, they

25   should call him from the street in the middle of the night and

1   he would pick then up from Tavernier, and he would drive them

2   up north to the Homestead area.

3          And after Mr. Atkins, the staff member, made that plan

4   with G.W. and L.P., on the night of August 15th, 2014, at about

5   11:00 at night, G.W. and L.P. did run away from the shelter.

6          They took nothing with them except for some clothes.

7   They had no money, no phone, no ID.

8          You're going to hear what happened directly from them,

9   they're going to take that witness stand and explain everything

10  to you.  Through the darkness of the night, they walked along

11  Old Highway, old U.S. 1 in Tavernier.  They stopped at a

12  friend's house to borrow a cell phone to call Mr. Atkins and

13  tell him that they had run away and they were ready to be

14  picked up by him.

15         Ultimately, they found their way to the back parking

16  lot of a commercial fitness center in Tavernier called Froggy's

17  Fitness.  There another person, a person G.W. and L.P. knew as

18  a homeless person, happened to be walking by, he had a

19  telephone that they borrowed again to call Mr. Atkins and let

20  him know, again, exactly where they were and, sure enough, by

21  this time, about 1:30 in the morning, Mr. Atkins drove down in

22  his silver Nissan Murano, he picked up G.W. and L.P. from the

23  Froggy's Fitness in Tavernier, and started driving them north

24  towards Homestead.

25         Once Mr. Atkins had the girls in his car, Mr. Atkins

1    then started to explain to G.W. and L.P., in more detail, more

2    directly what it was exactly they would be doing for Mr.

3    Atkins.

4         Mr. Atkins explained to the 15 and 16-year-old

5    children's shelter clients who were in his car, that from then

6    on they would be working for him as prostitutes.  He told them

7    he was going to take them to a woman who he described as his

8    cousin, Sandra Simon, who would supervise their work at a

9    hotel, who would arrange their prostitution dates, would

10   collect their earnings that they made from prostitution to be

11   delivered to him.

12        He told them they were going to make a ton of money,

13   enough to buy him a car, a red sports car that they would all

14   go joyriding in.

15        But before Mr. Atkins delivered G.W. and L.P. to Sandra

16   Simon's hotel room, he had some additional plans for G.W. and

17   L.P.

18        Mr. Simon (sic) took them to an area outside a

19   nightclub in Homestead, by this time, two, three in the

20   morning.  There, they met up with several of Mr. Atkins' adult

21   male associates who came out of the nightclub.

22        The whole group traveled together to an apartment in

23   Homestead, and in that apartment in Homestead Mr. Atkins told

24   G.W., the 15-year-old girl, something.  He told her, "you're

25   going to now be tested."  And when G.W. was lead inside the

1    house, she learned what the testing was and the testing was

2    that G.W. was required to engage in sex with three of Mr.

3    Atkins' adult friends, which she did.

4         While G.W. was being tested in that way, Mr. Atkins was

5    downstairs engaging in sexual intercourse with L.P., the

6    16-year-old.

7         Mr. Atkins then came back upstairs in the house and

8    instructed G.W., the 15-year-old, to perform oral sex on him,

9    which she did.

10        That grim initiation, having been completed at the

11   apartment in Homestead, the defendant left the Homestead

12   apartment.  Mr. Atkins took G.W. and L.P. now north on the

13   Turnpike driving north in his Nissan Murano, to the Cutler Bay

14   area where the Motel 6 was where Sandra Simon, the person he

15   had represented as his cousin, was waiting.

16        The defendant set G.W. and L.P. inside this Motel 6

17   hotel room where Ms. Simon was.  Now, why did the defendant

18   bring Sandra Simon into this?  How did she figure into his

19   plan?

20        Well, you're going to hear that as the defendant knew

21   very, very well, Ms. Simon, an adult, although several years

22   younger than Mr. Atkins, had been working as a prostitute for a

23   long time.  In fact, sometime prior to August 2014 when this

24   occurred, Mr. Atkins and Ms. Simon had developed a very, very

25   close relationship, simply to which was Ms. Simon giving all

1   her earnings as a prostitute to Mr. Atkins.  He's her pimp.

2       And Mr. Atkins had explained earlier that day to

3   Ms. Simon that he was going to be bringing girls from the

4   shelter to her to work with her in prostitution.

5       You're going to hear in this case directly from Ms.

6   Simon, who has herself pled guilty and been convicted in this

7   case, and you're going to hear from her exactly what happened

8   once Mr. Atkins dropped G.W. and L.P. off at that Motel 6.

9   You're going to hear that Ms. Simon then took pictures of G.W.

10  and L.P., suggestive pictures to be posted on advertisements on

11  the internet, offering them for prostitution on Backpage.com, a

12  website that offers escort and prostitution services.

13      And over the next several days in the Motel 6 and in a

14  Hampton Inn in Homestead, G.W. and L.P. did engage in multiple

15  prostitution dates with numerous strange men, each day

16  ascertaining money for Ricky Atkins.

17      But as you might suspect, Mr. Atkins wasn't content

18  simply to drop off G.W. and L.P. with Ms. Simon and then just

19  sit idly by.  He was very interested, intensely interested in

20  the progress of this moneymaking venture for these minor

21  children.

22      In fact as you're going to hear, after Mr. Atkins

23  dropped G.W. and L.P. off with Ms. Simon, he traveled back

24  there the very next day, for two reasons; number one,

25  collecting several hundred dollars in prostitution earnings

1    that G.W. and L.P. had already collected from engaging in

2    prostitution; and second, to drop off another cell phone, a

3    separate phone that G.W. and L.P. could use to further arrange

4    dates through advertisements on Backpage.com.

5            Now, in addition to the direct testimony of G.W., of

6    L.P., of Sandra Simon explaining all this to you, you're going

7    to see additional evidence also demonstrating Mr. Atkins'

8    movement on the night of August 15th and August 16th, 2014.

9            It's going to be cell-site evidence.  You may be

10   familiar with it but you're going to hear that cell phones, the

11   location of a cell phone and, therefore, the location of the

12   user of the cell phone, in this case it's Mr. Atkins' cell

13   phone, and, therefore, Mr. Atkins can be determined, to some

14   extent, by review of which cell phone tower the cell phone uses

15   when it places or receives a particular call.

16           And you're going to hear that that's because a cell

17   phone communicates with a cellular network through a network of

18   towers, it communicates with the tower which sends the

19   strongest signal and that is, maybe not always, but generally

20   tends to be the tower that's close to, and so by consulting

21   those towers, you can determine, to some extent, to some degree

22   of precision, the location of the phone and its user, again, in

23   this case, Ricky Atkins.

24           And when you see -- when you look at Mr. Atkins' cell

25   tower data for his cell phone, what you see, sure enough, on

1   the night of August 15th, 2014, is you see Mr. Atkins earlier

2   in the night spending time up in the Homestead and even in the

3   Cutler Bay area by the Motel 6 where Sandra Simon is, then

4   driving south towards the Keys, south past Homestead, past his

5   residence, to Tavernier on a night that he's not working in the

6   middle of the night.  You're going to see his cell phone

7   utilizes a tower, it's practically next door to Froggy's

8   Fitness, the location at which the girls were picked up by him,

9   and then you're going to see Mr. Atkins' cell phone traveling

10  back north again, first to Homestead, the area of the nightclub

11  and the apartment, as I just described, and sure enough, then

12  to Cutler Bay, the Motel 6 where G.W. and L.P. were delivered

13  by Mr. Atkins to Ms. Simon.  You're going to see all of that.

14          You're going to see that pattern moving, not just that

15  night, but the next night where Mr. Atkins, as I just said,

16  returned to the Motel 6 to collect prostitution earnings from

17  those minors he had delivered the previous night and to deliver

18  a cell phone.

19          You're going to see not only that, but you're also

20  going to evidence from turnpike toll plazas that Mr. Atkins'

21  vehicle was passing through those toll plazas at the relevant

22  times, further demonstrating his movement.

23          You're going to see more evidence than that.

24          Because when Mr. Atkins couldn't personally be there at

25  the Motel 6, for example, when he was working his job at the

1    children's shelter, Mr. Atkins, nevertheless, naturally wanted

2    to keep very close tabs on what was going on at the Motel 6.

3            And so he frequently called and he frequently texted

4    other people.  He frequently called and texted Ms. Simon and

5    other people to find out what -- how it was going, how many

6    dates G.W. and L.P. had done.  You're going to see a series of

7    text messages, for example, text messages exchange between Mr.

8    Atkins and a person stated in his phone as Leo when they're

9    outside that nightclub in Homestead just prior to going to that

10   apartment in Homestead.

11           Mr. Atkins tells them -- tells Leo that he had the

12   girls with them but he did not want to be seen with them.

13   You're going to see Leo's response to Mr. Atkins, he said,

14   "Who's going to see them in here?"  And Mr. Atkins says,

15   "Coworkers."

16           You're going to see subsequent texts with Sandra Simon

17   asking how many dates are G.W. and L.P. doing?  How much money

18   are they making?  Shouldn't they be doing more dates?  Is it

19   going slow?  "Oh, that's bad," and you're going to see

20   Mr. Atkins instruct Sandra Simon, "Make sure you delete these

21   texts."

22           And they were deleted in Mr. Atkins' phone, but they

23   were recovered, nevertheless, pursuant to a forensic search of

24   Mr. Atkins' phone.

25           In addition to all the evidence I just described, the

1    direct testimony of G.W., L.P., Sandra Simon, cell-site

2    evidence, text messages from Mr. Atkins' phone himself, you're

3    going to hear something else.

4         You're going to hear that G.W. and L.P. aren't the only

5    minors from the Florida Keys Children's Shelter that Mr. Atkins

6    has ever sold into prostitution.  You're going to hear from

7    J.H., who met Mr. Atkins when she was 17, when she first came

8    to the shelter, a few months prior to turning 18, and who

9    started a sexual relationship with Mr. Atkins prior to her

10   turning 18 while she was still living in the shelter, and who

11   shortly after turning 18, began just as G.W. and L.P., the

12   minors still at the shelter, began prostituting, working as

13   prostitutes for Mr. Atkins.

14        Now, as I mentioned, you're going to be able to hear

15   directly from G.W. and L.P. in this trial, and the reason that

16   that's a possibility is that G.W. and L.P. were ultimately

17   recovered by law enforcement officers in this case; and what

18   you'll hear is that after several days working for Mr. Atkins

19   under Ms. Simon's supervision in the Motel 6 and in the Hampton

20   Inn, you will hear that G.W. and L.P. left the custody of Ms.

21   Simon and went instead with another -- another adult couple,

22   another adult prostitute and her boyfriend, who continued to

23   traffic and prostitute G.W. and L.P. out for the next several

24   days after that, between the Miami and the Tampa areas.

25        And you'll hear that during one of the trips between

1    Tampa and Miami with that couple, they got into a very, very

2    serious car accident which caused law enforcement officers to

3    respond to the scene and ultimately recover G.W. and L.P.

4         Shortly after, when Mr. Atkins' involvement was

5    revealed in the case, he was first arrested.

6         Ladies and gentlemen, it probably will not come as a

7    surprise to any of you that it is a federal crime to sell minor

8    children into prostitution.

9         The evidence to be admitted at this trial, including

10   the evidence that I just described and more that I hadn't been

11   able to refer to in this opening, is truly overwhelming.  It

12   will conclusively prove Mr. Atkins guilty of each of the

13   charges in the indictment and, therefore, at the return -- at

14   the close -- at the conclusion of the evidence we will come

15   back for you and ask you to return the only verdict that's

16   consistent with all that evidence, it is guilty as charged in

17   the indictment.

18        Thank you very much.

19        THE COURT:  Thank you very much, Mr. Schlessinger.

20        Mr. Michaels, opening statement.

21             DEFENDANT'S OPENING STATEMENT

22        MR. MICHAELS:  May it please the Court, counsel,

23   counselor.  Good afternoon.  I hope you enjoyed your lunch.

24        Well, obviously, I feel and I believe the evidence will

25   show a very different story.

1          What the prosecutor told you is what they believe the

2     evidence will show; and there are a lot of things left out and

3     a lot of things that, hopefully, will come in and will show

4     that Mr. Atkins is guilty of only one thing, guilty by

5     association, guilty for being a little dumb, guilty for being

6     manipulated by several people.

7          Let me say that from the beginning Mr. Atkins did not

8     contribute, did not participate, did not benefit from these two

9     young prostitutes' activities.  They might be under 18, but

10    at least one of them, at least one of them started prostituting

11    way before my client met her.

12         What the Government is doing is they're talking about

13    trust, and they give all kinds of speeches at the beginning,

14    but this is all about -- there are a lot of people involved in

15    this case that you're not going to see here today.

16         You're only going to see the only person who really did

17    absolutely nothing or almost nothing.

18         We live in a society, obviously, where economic social

19    conditions are such that many of these young girls go into drug

20    and prostitution at a young age.

21         And instead of working and helping and changing the

22    condition, what do we do?  We have all these prosecutors

23    standing here -- taxpayer money -- going after a guy who is not

24    the smartest guy around.

25         You will hear evidence about that.

1          His co-worker is going to come and testify that he's

2     not necessary all together, that he's very naive and that he

3     believes a lot of people.

4          You have basically a case that started for one and one

5     only reason, and that is his relationship, Mr. Atkins'

6     relationship, with Sandra Simon.

7          Now, who is Sandra Simon?

8          Sandra Simon is very, very important.  I submit to you,

9     to pay attention to her testimony and to my cross-examination

10    of her.  Sandra Simon is not just a prostitute, she's a

11    convicted felon.  She was arrested, charged and convicted in

12    state court for human trafficking.

13         Nothing to do with my client.

14         She was on probation for human trafficking at the time

15    she got arrested on this case.  She learned from other

16    individuals how to manipulate the system and how to plead and

17    play the game when you get busted.

18         I hope she'll tell you that, because she learned this

19    in jail, how to plead guilty, how to blame other people, move

20    as much guilt away from you, admit as little as possible.

21         Sandra Simon is the one who recruited these two girls,

22    took them to motels, three motels within several weeks.

23    Simon -- Sandra Simon is the one who get the money.  Sandra

24    Simon is the one who prostitute them and get engaged with all

25    kind of sex activity.

1    Sandra Simon is the one who cooperated in a first

2   case -- the state case that I mentioned when she was arrested

3   and charged and convicted for human trafficking.

4    She played the game.  She cooperated, got a break.

5    And what she does?  She goes back, commits the same

6   crime.  And what she does?

7    She jumps in bed with the Government the second time.

8   She makes a deal with the state prosecutor -- her name is Jane

9   Anderson -- in a state human trafficking case.

10    She has no worry because she knows how to manipulate

11   the FBI, special task force, state prosecutor, federal

12   prosecutor.  Don't think that she's incapable of doing that.

13    Sandra Simon sent an e-mail to Jane Anderson telling

14   him that the pimp in this case, the one who does everything, is

15   Mr. Munoz.

16    Guess what the Government didn't tell you in their

17   opening statement?

18    When the two alleged victims, the two young prostitutes

19   were arrested in Tampa, who were they with?

20    Yes, Mr. Munoz, their real pimp.

21    Sandra has a golden rule, also, when you get in

22   trouble, blame someone else.  And she's very good at that.

23    They have a relationship, a sexual relationship, Sandra

24   and my client.  Sandra likes -- I don't know -- love? -- I

25   don't know what love is -- but Sandra likes and is attracted

1   physically and in the other way, I guess, to my client, and she

2   also is using him at the same time.

3        And basically, the way all of this started is because

4   one day Sandra called my client and tells my client, there are

5   two women I need you to take -- to transport here and there.

6   That's when my client first time ever gets involved in this.

7        My client works at the shelter for a while.

8        There's no history of him doing that, recruiting girls

9   for prostitutes.

10       He's been working there for years, I believe.

11       She calls him.  He goes and finds out that the two

12   women -- that Sandra called them -- not to prostitute, not to

13   minor -- they don't talk like this -- to "ho" -- are these two

14   girls that he knows from the shelter, the 15 and the

15   16-year-old G.W. and L.P.

16       He does what Sandra asks him to do, and that's, ladies

17   and gentlemen, which is take them here, take them there, take

18   them there, and that is the only involvement of Mr. Atkins with

19   this case.  That's the only involvement that Mr. Atkins has

20   with these two girls and this case.

21       That's not the evidence of human trafficking.

22       You'll hear the law, what the law requires.

23       That's someone who's not mature enough, not naive

24   enough, and he's not going to let these two girls in the middle

25   of the night on U.S. 1, where people can get run over,

1    attacked.

2         So since he knows them, he knows who they are, he take

3    them in the car, and that's what Sandra asked him to do, drop

4    them in different places, not knowing -- not knowing that this

5    is going to end up with these two girls becoming prostitutes

6    for Sandra Simon.

7         The person who should be charged, the person who should

8    be at the table is Sandra Simon, not Mr. Atkins.

9         But let's -- the Government wants to make examples, so

10   why not arrest the guy and prosecute the guy who works at the

11   shelter?

12        Did he fail, my client, into some of his obligations?

13        Most likely, he did.  Most likely, he should have

14   probably taken them back to the shelter.

15        Although, you'll hear evidence, I believe, I'll submit

16   to you, that the shelter is a free.  It's not a lock-up

17   shelter.  It's not a facility where they get locked up.  They

18   are free to leave, anybody that wants.  Ask yourself, what kind

19   of shelter is -- I don't know.

20        But this is not the type of shelter -- as far as I

21   know, I believe the evidence will show -- where you take them

22   there and you lock them in.  This is, they are free to come and

23   go.

24        And what maybe he should have done, take them back or

25   talk with them.  He acted because Sandra is his friend and she

1    says, take them there, don't worry, they're going to be with

2    some friends; and whatever else happened, he's not part of it.

3            He showed poor judgment, and poor judgment is not

4    evidence of a crime.  Poor judgment is not proof beyond and to

5    the exclusion of a reasonable doubt.  You will see that he's

6    not benefited, that he got no money from these girls, despite

7    what the Government told you.

8            I believe it's a one Western Union from Sandra to him

9    for 180 bucks, some money for a phone, some -- whatever

10   relationship they have.  Remember, they have a relationship.

11           I believe that there is no evidence of any

12   correspondence texted between these two girls, G.W. and L.P.,

13   there's nothing.  There's nothing.  Nothing.

14           Innuendos.  Speculations.

15           And Sandra Simon manipulated -- after she already was

16   in jail, she already took a plea to human trafficking.

17           She gets a second break by these people.  They're like

18   the wolf.  She's not charged.  She's already on probation for

19   human trafficking.

20           Hold them responsible to that.

21           It's inconceivable that Simon, who is guilty, who pled

22   guilty, who admitted guilty, who has experience, who has been

23   around, who did make money from young girls, prostituting

24   them -- and is on probation for that -- can't fool this

25   experienced prosecutor and the agent.

1          She's not even charged.

2          Now, if my client is the one who is in charge of this

3    operation, of course, according to the Government, why in the

4    world would you let your ATM machines -- G.W. and L.P. -- leave

5    to someone else?  Why?

6          It's illogical, it makes no sense, contradict our logic

7    and our philosophy and expectation of the case.  If I am a pimp

8    and I have these girls making me a ton of money -- as they

9    claim -- though, you'll see he has no money -- if I am a pimp

10   and these girls make me money, would I let them go with someone

11   else who's another pimp?

12         Would I let some girls to Tampa?  Am I in Tampa?  Am I

13   going to Tampa?  No, I'm not.

14         He's there with a girl, with a prostitute, which is

15   Munoz's girlfriend.  Her name is -- Gomez.  It's Ms. Gomez,

16   Mr. Munoz, their pimp, and they go to Tampa with this G.W. and

17   L.P.

18         Why would I, the big boss, the one in Federal court,

19   allow this to happen?  It's absurd.

20         G.W., by the way, what the Government also failed to

21   mention to you, when she was first interviewed by police, she

22   denies that my client has anything to do with her.

23         Why is the Government not puts everything on the table

24   for you to decide?  Ask yourself that.  Why?  I thought we are

25   here, usually that the sign everywhere, we are here seeking the

1    truth.  Well, then put the truth on the table.

2            Let you decide  when G.W. is telling the truth and when

3    she's lying.  She give a different version.

4            And not only that, she let her own participate in armed

5    robbery and attempted murder, this little girl, this little

6    innocent little child that was abused, she was a murderer.  She

7    was not charged, of course, because it's more important to look

8    good in the eye of society prosecuting this guy for

9    prostitution.

10           This is a little girl, 15-year-old, who is an innocent

11   victim, participating in armed robbery and doing the type

12   robbery, a guy got shot in the stomach.

13           These are not children.  You know better now.  These

14   are not children.

15           They are children, unfortunately, yes, they are.  They

16   came from whatever background they came; and instead of getting

17   help, they're getting thrown to the wolves by a society who now

18   instead of helping them is looking for scapegoats.

19           That's why we are here.

20           You don't think that lieutenants in a state police

21   department -- it's actually -- it's a unit of the state

22   attorney in Dade County and they have a specialized so-called

23   cops who deal -- state cops, not FBI -- who deal with runaways

24   and they call them task force or whatever -- when they

25   interview these girls, they scare them to death.

1          They tell them they're going to be in jail for many

2     years, they're going to rot in jail.  They lie to, them.

3     Everyday they lie to them to convince them to say what they

4     like to hear.  Because the very existence of this task force is

5     to make cases of human trafficking.

6          This is the newest crime.  This is the new kid on the

7     block.  This is what now we do.  We want -- instead of

8     addressing the issue at the root, we go at the end and they try

9     to make a justification.  These kids are not prostituting

10    because of pimps.  They're prostituting because of their

11    parents, education, lack of socio economic.

12          But that's not -- we are hiding our heads in the sand.

13    We're not worried about that now.  We are now worried about

14    making cases because we have to justify our existence, a task

15    force, we have to make as many cases as possible.

16          So this cop gave these runaway girls -- they all

17    runaway girls, they all prostitutes -- they go and they scare

18    them and they make them say what they have to do to make cases.

19          You'll hear in the testimony from G.W. and L.P., you

20    have to judge for yourself how truthful they are and when they

21    tell the truth and when they lie.

22          You'll hear testimony from Sandra and you'll have to

23    pay a lot of very careful attention to her, where she's coming

24    from with her testimony and what's behind her testimony.

25          You'll hear testimony from some of his co-workers who

1    will testify in his favor, that he never tried to recruit

2    anybody, that he was always nice and kind to these girls, that

3    they play him a lot of times.

4         And most important, when everything is said and done,

5    you and only you, as I said in voir dire, with all due respect,

6    not to comment on the Court, not the Government, not me -- you

7    and only you have to decide.

8         And when you look and you remember that the defendant,

9    Mr. Atkins, is presumed innocent -- that's all he is here to

10   start -- he is presumed innocent -- and the Government has to

11   prove beyond and to the exclusion of a reasonable doubt his

12   guilt; not a maybe, it looks like, maybe he was there, maybe he

13   knew, maybe he didn't, that's not enough.  That's not proof

14   beyond a reasonable doubt.  Please remember that.

15        When you look at all the evidence, I hope that you'll

16   come with the only verdict that is fair and just and send a

17   message to everybody who needs to receive a message that

18   Mr. Atkins is not guilty.  Thank you.

19        THE COURT:  Counsel for the United States, would you

20   call your first witness, please?

21        MR. SCHLESSINGER:  Yes, Your Honor.

22        The United States calls Ben Kemmer.

23        THE COURT:  Sir, before you have a seat, I'm going to

24   ask you to raise your right hand to be sworn.

25        COURTROOM DEPUTY:  Raise your right hand, please.

1          Do you swear to tell the truth, the whole truth and

2     nothing but the truth, so help you God?

3          THE WITNESS:  I do.

4          COURTROOM DEPUTY:  Thank you, sir.  Please have a seat.

5          Adjust the microphone in front of you, state your full

6     name for the record, and spell your last name for us, please.

7          THE WITNESS:  My name is Benjamin Douglas Kemmer,

8     spelled K-E-M-M-E-R.

9          MR. SCHLESSINGER:  Mr. Kemmer, thank you very much.  I

10    don't think you need to speak quite that close into the

11    microphone, but thank you.

12         (BENJAMIN KEMMER, after having been first duly sworn,

13    was examined and testified as follows:)

14                         DIRECT EXAMINATION

15    BY MR. SCHLESSINGER:

16    Q.   Mr. Kemmer, good afternoon.  Where do you work, sir?

17    A.   I work at the Florida Keys Children's Shelter.

18    Q.   How long have you worked at the Florida Keys Children's

19    Shelter?

20    A.   I have worked there now for 15 years.

21    Q.   And what's your position there now?

22    A.   I am co-CEO of the Children's Shelter.

23    Q.   What do you do as co-CEO of the Children's Shelter?

24    A.   Mostly manage the financial aspects and the staffing

25    aspects of the program.

1   Q.   And do you mind if I ask you, Mr. Kemmer, for the record,

2   what's the address of the Florida Keys Children's Shelter?

3   A.   It's 73 High Point Road in Tavernier, Florida.

4           MR. MICHAELS:   No objection.   No objection.

5           MR. SCHLESSINGER:   Your Honor, without objection at

6   this time, the Government moves for admission into evidence of

7   Exhibit 1.

8           THE COURT:   Exhibit 1 is received.

9           MR. SCHLESSINGER:   Your Honor, may I publish via the

10  Elmo?

11          THE COURT:   Yes, you may.

12          (Government's Exhibit 1 received into evidence.)

13          THE COURT:   I don't know why it's that color, Ivan.   I

14  think that's the best we can do this afternoon.

15          MR. SCHLESSINGER:   That's fine, Your Honor.   Can you

16  see that on your screen, ladies and gentlemen?

17  BY MR. SCHLESSINGER:

18  Q.   Mr. Kemmer, are you able to see that on your screen?

19  A.   I have nothing on my screen.

20          THE COURT:   It's on, Ivan.   I think we might have to do

21  this old-fashioned way, Mr. Schlessinger.

22          THE WITNESS:   I can see it on that screen right there.

23  BY MR. SCHLESSINGER:

24  Q.   Mr. Kemmer, if you're able to see sufficiently from where

25  you are on that screen, I'm showing you what's been admitted as

1    Exhibit 1.  Do you recognize what Exhibit 1 is?

2    A.   Yes, that's the shelter in Tavernier, Florida.

3    Q.   And how long has the children's shelter been opened?

4    A.   A little over 25 years.

5    Q.   Can you describe to the members of the jury what's the

6    mission of the children's shelter?

7    A.   Well, what we do is we shelter abused and neglected kids

8    that have been removed from the family.  We also shelter

9    homeless and runaway kids, as well as at-risk kids in the

10   community.

11   Q.   Can you tell the members of the jury a little bit about how

12   the shelter kind of operates?

13   A.   It's a 24-hour, seven day a week facility.  We have 19

14   beds.  We have both male and females clients.  The shelter is

15   staffed in shifts.  The shifts range from six in the morning

16   until two in the afternoon; two in the afternoon until ten at

17   night; and then at ten to six in the morning; so we run it on

18   shifts, usually between two to four staff per shift throughout

19   the day.

20   Q.   And Mr. Kemmer, if I could ask you, what are the age ranges

21   of the children that are at the shelter?

22   A.   The age ranges are 11 to 17.

23   Q.   So just to be clear, after a child turns 18 can the child

24   stay in the shelter past once he or she has turned 18?

25   A.   When they turn 18, usually, they go into an independent

1   living program.

2   Q.  Not at the shelter?

3   A.  Not at the shelter, no.

4   Q.  Mr. Kemmer, I wanted to ask you, are there any video

5   cameras installed inside the shelter?

6   A.  Right now we have, I believe, it's 24 cameras inside and

7   outside of the shelter.

8   Q.  And the cameras that are inside the shelter, which -- what

9   areas of the interior of the shelter do those cameras cover?

10  A.  They cover every -- they cover every area of the inside of

11  the shelter except for the kids' bedrooms and bathrooms.

12  Q.  So is it fair to say the cameras do not cover the kids'

13  bedrooms?

14  A.  No, they don't.

15  Q.  Now, what are -- Mr. Kemmer, you may have started but what

16  are some of the typical ways that children -- I'm not asking

17  about anybody in particular -- but what are some of the typical

18  ways that children come to reside in the Florida Keys

19  Children's Shelter?

20  A.  We have several different ways.  Kids, there could be a

21  self-referral where a kid can just come to the door, runaway or

22  homeless.  Other ways are parents can have their kids placed

23  there for periods of time if they're not doing very good in

24  school, if they're not following mom and dad's rules at home,

25  and then kids can also be placed there, like I said earlier, if

1    they had been removed from the families due to abuse or neglect

2    by the Department of Children and Families.

3    Q.   And Mr. Kemmer, what's the ultimate goal for the staff at

4    the children's shelter for the children who reside there?

5    A.   Well, the staff he -- we have different staff, but the

6    staff that work directly with the kids at the residential unit

7    are basically the kids' parents while the kids are there.

8         So life skills, just and basic day-to-day recreation.  Just

9    taking care of the kids like a parent would.

10   Q.   I will follow-up on that in a second, Mr. Kemmer, but I

11   just mean from a long-term perspective, what is the sort of

12   ultimate goal for the kids who are residing there if it's not

13   for them to stay at the shelter, you know, indefinitely?

14   A.   It is either reunification with the parent, or legal

15   guardian, or foster placement.

16   Q.   Mr. Kemmer, you began to talk about the staffing at the

17   shelter.  Can you give the jurors a sense of what is the staff

18   like at the shelter?  What are sort of the different types of

19   employees who work there?

20   A.   There are basically for the residential unit, which is

21   the -- is where the kids live at the shelter, there are

22   residential mentors which are the basic house parents for the

23   kids; there's the team leaders, which are the shift supervisors

24   that supervise the shifts; and then there's the residential

25   coordinator that oversees everything on the residential unit at

1    the shelter.

2    Q.   Let me ask you now, Mr. Kemmer, did somebody named Ricky

3    Atkins ever work as an employee in any capacity at the

4    children's shelter?

5    A.   Yes, Ricky was a mentor at the shelter.

6    Q.   When did Mr. Atkins begin his employment at the children's

7    shelter?

8    A.   I believe it was August 2011.

9    Q.   Mr. Kemmer, I'm going ask you now, stand up if you need to,

10   but I'm going to ask you to look around court, see if you see

11   the person that you identified as Ricky Atkins who worked at

12   the children's shelter --

13           MR. MICHAELS:  I stipulate for ID.

14           THE COURT:  For the record, Mr. Michaels is agreeing

15   that Mr. Atkins is the individual who worked at the shelter on

16   the days in question.

17           Counsel,  you may proceed.

18           MR. MICHAELS:  He's in court now.

19           MR. SCHLESSINGER:  Thank you, Your Honor.

20   BY MR. SCHLESSINGER:

21   Q.   So, what was Mr. Atkins' job at the children's shelter?

22   A.   He was a mentor.

23   Q.   And again, I think you described it, but could you tell the

24   members of the jury what are the basic responsibilities of

25   Mr. Atkins as a mentor at the shelter?

1    A.   Basic supervision of the kids, getting the kids out on

2    recreational outings, life skills training, just like I said,

3    basically being the kids' parents while they're at the shelter.

4    Q.   And would that include just interacting with the children,

5    simply just talking to them and having conversations with them?

6    A.   Oh, yeah, they're expected to, yes.

7    Q.   By the way, do you know if Mr. Atkins, as part of his

8    employment at the shelter, was authorized to drive any vehicles

9    at the shelter?

10   A.   The staff are authorized to drive the shelter vans, which

11   we have two shelter vans.

12   Q.   And would that include Mr. Atkins, is authorized include to

13   drive those vans?

14   A.   Yes, he is.

15   Q.   Now, to become a mentor at the children's shelter, did

16   Mr. Atkins have to complete any sort of application process?

17   A.   He did, he completed the application process in the

18   beginning.

19        MR. MICHAELS:  I have no objection.

20        MR. SCHLESSINGER:  Without objection, the Government

21   offers Exhibit 2.

22        THE COURT:  Exhibit 2 is received.

23        (Government's Exhibit 2 received into evidence.)

24        MR. SCHLESSINGER:  I'm going to publish Exhibit 2 on

25   the Elmo at this time.

1            For the record, I'm moving to page five.

2    BY MR. SCHLESSINGER:

3    Q.   Publishing page five of what is Exhibit 2, Mr. Kemmer, do

4    you recognize this particular page of Exhibit 2?

5    A.   Yes, I do.

6    Q.   And I know you're sort of far away from it, if you would

7    like me to actually bring it up to you at any time, just let me

8    know.  What is this page?

9    A.   It's the beginning application with his name and address.

10   Q.   Okay.  And is the phone number recorded here?

11   A.   That is a -- I'm not sure, that must be -- I don't know if

12   it's his or not, I don't know.

13   Q.   But is a phone number listed as his here?

14   A.   It looks like it, yes.

15            MR. MICHAELS:  I object, it's kind of late, to leading.

16            THE COURT:  Overruled.

17   BY MR. SCHLESSINGER:

18   Q.   Is there a questionnaire that's part of the application?

19   A.   Yes, there is, yeah.

20   Q.   Now I'm just going to publish now from page 10, the answer

21   to question eight in the questionnaire, it reads:

22        "Why did you decide to seek a position with our

23   organization," and the answer is, "I like to help kids and see

24   how people change their life, how they grow up to be. "

25            Mr. Kemmer, as of August 2014, was Mr. Atkins working at

1    the Florida Keys Children's Shelter?

2    A.   He was, yes.

3    Q.   You mentioned that the employees of the children's shelter

4    worked in shifts.  So as of 2014, do you know what shift

5    Mr. Atkins was working?

6    A.   At that point in time, Ricky was working mostly overnight

7    shifts, so it would be the ten p.m. to two a.m. shift -- I

8    mean, the ten p.m. to six a.m. shift.

9    Q.   Beginning to work at ten p.m. and ending at six a.m.?

10   A.   Six a.m., yes.

11   Q.   Do you know at that time, beginning August of 2014, what

12   night of the week Mr. Atkins was working?

13   A.   It was -- I believe it was mostly Monday through Friday.

14          MR. MICHAELS:  We have no objection.  We stipulate to

15   it coming in.

16          MR. SCHLESSINGER:  With no objection, Government offers

17   Exhibit 3.

18          THE COURT:  Exhibit 3 is received.

19          (Government's Exhibit 3 received into evidence.)

20          MR. SCHLESSINGER:  With the Court's permission, I would

21   like to approach the witness to hand the witness Exhibit 3

22   that's now been admitted.

23          THE COURT:  You may.

24   BY MR. SCHLESSINGER:

25   Q.   Mr. Kemmer, take a moment if you need to, to look at

1    Exhibit 3, and let me know if you recognize what kind of

2    document that is.

3    A.   The first two documents are time sheets that staff hand in

4    at the end of the pay period in order to get paid.

5    Q.   What time period does that cover, the first two sheets of

6    Exhibit 3?

7    A.   It looks like August 4th to August 31st.

8    Q.   And for which employee are those time sheets reflecting the

9    hours?

10   A.   These are Ricky Atkins' time sheets.

11   Q.   Okay.  Looking at those time sheets, are you able to tell

12   now what nights of the week Ricky Atkins was working and not

13   working in August 2014?

14   A.   Yeah, Monday to Thursday -- or basically, Sunday night to

15   Thursday night.

16   Q.   So when Ricky Atkins -- was Ricky Atkins working on Friday

17   nights or Saturday nights in August 2014?

18   A.   He was not, no.

19   Q.   Publishing Exhibit 3 on the Elmo now, the first page, again

20   this is a time sheet for Mr. Atkins; correct?

21   A.   Yes.  Yes.

22   Q.   And do these columns here reflect the dates and times that

23   Mr. Atkins was working at the shelter in August 2014?

24   A.   Yes, they do.

25   Q.   And specifically, looking at the night of Friday, August

1    15th, 2014, is Mr. Atkins working on that night?

2    A.  He would not have been working on that night, no.

3    Q.  And similarly, asking about August 16th, 2014, did

4    Mr. Atkins work that night?

5    A.  No, he would not have been on that night either.

6    Q.  Now, Mr. Kemmer, let me ask you now about some of the

7    clients who live at the shelter.

8         Was G.W. one of the children who lived at the shelter?

9    A.  Yes, she was.

10   Q.  And how about L.P.?

11   A.  Yes, she was.

12   Q.  I'll come back to them, but let me ask you ask you also

13   about J.H., was she also a child who lived at the shelter?

14   A.  She was.  Yes, she was.

15   Q.  When was J.H. a child at the shelter?

16   A.  It was back in 2011, I can't pull the exact date, but it

17   was 2011.

18   Q.  Was she -- how long was she at the shelter?

19   A.  It wasn't very long.  She was an older -- she was 17 and

20   she aged out and moved back to Miami, so she wasn't -- maybe

21   three months.

22   Q.  Okay.  All right.  Mr. Kemmer, asking you again, once

23   again, now about G.W. and L.P.  You mentioned that they had

24   been residents of the shelter.

25        Were they residents of the children's shelter specifically

1   in August of 2014?

2   A.   Yes, they were .

3         MR. MICHAELS:  I have no objection, stipulate to --

4   it's a birth certificate, right, no objection.

5         THE COURT:  And the exhibit number, Mr. Schlessinger,

6   is?

7         MR. SCHLESSINGER:  Exhibits 4 and 5.

8         THE COURT:  Received.

9         (Government's Exhibits 4 and 5 received into evidence.)

10        MR. SCHLESSINGER:  Your Honor, with the Court's

11  permission, I would ask to publish these the old-fashioned way,

12  by passing them among the jury.

13        THE COURT:  You may.

14  BY MR. SCHLESSINGER:

15  Q.   Mr. Kemmer, on the night of August 15th, 2014, did anything

16  happen at the shelter with respect to G.W. and L.P.?

17  A.   Both girls were --

18        MR. MICHAELS:  I'm sorry, I can't hear --

19  A.   Both girls ran away that night about 11:15, 11:20 in the

20  evening.

21  BY MR. SCHLESSINGER:

22  Q.   And when you mention 11:15 or 11:20 in the evening, is that

23  approximately when they were discovered to have run away?

24  A.   Yes.  The staff noticed them missing from their room at

25  about 11:20 that night.

1          MR. MICHAELS:  No objection, Your Honor.

2          MR. SCHLESSINGER:  The Government offers Exhibit 6 and

3   7 without objection.

4          THE COURT:  Received.

5          (Government's Exhibits 6 and 7 received into evidence.)

6   BY MR. SCHLESSINGER:

7   Q.  Without publishing these, on the Elmo, Mr. Kemmer, I'm

8   going to bring these exhibits to you and ask you what they are.

9   A.  Okay.  I do.  I do know what both of these are.

10  Q.  Let me ask you about first 6A, what is that?

11  A.  6A is the critical incident report that is reported to

12  Wesley House Family Services stating that both girls had run

13  away that night.

14  Q.  What about 6B, what is that?

15  A.  6B is the logbook that staff keeps track of the kids

16  throughout the day, and at night they do 15 minute bed checks,

17  and it is the document that they documented that the kids were

18  missing at around 11:20 that night.

19         MR. SCHLESSINGER:  Thank you.

20         (Government's Exhibits 6A and 6B received into

21  evidence.)

22  BY MR. SCHLESSINGER:

23  Q.  Thank you.  Again, Mr. Kemmer, I may have asked you this

24  but Mr. Atkins was not working on either August 15th or 16th;

25  is that correct?

1   A.   He was not, no.

2   Q.   Did Mr. Atkins return to work on the Sunday, August 17th,

3   2014?

4   A.   Yes, he did, I believe.

5   Q.   Publishing again the first page of the Exhibit 3,

6   Mr. Kemmer, does that help confirm whether Mr. Atkins worked

7   the following night?

8   A.   Yes, that's his time sheet stating that he did work that

9   night.

10   Q.   Now, did Mr. Atkins ever indicate to you or to anyone else

11   at the shelter that as far as you're aware, whether he had any

12   knowledge of where G.W. and L.P. went on August 15th?

13   A.   No, he never said anything to me or anyone else that I'm

14   aware of.

15   Q.   Mr. Kemmer, did there come a time when G.W. and L.P.

16   returned to the shelter?

17   A.   Yes, they did.   I believe they returned on the 24th of

18   August.

19   Q.   Okay.   So, would that be approximately nine days or so

20   after they left?

21   A.   Yeah, nine days.

22   Q.   And was Mr. Atkins still working at the shelter at that

23   time?

24   A.   He was, yes.

25   Q.   And at the time when G.W. and L.P. first returned to the

1    shelter, in that period, would Mr. Atkins also have had the

2    opportunity at that time to interact with G.W. and L.P.?

3    A.   He would have, yes.  He would have been working the shifts.

4    Q.   Now, does Mr. Atkins still work at the shelter today?

5    A.   He does not, no.

6    Q.   Okay.  Why not?

7    A.   We were --

8              MR. MICHAELS:  I'm sorry, I'm going to object, I want a

9    sidebar.

10             MR. SCHLESSINGER:  That's fine, Your Honor, I'll

11   withdraw that question.  That's fine.

12             THE COURT:  The question's been withdrawn.

13   BY MR. SCHLESSINGER:

14   Q.   Mr. Atkins no longer works at the shelter?

15   A.   He does not, no.

16             MR. SCHLESSINGER:  No further questions, Your Honor.

17             THE COURT:  Mr. Michaels.

18             MR. MICHAELS:  Thank you, Your Honor.

19                            CROSS-EXAMINATION

20   BY MR. MICHAELS:

21   Q.   Good afternoon, sir.

22   A.   Good afternoon.

23   Q.   You've been working there for how long you said, 15 years

24   or so?

25   A.   Fifteen years, yes.

1    Q.   Okay.  This particular location or in the system?

2    A.   That particular location, yes.

3    Q.   Did you hire Mr. Atkins?

4    A.   I did not hire Mr. Atkins.  I was not in the position to

5    hire him at that time, no.

6    Q.   You're not hiring at the time?  Someone else was in a

7    position to hire or reject people; right?

8    A.   Yes, it would have been the residential coordinator who

9    hires for the residential unit, yeah.

10   Q.   But he obviously went through the application process, he

11   qualified and was accepted to work in the facility?

12   A.   Yes, he was.

13   Q.   Okay.  It would be fair to say that in the three years he

14   worked there you did not have major -- I'm sure things happen

15   but you did not have any major problem with Mr. Atkins?

16   A.   Not that I'm aware of, no.

17   Q.   All right.  So it would be fair to say that he was a good,

18   regular employee?

19   A.   Yeah.

20   Q.   Okay.  Don't be afraid, don't be shy.

21   A.   No, I...

22   Q.   No one is going to punish you.

23        Now, you said this facility is a 24-hour facility; right?

24   A.   Yes, it is.

25   Q.   Nineteen beds mean 19 kids, I assume, I hope so?

1   A.   Yes, it can be up to 19 kids.

2   Q.   Up to 19?

3   A.   Yeah.

4   Q.   Eleven to 17?

5   A.   Yes.

6   Q.   And is it true that this facility, it's not a locked-up

7   facility?

8   A.   It is not a locked facility, no.

9   Q.   Okay.  So for better or for worse, kids can come and go?

10   A.   We prefer they stay, but yes, they can go.

11   Q.   I'm sure especially 11, 12, you don't want --

12   A.   No, no.

13   Q.   Obviously.  But 15, 16, 17, you can't legally stop them

14   from leaving, I guess that's what I'm asking; correct?

15   A.   If -- we cannot, but if they do, we have to call them in as

16   a runaway, yes.

17   Q.   Right, there's a procedure in place to call for runaways if

18   they become again -- or not again -- but some of them become

19   runaways; right?

20   A.   Yes.

21   Q.   Like I said, you cannot really physically or even legally,

22   for that matter, stop them for leaving?

23   A.   No, we cannot physically restrain them from leaving.

24   Q.   Now, I'm sure I misunderstood you, because -- strike this.

25        The people who work there in shifts, you said there are two

1   per shifts?

2   A.   There's between two and four staff per shift.

3   Q.   Okay.  Because two seems to me it's not enough, but I don't

4   know.

5   A.   We have to -- it all depends on the number of kids there

6   is.

7   Q.   Okay.

8   A.   We have to maintain a one-to-six ratio.  So if we have

9   under 12, then two staff can actually -- we make that ratio.

10  Q.   Okay.  That makes sense.

11       And they -- these people, they act and they try to provide

12  comfort, emotional comfort to these kids?

13  A.   We're trying to --

14  Q.   Nurturing?

15  A.   -- nurturing environment, yes.

16  Q.   And you said that they're parents, you meant to say these

17  people who work act like parents?

18  A.   Yes.

19  Q.   They substitute for, obviously, what they don't have at

20  home?

21  A.   Yes.

22  Q.   You're aware also that Mr. Atkins has children of his own;

23  right?

24  A.   I do, yes.

25  Q.   Would you agree with me that this kind of job require a

1    special affinity for children, to like children, to like to

2    work with children?

3    A.   I would hope so, yes.

4    Q.   And it's not obscene, but some people don't like children,

5    don't like to work with children; right?

6    A.   Yes.

7    Q.   Okay.  So, his schedule is basically what you said, Sunday

8    to Thursday, ten p.m. to six a.m.?

9    A.   Yes.  During the --

10   Q.   Or at least in hours when the evidence was --

11   A.   Yeah, during that period of time, yes, Ricky was working

12   mostly those shifts, although he has worked all the shifts.

13   Q.   Right.

14   A.   Yes.

15   Q.   But we're talking this --

16   A.   Yeah.

17   Q.   Okay.  So, he's free Friday and Saturday?

18   A.   Yes.

19   Q.   Like any employee, he gets two days off; right?

20   A.   Yes, yes.

21   Q.   Because the way the Government brought it in was like a big

22   conspiracy; he's entitled to have these two days off, right?

23   A.   Yes.

24   Q.   He's entitled to have two days off, right?

25   A.   Yes.

1    Q.   Oh, okay.  And by the way, there were in the past -- there

2    are children who run away from your shelter, in the last three

3    years?

4    A.   Oh, yes, definitely.

5    Q.   Happen all the time; right?

6    A.   I wouldn't say all the time.

7    Q.   You tell me because I wouldn't know.

8    A.   I wouldn't say all the time but it does happen.

9    Q.   It does happen --

10   A.   Yes.

11   Q.   -- more than you like to happen?

12   A.   Of course.  I wish it wouldn't happen at all.

13   Q.   Right, one is one too many, but it happen to some extent

14   frequently.  Can you guess -- I mean, if you can't, don't.

15   A.   No, I can't.

16   Q.   Okay.  But would it be fair to say that most adult

17   children, I don't know if there's such a thing, adults minor

18   and I make a word up, about 15, 16, 17, most of the time they

19   go away Friday and Saturday night?  Would be fair to say that?

20   A.   No, most of them -- most of them stay.

21   Q.   No, but when they go, the kids who go, when they go, it's a

22   weekend -- it's a bigger draw then the regular week -- the day

23   week?

24   A.   Yeah, I couldn't accurately answer that question, I

25   couldn't.

1    Q.   Okay, that's fine.

2         Either when G.W. and L.P. went away, this happened on a

3    Friday night?

4    A.   It did, yes.

5    Q.   Okay.  And they left around 11:00, between 11:00, 11:15,

6    20?

7    A.   Yes.

8    Q.   Someone find 11:30, I believe you said, the beds were

9    empty?

10   A.   Yeah.

11   Q.   Were they living in the same room, if you remember?

12   A.   I don't remember for sure.

13   Q.   How many kids per room -- I mean --

14   A.   Two kids per room.

15   Q.   Oh, okay, so you got 19, that's -- well, that's an odd

16   number so you got eight or nine?

17   A.   Yeah, one room has three.

18   Q.   Oh.  So you got, what is it nine or two -- you got nine

19   rooms?

20   A.   Yes.

21   Q.   All right.  See my math works.  And you don't know if G.W.

22   and L.P. were sharing a room?

23   A.   I am not sure, no.

24   Q.   Okay.  And J.H., you said was in the shelter, you remember,

25   2011 and she was 17 at the time?

1   A.   She was, yes.

2   Q.   And she was there for three months?

3   A.   Yes.

4   Q.   Approximately?

5   A.   Approximately, yeah.

6   Q.   Do you know when my client started working in 2011, if you

7   know?

8   A.   It was August 2011.

9   Q.   Was J.H. there during -- if you remember?

10  A.   She was, I believe she was there in October, November,

11  December that year.

12  Q.   Okay.  They came back on the 24th; right?

13  A.   I'm sorry, what's that?

14  Q.   G.W. and L.P., the two runaways --

15  A.   Yes, they came.

16  Q.   -- they came on their own back on August 24th?

17  A.   They did, yes.

18  Q.   Did anybody bring them that you know of?

19  A.   Not that I know of, no.

20  Q.   Did they drive, they walk, did they take a cab, if you

21  know?

22  A.   What they did is they showed up at the front door and they

23  came in and we called Monroe County Sheriff's Department, and

24  then they take over as far as questioning the kids, where they

25  were, and who they were with.

1    Q.   Okay.  And that's what I was getting to, okay.  Did you --

2    did you or someone on your staff, did you guys interview these

3    two people?

4    A.   The residential coordinator does when they come back.

5    Q.   Do you know what, if anything, these two girls told?

6    A.   To the coordinator, they didn't -- I believe they didn't

7    say anything to them.  They were just on runaway.

8    Q.   So, at no time did they claim that my client is the one who

9    took them away or helped them run away?

10   A.   No, not to our staff.

11   Q.   Okay.  Did any of your staff ask, was anybody at this

12   facility mention help you go away?  Did you ask this, if you

13   know?

14   A.   I don't know, but I doubt it.

15   Q.   Okay.  Do you know what the police told them?

16   A.   No, I don't know.

17   Q.   I mean, what they told the police, I meant to say.

18   A.   No.  I don't, no.

19   Q.   Let's assume for a second that, indeed, Ricky is the one

20   who helped them.  What kind of crime will that be, do you know?

21        MR. SCHLESSINGER:  Objection, Your Honor, that calls

22   for a legal conclusion.

23        THE COURT:  Objection sustained.  The jury's to

24   disregard the question and the answer.

25   BY MR. MICHAELS:

1    Q.   If you find out that Ricky is the one who allegedly helped

2    them to -- drove them somewhere, would you have called the

3    police department?

4    A.   Yes, we would have.

5    Q.   Okay.  It's something that you're supposed to do?

6    A.   Yes.

7    Q.   Did they mention that they were involved in prostitution?

8    A.   Did they?

9    Q.   Yes.  Did they mention to you, during the interview on

10   August 24th, that they were involved in prostitution?

11   A.   No, not that I know of.

12   Q.   Did anybody ask them these questions?

13   A.   Not that I know of.

14   Q.   And I believe you testified that Ricky Atkins came back to

15   work on his regular day, which is Sunday, the 17th?

16   A.   Yes.

17   Q.   And he never skipped shift or asked -- he was there when he

18   was supposed to be, right?

19   A.   Yes, he was.

20           MR. MICHAELS:  Can I see 6A and B, please?

21           Can I have a second, Your Honor, please?  I'm almost

22   done anyway.

23           THE COURT:  All right.

24           MR. MICHAELS:  On this what do I do?

25           THE COURT:  You put it right there.

1          MR. MICHAELS:  Wow, I'm getting smart, Judge.

2    BY MR. MICHAELS:

3    Q.  On this document that is Government 6A, it says, type of

4    incident; right?

5    A.  Yes.

6    Q.  And there are different options; right?

7    A.  Yes.

8    Q.  Like criminal activity, exploitation, physical aggression,

9    sexual battery; right?  There's sexual battery right there?

10   A.  Yes.

11   Q.  That's sexual battery; right, right there?

12   A.  I see it, yes.

13   Q.  And so on and so forth.  There are different options to

14   mark, but abuse, altercation with the staff; but the only thing

15   was marked, correct me if I'm wrong, on this 6A, is this

16   runaway; right?

17   A.  That's what the incident was, yes.

18   Q.  Please, did someone falsify this document?  It says

19   runaway, they must be runaway; right?

20   A.  Yes, that's what it was, was runaway.

21   Q.  Walk like a duck, quack like a duck, oops, may be a duck.

22   I guess what I'm saying to you, sir, no one would be so

23   careless to write things out of the blue just to fill out a

24   report.  You write what you think the truth is; right?

25        What's in this document is what -- whoever is filing, the

1  document was in evidence, is the truth to the best of your

2  knowledge; correct?

3  A.  Yes, yeah.  That's what was filled out the night the girls

4  ran away, yes.

5  Q.  Okay.  And this is Government's 6B.  I can't read any of

6  this.  What is all these entries here?  What do they mean?  You

7  know, it's only letters, initials, number.  It's like a secret

8  code from World War II.

9  A.  Okay.  In the first part is that the date and time, the

10 second part is client initials, and then behind the client

11 initials will be where the clients are, and then after that it

12 will have the staff signature.

13 Q.  I don't want the jury to hate me by starting to go through

14 each one of them, so I'm going to do this on my own some other

15 time maybe.

16     I have, I'm sorry, two or three more questions.

17     Did G.W. and L.P. run away before that date of August 2014?

18 A.  Yes, both girls had run away before that.

19 Q.  And they run away together, if you know?

20 A.  I'm not sure.

21 Q.  Okay.  How many times, if you know, did they run away,

22 before August 14?

23 A.  Once again, I couldn't accurately give you a number.

24 Q.  Well, the Government called you as a witness today?

25 A.  Yes, they did.

1    Q.   They subpoenaed you; right?

2    A.   Yes.

3    Q.   They didn't bother to -- all these bright prosecutors and

4    agents there, they didn't bother to ask you for the record of

5    how many times these two girls run away in the past?

6    A.   They --

7    Q.   Did they ask you or not?

8    A.   They didn't ask, no, but they have the incident reports.

9    Q.   Yeah, okay.  Is there any allegation in the past that Ricky

10   Atkins had anything to do with them running away that you know

11   of?

12   A.   I'm sorry, what's that again?

13   Q.   You said they run away several times, you don't know how

14   many times; correct?

15   A.   Yes.

16   Q.   Is there any allegation in the past that when they run

17   away, when these two girls run away, did Ricky Atkins have

18   anything to do with them running away?

19   A.   No.

20   Q.   Were they behavioral child -- children?

21   A.   Oh, yes, definitely.

22   Q.   And I don't want you to think I'm blaming you, because I'm

23   not.  What is it the shelter can do or what did the shelter did

24   in this particular case, if you have behavioral children, what

25   do you do?  I mean, I don't know.

1   A.   Yeah, what we do is give them a safe place to live, and

2   with that we have counselors that counsel the kids, and we also

3   have behavioral management systems that the kids, if they

4   follow the rules and if they get their points through the

5   behavior management system, then they get gifts and they get

6   rewards.

7        So, it works for a lot of kids, some kids it does not.

8   Q.   You do the best you can.  Obviously, you're they're to

9   help; correct?

10  A.   Yes.

11  Q.   And so are all the employees who work there are there to

12  help; right?

13  A.   I would hope so, yes.

14  Q.   And sometimes you're successful and sometimes,

15  unfortunately, like everything in life we go through, it

16  doesn't work; correct?

17  A.   Sometimes, yes.

18         MR. MICHAELS:  Sir, thank you very much for your time.

19         THE WITNESS:  Thank you.

20         THE COURT:  Redirect?

21         MR. SCHLESSINGER:  Thank you, Your Honor.

22                      REDIRECT EXAMINATION

23  BY MR. SCHLESSINGER:

24  Q.   Sir, the incident report, do you remember being asked about

25  that?

1    A.   Yes.

2    Q.   When is that report being filled out?

3    A.   That report would have been filled out and sent to Wesley

4    House Family Services the night the girls ran away, usually

5    within two hours.

6    Q.   To be clear, this is the report that says runaway; right?

7    A.   Yes.

8    Q.   At that time, usually if it's within a few hours, do you

9    have any information beyond the fact that the girls were no

10   longer in the shelter?

11   A.   No, there is no more information.

12   Q.   I mean, did that report result in you conducting a months

13   or years long investigation into the case?

14   A.   No, it was done that night.

15   Q.   When that report was created, would you have had the

16   opportunity, for example, to review the content of any of the

17   defendant's text messages?

18   A.   No.

19   Q.   Would you, for example, have had the opportunity to review

20   any of the cell-site data associated with the defendant's cell

21   phone?

22   A.   No.

23   Q.   In fact, would you even have had the opportunity to talk to

24   G.W. and L.P., given the fact that they were gone at the time?

25   A.   No.

1    Q.  Let me ask you about G.W. and L.P.  Do you remember being

2    asked in cross-examination --

3           MR. MICHAELS:  I can't hear you.  That's why I'm

4    sitting here.

5    BY MR. SCHLESSINGER:

6    Q.  Do you remember being asked on cross-examination about

7    whether G.W. and L.P. said anything to any staff members about

8    Mr. Atkins' involvement?  Do you recall being asked about that?

9    A.  Yes.

10   Q.  And I believe, correct me if I'm wrong, your answer on

11   cross was as far as you knew, they didn't say anything to any

12   staff members; is that right?

13   A.  Yes.  No, they didn't.

14   Q.  Now, Ricky Atkins was himself one of the staff members

15   still working there when G.W. and L.P. were returned to the

16   shelter; isn't that right?

17   A.  Yes, he was.

18   Q.  And you mentioned that G.W. and L.P. were interviewed by

19   law enforcement officers also when they returned to the

20   shelter?

21   A.  Yes.

22          MR. MICHAELS:  Your Honor, I'm going to object.

23          THE COURT:  What's the basis?

24          MR. MICHAELS:  Leading.

25          THE COURT:  Sustained.

1    BY MR. SCHLESSINGER:

2    Q.  Mr. Kemmer, were G.W. and L.P. interviewed by law

3    enforcement officers after they returned to the shelter?

4    A.  Yes, they were.

5    Q.  Are you privy to what was said in the law enforcement

6    interviews?

7    A.  I'm not, no.

8    Q.  I want to ask you also, Mr. Kemmer, are staff members at

9    the children's shelter, like Ricky Atkins, given any sort of

10   information about any of the background of the children living

11   at the shelter?

12   A.  Yes, they are.

13   Q.  Does that include basic vital statistics such as the

14   children's age?

15   A.  Yes.

16   Q.  And again, don't tell me how it came about, but can you

17   please tell me just what was the last day of Mr. Atkins'

18   employment at the Florida Keys Children's Shelter?

19   A.  September 10th, 2014.

20       MR. SCHLESSINGER:  Thank you.  I have no additional

21   questions, Your Honor.

22       THE COURT:  Thank you very much, sir.  You're excused.

23       THE WITNESS:  Thank you.

24       (Witness excused.)

25       THE COURT:  Ladies and gentlemen, we've exceeded our

1   time for today and I thank you for your patience.  As you can

2   tell, this witness traveled from some distance and we wanted to

3   complete his testimony today.

4          All right.  Here are your rules of behavior for the

5   next 36 hours.

6          First, once again, look around the room.  You see these

7   people, elevator, parking lots, snack bar, they're going to

8   ignore you.

9          Two, remember you're not to discuss the case amongst

10  yourselves, even though you heard a little bit today.

11  Tomorrow, you're free to go about whatever business you have to

12  attend; work, school, reruns of Oprah, whatever you want to do,

13  you can do it tomorrow.

14         Wednesday, Wednesday, you should be back in the jury

15  room at 1:15.  Our plan is to start as close to 1:30 as

16  possible.  As close to 1:30 as possible.

17         On behalf of all the parties and the Court, I want to

18  thank you very much for your attendance.  I'll see you back on

19  Wednesday.  You're free to leave your notebooks on your chair,

20  there will be no one else sitting in your chair until

21  Wednesday.  All rise for the ladies and gentlemen of the jury.

22         Excuse me, ladies and gentlemen, if you can be in the

23  jury room at 12:45, 12:45.  Mr. Marchena just told me we can

24  start at 1:00, instead of 1:30.  All right.

25         (Jury exited courtroom at 5:25 p.m.)

1          THE COURT:  All right.  I will see all of you ready to

2    start at 1:00 p.m. on Wednesday.

3          MR. SCHLESSINGER:  Thank you, Your Honor.

4          MR. MICHAELS:  Yes, Your Honor, 1:00 p.m. on Wednesday.

5    Thank you.

6          THE COURT:  All right.

7          (Proceedings adjourned at 5:26 p.m.)

8

9

10                    C E R T I F I C A T E

11

         I hereby certify that the foregoing is an
12
    accurate transcription of the proceedings in the
13
    above-entitled matter.
14

15    June 10, 2016      /s/Glenda M. Powers
     DATE                GLENDA M. POWERS, RPR, CRR, FPR
16                        Official Federal Court Reporter
                          United States District Court
17                        400 North Miami Avenue, 08S33
                          Miami, Florida 33128
18

19

20

21

22

23

24

25