```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2
                      CASE NO. 1:14-CR-20895-MGC-1
 3

 4   UNITED STATES OF AMERICA          Miami, Florida

 5          vs.                        Wednesday
                                       October 21, 2015
 6   RICKY JERMAINE ATKINS             Scheduled 1:00 p.m.
                                       1:05 p.m. to 4:32 p.m.
 7
                                       Day 2 of 10
 8                                     Pages 1 - 135

 9   _____

10                             JURY TRIAL
                   BEFORE THE HONORABLE MARCIA G. COOKE
11                   UNITED STATES DISTRICT JUDGE

12
     APPEARANCES:
13

14   FOR THE GOVERNMENT:        SETH M. SCHLESSINGER, ESQ.
                                 ELINA A. RUBIN-SMITH, ESQ.
15                               United States Attorney's Office
                                 99 N.E. 4th Street
16                               Miami, Florida  33132

17
     FOR THE DEFENDANT:         ALEXANDER JOHN MICHAELS, ESQ.
18                               999 Ponce de Leon Boulevard
                                 Suite 750
19                               Coral Gables, Florida  33134

20


21
     STENOGRAPHICALLY
22   REPORTED BY:               GLENDA M. POWERS, FPR, CRR, FPR
                                 Official Federal Court Reporter
23                               United States District Court
                                 400 North Miami Avenue
24                               Miami, Florida 33128

25
```

```
 1                          I N D E X

 2

 3   WITNESSES                                    PAGE

 4
                     GOVERNMENT'S EVIDENCE
 5
     G.W.
 6
         Direct Examination by Ms. Rubin-Smith      14
 7
         Cross-Examination by Mr. Michaels          56
 8
         Redirect Examination by Ms. Rubin-Smith   117
 9
     COMMANDER JOSE ALFONSO
10
         Direct Examination by Ms. Rubin-Smith     127
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    E X H I B I T S

 2

 3   EXHIBIT                              PAGE RECEIVED

 4

 5   Government's Exhibit 8                     27

 6   Government's Exhibit 9                     27

 7   Government's Exhibit 7A                    28

 8   Government's Exhibit 7B                    28

 9   Government's Exhibit 7C                    28

10   Government's Exhibit 10A                   35

11   Government's Exhibit 10B                   35

12   Government's Exhibit 11                    39

13   Government's Exhibit 12                    47

14

15

16

17

18

19

20

21

22

23

24

25
```

 1          (Call to the Order of the Court:)

 2          COURTROOM DEPUTY:  All rise.

 3          THE COURT:  All the jurors are here.

 4          But, Mr. Schlessinger, late yesterday afternoon, you

 5     filed a matter under seal.

 6          MR. SCHLESSINGER:  Your Honor, we did.  We filed one

 7     matter under seal, and also, we filed one motion, also, not

 8     under seal, both relating to proceedings that happened the

 9     previous day, on Monday.

10          THE COURT:  Okay.  Well, the one I know I have right

11     off the top of my head is the issue related to the one under

12     seal -- spectators may be seated.

13          Can we talk about that one first, Mr. Schlessinger?

14          MR. SCHLESSINGER:  Yes, Your Honor.  And with the

15     Court's permission, I will let Ms. Rubin-Smith, who actually

16     authored that motion, address that.

17          THE COURT:  All right.  Ms. Rubin-Smith.

18          MS. RUBIN-SMITH:  Good afternoon, Your Honor.

19          THE COURT:  You may proceed with your argument on that

20     issue.

21          MS. RUBIN-SMITH:  Yes, Your Honor.  I filed a motion

22     because in opening statement the defense attorney called

23     G.W. -- who will be our first witness for today -- called her a

24     "murderer" and said that she participated in a robbery and a

25     murder.

1           And I set out the facts of what happened in the motion.

2           THE COURT:  Now, Ms. Rubin-Smith, if I understand the

3    fact, were you ever, independently of her statement, able to

4    confirm?

5           MS. RUBIN-SMITH:  No, Your Honor.

6           MR. MICHAELS:  He's in trial.

7           THE COURT:  Whoa, whoa, whoa, it's not your turn.

8           MR. MICHAELS:  Sorry.  Sorry.

9           MS. RUBIN-SMITH:  No, Your Honor.  We narrowed down the

10   location of where it may have happened.  G.W. was not sure of

11   the exact location.  The FBI agent talked to various police

12   departments.  There was no shooting reported, so there is no

13   person of interest.

14          You know, the person who she said actually did the

15   shooting, we don't know, you know, who they are.

16          And the matter has not gone --

17          THE COURT:  So the person that she said was involved in

18   the shooting is not the boyfriend of Sandra Diaz?

19          MS. RUBIN-SMITH:  No.

20          THE COURT:  I mean, the other -- the co-defendant.

21          MS. RUBIN-SMITH:  That's Robert Munoz.  It was his

22   friend.  It was Robert Munoz and his friend took her and she

23   saw an altercation and she saw the friend pull out a gun and

24   shoot the victim, she was very shaken up by it.  She was the

25   one that reported it to law enforcement.

1          She has been consistent in what she has reported.  We

2   have not been able to verify a shooting, and this is clearly an

3   attempt by the defense to assassinate her character and call

4   her a "murderer," as they did in opening.

5          It has nothing to do with her credibility.

6          THE COURT:  Let me hear from Mr. Michaels before I

7   rule.

8          MR. MICHAELS:  Judge, I got this information from the

9   discovery, from the discovery I received.  There is no motion

10  filed in limine or any kind of motion.

11         THE COURT:  They're saying all that, but they're saying

12  now that they know you're going to talk about it, they want to

13  know, Judge, what's the probative value of allowing this,

14  essentially, 404, in?  What are you trying to prove?

15         MR. MICHAELS:  First of all, I misspoken if I said

16  "murderer."  I thought I said "attempt murder," that's if they

17  want a correction; or they can talk about rehabilitative.  I

18  meant to say "armed robbery," not "attempted murder."  That's

19  exactly what she testified, what she described as happening.

20  She was a participant, she was there.

21         THE COURT:  So she actually saw this, according to her

22  statement?

23         MR. MICHAELS:  Judge, you know, I try a lot of cases

24  with people --

25         THE COURT:  That's not my question.  My question is,

1    according to her statement --

2         MR. MICHAELS:  She was a participant.  She was a

3    principal.  According to my understanding of the law on this, I

4    can explore more based on whatever the Government give me.  In

5    my book, she was a participant.  She was a principal.  Under

6    the principal theory, if she is there and has some knowledge --

7         THE COURT:  How does this relate to either of the three

8    counts contained in the indictment?

9         MR. MICHAELS:  It goes to her credibility as a witness.

10        THE COURT:  But, remember, we also have to weigh,

11   Mr. Michaels, is, is it more prejudicial than probative?

12        MR. MICHAELS:  Well, if she's willing to participant in

13   armed robberies and attempted murders, the fact that she's a

14   prostitute, it's a minor thing, obviously.

15        I mean, in everybody's eye, I would think that she's

16   more guilty and she's more -- if she's willing to get involved

17   in these kind of crimes, why she needs my client to get

18   involved in prostitution?  And she's there with other pimps.

19        It shows even more that not only she has nothing to do

20   with my client, but she's involved with other people the pimp

21   may use, maybe, to set people up for armed robberies.

22        Why is this not relevant, and why am I allowed to say

23   that in opening statement?  They didn't anticipate I would say

24   that?  Really?  I mean, I was born last night?  I'm going to

25   miss the opportunity, file a motion, and then I won't mention

1   it?

2          It's not fair now, after I already said that, to stop

3   me from asking her on cross-examination and make me look like I

4   lied to the jury.  It's highly prejudicial to my client.

5          It's their job and their duty to anticipate strategy

6   and file motion accordingly.

7          THE COURT:  So this is Mr. Michaels' argument, is that

8   I have now stated in front of the jury that this individual is

9   going to say X, and I have -- I will have lost my credibility

10  with the jury by telling them certain facts are going to be

11  elicited and now they're not; even though we tell them

12  repeatedly that it's not evidence.

13         MS. RUBIN-SMITH:  Your Honor, just because he opens on

14  evidence that may not be admissible doesn't mean that we should

15  now commit further error and admit it's evidence.

16         He also said in opening statement that Sandra Simon

17  should be charged.  Obviously, she was charged and is

18  convicted, and that opening statement in that part will be

19  contradicted as well.

20         THE COURT:  So you didn't anticipate the issue of her

21  being involved in an armed robbery and an attempted murder

22  might come in as an attack on her credibility?

23         MS. RUBIN-SMITH:  Your Honor, she was not a willing

24  participant.

25         THE COURT:  That's not my question.  My question was,

1   you did not anticipate that her credibility might be attacked

2   because she was involved, whether unwillingly or willingly, in

3   an armed robbery and an attempted murder?

4          If the tables were turned and Mr. Atkins -- and this is

5   for purposes of argument only, not to say that he must testify

6   or anything related to his Fifth Amendment rights -- but if he

7   were on the stand testifying about conduct that he had with a

8   witness or another individual involved in this conspiracy and

9   he said, oh, by the way, I kind of sort of had this armed

10  robbery where somebody, who even though I wasn't involved in

11  it, committed an armed robbery while I was there, the tables

12  were turned, the Government would be arguing that that's an

13  attack on a -- a bona fide attack on his credibility as a

14  witness; correct?

15         MS. RUBIN-SMITH:  Right.  I mean, there is a --

16         THE COURT:  Why is it not, as I want to say, goose and

17  gander?

18         MS. RUBIN-SMITH:  Well, we understand that her

19  credibility and her character may be attacked in various

20  aspects, for example, she may be asked if she prostituted

21  previously.

22         THE COURT:  Well, we know that one's going to come, but

23  what he's saying is I want to -- his theory has been

24  consistently, these were people involved -- I think he used the

25  phrase "on the road to perdition" long before Mr. Atkins came

1    along.

2         MS. RUBIN-SMITH:  Well, so this event with the -- where

3    she was taken to the robbery, that was after Mr. Atkins.  It

4    was after she left Ms. Simon, and she will testify --

5         THE COURT:  If she testifies, according to your

6    documents, that this occurred sometime in August.  This

7    conspiracy remains open until September 10th, 2014.

8         So according to the indictment, this is taking place in

9    the heart -- this is even a month before the conspiracy ends,

10   because the conspiracy ends on September 10th, and according to

11   the Government's document, this occurred sometime around August

12   13th or 14th?

13        MS. RUBIN-SMITH:  This occurred sometime after August

14   18th when Robert Munoz and Claudia Gomez joined Sandra Simon,

15   and the testimony will be pretty much consistent from all the

16   witnesses that the minors left Sandra Simon around August 20th,

17   and they went with Claudia Gomez and Robert Munoz and she will

18   testify --

19        THE COURT:  Is that a separate conspiracy for which

20   he's not charged?

21        MS. RUBIN-SMITH:  He is not charged for that

22   conspiracy, and he had communications with Simon about the

23   minors after they left, but --

24        THE COURT:  But you have the conspiracy being opened

25   until September 10th?

 1          MS. RUBIN-SMITH:  That's correct.

 2          THE COURT:  So there's a time when they leave -- they

 3    leave the co-defendant and go off on another lark of their own?

 4          MS. RUBIN-SMITH:  That is correct, and they are

 5    recovered by law enforcement when they are with Munoz and

 6    Gomez.  They're recovered in Tampa and brought back to the

 7    shelter, and that's when law enforcement gets involved and

 8    interviews them.  So all of that will be coming out.

 9          But all of the reports that we handed over in an

10    abundance of caution about this incident are clear, that she

11    was taken there -- not because she wanted to go, she didn't

12    know where she was going -- and she was instructed to look for

13    drugs.  She didn't say that she found drugs.  She didn't say

14    that she did anything.  She said that she saw the shooting and

15    she came forward about it to law enforcement.

16          THE COURT:  Here's my concern, Mr. Michaels, that once

17    you say "murder/attempted murder," that you have a strong

18    prejudicial backwash over the witness.

19          MR. MICHAELS:  Well, unfortunately for the witness, it

20    was a Government case, that's what she participated in.  I

21    don't make her participate in that.

22          You want me to say just "armed robbery," I guess I can

23    live with that as a compromise.  But the facts are what the

24    facts are.  The truth is she was involved -- to what extent,

25    there's no jury to determine that -- she was involved in a

1    robbery and attempted murder and she was doing that, like you

2    pointed out rightfully, during the conspiracy that these

3    charges while, in fact, she's with other people committing

4    other crime.

5           Why is this not part of my -- why am I not allowed as

6    part of my defense and the defendant's due process right to

7    point out that she has other pimps that she does a lot of

8    things, not only prostitution, but more serious crime?

9    Therefore, he is not even there.  He is not telling her what to

10   do.

11          In fact, to turn the Government argument around, I like

12   the fact that they say, oh, she was an unwilling participant.

13          That's even better for my argument because it shows

14   that she does what these people make her do, these new pimps.

15   So why is she not prostituted for them?  Why is she not making

16   money and gives them the money?

17          Obviously, it's even more powerful what she just said

18   now, in my opinion.

19          THE COURT:  Okay.  This is my ruling, and if you want

20   to take a moment to discuss this with your witness,

21   Ms. Rubin-Smith, you can talk about an armed robbery, you can

22   talk about her going other places with Carlos Munoz, but not

23   about a shooting.

24          MR. MICHAELS:  That's fine.

25          THE COURT:  I think that's so prejudicial that the jury

1    will not be able to separate that out.

2              MR. MICHAELS:  I can live with that.  Thank you, Judge.

3              THE COURT:  All right.  Take a moment with your

4    witness.  The jurors are all here, so just go outside, if she's

5    outside, take a moment with her, and then we'll be right out.

6              I'll wait here for you to have a discussion with her

7    before we call the jury in.

8              Let them know to be ready in five minutes.

9              COURT SECURITY OFFICER:  Yes, Your Honor.

10   (Brief pause in the proceedings from 1:17 p.m. to 1:19 p.m.)

11             THE COURT:  Ms. Rubin-Smith, are we ready?

12             MS. RUBIN-SMITH:  Yes, Your Honor.

13             THE COURT:  All right.  Jurors, please.

14             COURT SECURITY OFFICER:  All rise.

15             (Jury entered courtroom at 1:19 p.m.)

16             THE COURT:  Welcome back, ladies and gentlemen, please

17   take your same seat.  Please take your same seat.

18             Thank you very much, ladies and gentlemen, all of our

19   jurors are here.  You may be seated.  Welcome back.

20             Counsel for the United States, your next witness,

21   please.

22             MS. RUBIN-SMITH:  Yes, Your Honor, the United States

23   would like to call G.W.

24             THE COURT:  I would ask G.W. to step into the

25   courtroom, please, and the courtroom deputy will administer the

1   oath.

2          COURTROOM DEPUTY:  Before you have a seat, I'm going to

3   ask you to please raise your right hand to be sworn.

4          Do you swear to tell the truth, the whole truth and

5   nothing but the truth, so help you God?

6          THE WITNESS:  Yes, I do.

7          COURTROOM DEPUTY:  Thank you, please have a seat.

8   Adjust the microphone in front of you.  State your full name

9   for the record and spell your last name for us, please.

10          THE WITNESS:  G.W., (spelling her name).

11          THE COURT:  Before we continue, G.W., are you chewing

12   gum?

13          THE WITNESS:  Yes, ma'am.

14          THE COURT:  Why don't we get rid of that first?

15          Thank you, Ivan.

16          Counsel for the United States, you may proceed.

17          (G.W, after having been first duly sworn, was examined

18   and testified as follows:)

19                        DIRECT EXAMINATION

20   BY MS. RUBIN-SMITH:

21   Q.  Good afternoon, G.W.  How old are you?

22   A.  I'm 16 years old.

23          MS. RUBIN-SMITH:  Your Honor, may I publish

24   Government's Exhibit 4?  It's already been admitted into

25   evidence.

```
 1            THE COURT:  Yes, you may.  Let me make sure it's on.
 2  The witness monitors are on.
 3            Mr. Blanford, is the witness monitor working?  We were
 4  having some trouble with it the other day, the witness monitor.
 5            Are theirs working?
 6            COURT SECURITY OFFICER:  Yes, they are all working.
 7            THE COURT:  And is the witness's monitor working right
 8  here?
 9            COURT SECURITY OFFICER:  Yes.
10            THE COURT:  All right.  Counsel, you may proceed.
11  BY MS. RUBIN-SMITH:
12  Q.  G.W., do you see that document on the screen?
13  A.  Yes, ma'am.
14  Q.  Is that your birth certificate?
15  A.  Yes, ma'am.
16  Q.  Is your date of birth January 23rd, 1999?
17  A.  Yes, ma'am.
18  Q.  Okay, thank you.
19            G.W., where do you currently live?
20  A.  In Key West, Florida.
21  Q.  Do you go to school?
22  A.  Yes, ma'am.
23  Q.  What grade are you in?
24  A.  My junior year.
25  Q.  Do you have family here, in Florida?
```

1    A.   No, ma'am.

2    Q.   Where are you from, originally?

3    A.   Originally, I'm from Davenport, Iowa.

4    Q.   Was there a time when you lived at the Florida Keys

5    Children's Shelter?

6    A.   Yes, ma'am.

7    Q.   When was that, when did you start living there?

8    A.   March 23rd, 2014.

9    Q.   How long did you live there?

10   A.   Approximately, eight to nine months.

11   Q.   How old were you when you lived at the children's shelter?

12   A.   I had just turned 15.

13   Q.   Now, I'm going to show you what's been admitted into

14   evidence as Exhibit 1.

15        G.W., do you recognize that?

16   A.   Yes, that's the Florida Keys Children's Shelter where I

17   lived.

18   Q.   Thank you.  Where did you live before you lived at the

19   Florida Keys Children's Shelter?

20   A.   I traveled around in an RV with my mother.

21   Q.   And how did you end up in Florida?

22   A.   My parents had a couple of state park offerings here, to

23   work the state park.

24        MR. MICHAELS:  I'm sorry, Judge.  I'm having a hard

25   time.

1          THE COURT:  I need you to speak up so we can all hear

2     you, ma'am.

3          THE WITNESS:  My mom got a couple of job offerings at a

4     state park here.

5     BY MS. RUBIN-SMITH:

6     Q.  Now, when you lived at the Florida Keys Children's Shelter,

7     did your mom live there with you?

8     A.  No.

9     Q.  Did you have anyone living there with you?

10    A.  Related to me?

11    Q.  Yes.

12    A.  No.

13    Q.  While at the children's shelter, did you meet someone by

14    the name of "Ricky Atkins?"

15    A.  Yes, ma'am.

16    Q.  Approximately, when did you meet Mr. Atkins?

17    A.  A few weeks after living there.

18    Q.  So would that be approximately in April or so of 2014?

19    A.  Yes, ma'am.

20    Q.  What was Mr. Atkins' role at the shelter?

21    A.  He was a staff member, a mentor.

22    Q.  How did you meet him?

23    A.  I guess he was a staff member there, so he took care of us.

24    Q.  Did you have interactions with him often?

25    A.  Like when he came in for his shifts.

1   Q.   And what shifts did he usually work?

2   A.   It depended.  Sometimes the afternoon, sometimes the night

3   shift.

4   Q.   Now, please take a look around the courtroom and let me

5   know if you recognize Mr. Atkins here today.

6   A.   I do.  He's behind you in a blue tie.

7        MS. RUBIN-SMITH:  Thank you.  Please let the record

8   reflect the witness has identified the defendant, Mr. Atkins.

9        THE COURT:  The record will reflect that she has

10  indicated the defendant.

11  BY MS. RUBIN-SMITH:

12  Q.   When you first met Mr. Atkins in April of 2014, what was

13  your relationship like?

14  A.   Professional, like he was a mentor; so if I had any

15  questions, like, regarding, like, rules there, I could ask him.

16  Q.   And as a mentor at the shelter, what kinds of things did he

17  do as part of his job?

18  A.   He, like, would enforce the rules and help us if we had

19  questions on anything.

20  Q.   What types of rules would he enforce?

21  A.   Like, I don't know, there were rules like going outside and

22  coming out of our hallways and...

23  Q.   Okay.  At some point did your relationship with Mr. Atkins

24  change from professional to something else?

25  A.   Yes, ma'am.

1    Q.  And can you please explain to the jury how it changed.

2    A.  One day he just started flirting with me and I did flirt

3    back, I found him attractive.

4    Q.  And did anything sexual happen between you two while you

5    were in the shelter?

6              MR. MICHAELS:  Objection, leading.  Objection, leading.

7              THE COURT:  Objection overruled, but be careful in your

8    phrasing, Counsel.

9              MS. RUBIN-SMITH:  Thank you, Your Honor.

10             THE WITNESS:  Yes, ma'am.

11   BY MS. RUBIN-SMITH:

12   Q.  Please explain what happened.

13   A.  One day I was really sick and the staff refused to drive me

14   to the hospital, so I took it upon myself to leave and walk

15   there; and within walking there, Ricky pulled up and got out of

16   the car.

17            And I started telling him, like, I wasn't going back to the

18   shelter, I was taking myself to the hospital.  And then he

19   started sexually touching me, and we got into the van and

20   pulled into a parking lot, like, a few blocks down, and when we

21   got out I gave him oral sex.

22   Q.  Now, when you say you were in the van, what van were you

23   in?

24   A.  Our shelter van.

25   Q.  And when you say you gave him oral sex, was that in the

1   shelter van?

2   A.   No, ma'am, outside.

3   Q.   And outside where?

4   A.   Of the van, in the parking lot.

5   Q.   And do you remember what parking lot you were in?

6   A.   Only that it was a few blocks away from the hospital.

7   Q.   And which hospital are you referring to?

8   A.   The one in Key Largo/Tavernier.  I don't know the name of

9   it.

10  Q.   Do you remember, approximately, what time of the night this

11  happened?

12  A.   Probably, like one in the morning or two in the morning.

13  Q.   And what happened afterwards?

14  A.   He drove me back to the shelter so the female staff would

15  drive me to the hospital with the correct paperwork to take

16  care of me.

17  Q.   And at some point, did Mr. Atkins talk to you about running

18  away from the shelter?

19  A.   Yes, ma'am.

20  Q.   Approximately, when was that?

21  A.   The beginning of August or like a week before August.

22  Q.   And that's also in 2014?

23  A.   Yes, ma'am.

24  Q.   At that point, had you ever run away from the shelter

25  before?

1    A.   Yes, ma'am.

2    Q.   Why is that?

3    A.   I just really did not like the other kids there.

4    Q.   What did Mr. Atkins tell you about running away?

5    A.   He asked if I was planning to run away again, and I told

6    him, yeah.  And he told me that if I ever ran away to call the

7    two numbers that he had given me, and, like, it was like in a

8    candy wrapper so the cameras wouldn't see him giving me the

9    numbers.

10   Q.   Now, when you were saying two numbers, is that two phone

11   numbers?

12   A.   Yes, ma'am.

13   Q.   And do you know whose phone numbers he gave you?

14   A.   I believe one number was his and another one was one of his

15   friend's, he said.

16   Q.   Did he tell you which friend?

17   A.   No, ma'am.

18   Q.   And can you explain to the jury how he provided you with

19   those phone numbers?

20   A.   He put them in a Reese's, like, long candy bar container

21   and gave one Reese's to me so it looked like on the camera

22   that's all he was giving me was the candy.

23   Q.   Where were you when he gave you those phone numbers?

24   A.   I was in the C.A., or common area, of the shelter.

25   Q.   And you talk about video cameras.

1        Are there video cameras in the common area of the shelter?

2   A.  Yes, ma'am.

3   Q.  And other than telling you that you can call him if you ran

4   away, did he talk about anything else?

5   A.  Yes, ma'am.

6   Q.  And please explain to the jury what he told you?

7   A.  First, he was talking about how he was going to Georgia and

8   wanted to take me with, but I told him that I had already

9   planned to run away with my really close friend that also lived

10  there.

11       And he said that he wouldn't be able to take her with, and

12  I said I wasn't leaving without her.  So then he started

13  talking about running away to Miami, and I told him he'd have

14  to talk to her; and as far as I knew, he did talk to her

15  because he went back into the hallway.

16       And when he came out and I went back there, she was talking

17  about leaving to Miami with him.

18  Q.  Now, which friend are you referring to?

19  A.  L.P.

20  Q.  And who is L.P.?

21  A.  She was my roommate and best friend.

22  Q.  Your roommate at the shelter?

23  A.  Yes, ma'am.

24  Q.  Did Mr. Atkins tell you what you would be doing if you ran

25  away to Georgia or to Miami?

1   A.   Not to Georgia, but to Miami, he said was all I'd have to

2   do is sit in a room and look pretty and I'd get money.

3   Q.   What did you understand that to mean?

4   A.   Usually, just that, like, I'd sit there, like laugh, have

5   conversations with everybody in the room and that would be it.

6   Q.   Now, at that point, G.W., had you ever prostituted before?

7   A.   No, ma'am.

8   Q.   And what happened after Mr. Atkins talked to your friend,

9   L.P.?

10   A.   She asked when we were going to leave and run away, and we

11   decided that we were going to leave before school started,

12   like, a week before school started so we could get back in time

13   when school did start.

14   Q.   And did you and Ms. P. decide how you would run away?

15   A.   As in transportation or where?

16   Q.   Yes, what would you do after running away from the shelter?

17   A.   When we ran away, she wanted to call Ricky, so...

18   Q.   And was that your plan before you left the shelter?

19   A.   Before or after talking to Ricky?

20   Q.   After talking to Ricky but before running away, did you

21   plan on running away and calling Mr. Atkins?

22   A.   Yes, ma'am.

23   Q.   Did you have any cell phones?

24   A.   No, ma'am.

25   Q.   Did you have a plan for how you would call Mr. Atkins after

1   running away?

2   A.   That we just find a local person and ask to use their

3   phone.

4   Q.   Did you have a meeting place set up in advance with

5   Mr. Atkins?

6   A.   No, ma'am.

7   Q.   Did you and Ms. P. end up running away?

8   A.   Yes, ma'am.

9   Q.   And do you remember the dates of when that happened?

10  A.   I believe it was August 15th, 2014.

11  Q.   And can you explain what happened that night?

12  A.   That night we waited for the 11:00 shift to come into our

13  rooms and make sure we were there, and when they left, we,

14  like, stuffed our beds to make it seem like we were still there

15  and we put on black clothes and jumped out of the window in our

16  room.

17  Q.   And you said you waited until the night shift.

18       Was Mr. Atkins working that night?

19  A.   No, ma'am.

20  Q.   And how did you actually leave the shelter?

21  A.   We jumped out of our window and walked.

22  Q.   Where did you walk to?

23  A.   We walked until we got to one of her friend's house, to

24  L.P.'s friend's house, and then we contacted Ricky.

25  Q.   Do you remember the friend's name?

1    A.   Of hers?

2    Q.   Yes.

3    A.   No, ma'am.

4    Q.   And you said that you contacted Ricky from the friend's

5    house?

6    A.   Yes, ma'am.

7    Q.   What did you do next?

8    A.   Her friend was driving us to the movie theater, but we saw

9    police there, so she, L.P., called Ricky again and her friend

10   ended up driving us to Froggy's, which is a local gym where I

11   live.

12   Q.   And whose phone did L.P. use to call Ricky?

13   A.   L.P. used her friend's phone.

14   Q.   The same friend that drove you to the movie theater?

15   A.   Yes, ma'am.

16   Q.   And where was that movie theater, approximately?

17   A.   It was, like, in the Tavernier Towne Shop.

18   Q.   And you said you went to Froggy's next?

19   A.   Yes, ma'am.

20   Q.   When you got to Froggy's, was Mr. Atkins there?

21   A.   No, ma'am.

22   Q.   What did you do when you got to Froggy's?

23   A.   We changed our clothes, like out of our black clothes, and

24   we found a local guy riding his bike past, and so she used his

25   phone to call him again, to call Ricky again.

```
 1   Q.   Why did you change your clothes at Froggy's?

 2   A.   To look cuter.

 3   Q.   What did you think you would be doing that night?

 4        MR. MICHAELS:  Objection.

 5        THE COURT:  Overruled.

 6   BY MS. RUBIN-SMITH:

 7   Q.   You may answer.

 8   A.   Honestly, I didn't know.  I was just going where L.P. was

 9   going.

10   Q.   And you said Ms. P. used a homeless man's phone to call

11   Mr. Atkins?

12   A.   Yeah.

13   Q.   Do you know his name, the homeless man?

14   A.   No, ma'am.

15   Q.   Had you seen him before that night?

16   A.   Yes.  Multiple times.

17   Q.   Where had you see him?

18   A.   At the Towne Shop outside of the Winn-Dixie.

19        MS. RUBIN-SMITH:  Your Honor, I would like to move to

20   admit Exhibit 8 into evidence, without defense objection.

21        THE COURT:  Is that correct, Counsel?

22        MR. MICHAELS:  That's correct, Your Honor.

23        THE COURT:  Government's Exhibit 8 is admitted.

24        MR. SCHLESSINGER:  Thank you.

25        Permission to publish, please?
```

1           THE COURT:  You may.

2           (Government's Exhibit 8 received into evidence.)

3    BY MS. RUBIN-SMITH:

4    Q.  I show what was marked as Exhibit 8, which is Florida

5    driver and vehicle information database printout and the

6    customer name here is Mark Richard Peto.

7           Please take a look at the photograph in this document.

8           G.W., do you recognize this photograph?

9    A.  Yes, ma'am.

10   Q.  And who is this?

11   A.  That is the homeless local that we used his phone.

12   Q.  And that was by Froggy's?

13   A.  Yes, ma'am.

14   Q.  Thank you.

15          MS. RUBIN-SMITH:  Your Honor, I'd also like to move to

16   admit Government's Exhibit 9 without objection into evidence.

17          THE COURT:  Any objection to Exhibit Number 9?

18          MR. MICHAELS:  No, Your Honor.

19          THE COURT:  Exhibit 9 is received.

20          (Government's Exhibit 9 received into evidence.)

21   BY MS. RUBIN-SMITH:

22   Q.  Exhibit 9 is documentation from Sprint.  Just to read into

23   the record, the subject number is 305-942-0819.  And under the

24   account details, the account is registered to Mark Peto,

25   effective 10-16-2013.

1      G.W., what happened after L.P. called Ricky Atkins from the

2   homeless man's phone?

3   A.   About 20 minutes later, Ricky pulled up.

4   Q.   What was the purpose of L.P.'s phone call to Mr. Atkins?

5   A.   To tell him where we were and that we were ready to get

6   picked up.

7   Q.   And you said he pulled up 20 minutes later?

8   A.   Yes, ma'am.

9   Q.   Where did you wait for him for those 20 minutes?

10  A.   In the back of Froggy's.

11       MS. RUBIN-SMITH:  At this time, the Government would

12  like to move into evidence Exhibit 7A, 7B and 7C without

13  objection.

14       THE COURT:  Any objection --

15       MR. MICHAELS:  That's correct, Your Honor.

16       THE COURT:  Exhibit 7A, B and C, is that correct,

17  Counsel?

18       MS. RUBIN-SMITH:  Yes, Your Honor.

19       THE COURT:  Received.

20       (Government's Exhibits 7A, 7B and 7C received into

21  evidence.)

22       MS. RUBIN-SMITH:  Thank you.

23  BY MS. RUBIN-SMITH:

24  Q.   G.W., I'm putting on the screen here Exhibit 7A.

25       Do you recognize the photograph in this?

1   A.   Yes, ma'am.

2   Q.   What is that?

3   A.   That's the gym we were waiting behind.

4   Q.   Is that in Tavernier, Florida?

5   A.   Yes, ma'am.  Well, Tavernier/Key Largo.

6   Q.   And now, showing you 7B, does this look familiar to you?

7   A.   Yes, ma'am.

8   Q.   And what does this show?

9   A.   The side of Froggy's.

10  Q.   And now 7C, does this look familiar to you?

11  A.   That's the back of Froggy's where we waited.

12  Q.   Now, do you remember where you waited?

13  A.   I waited on the corner of the last picture you showed and

14  in the corner by the door in this picture.

15  Q.   So in the back of the gym?

16  A.   Yes, ma'am.

17  Q.   Why did you and L.P. wait for Mr. Atkins in the back of the

18  gym?

19  A.   Because it was out of view, if anybody saw us.

20  Q.   Why didn't you want anyone to see you?

21  A.   Because we were on runaway, we didn't want to be brought

22  back to the shelter.

23  Q.   Did Mr. Atkins come to pick you up at Froggy's?

24  A.   Yes, ma'am.

25  Q.   Do you remember what car he was driving on the night he

1   picked you up?

2   A.   I don't remember the, like, brand or whatever.

3   Q.   What do you remember about it?

4   A.   That it was, like, it was four doors, and it was, like,

5   kind of a bigger, like, SUV size.

6   Q.   Do you remember the color?

7   A.   I think, silver.

8   Q.   When Mr. Atkins picked you up, was he alone?

9   A.   Yes, ma'am.

10   Q.   Did you get into the car?

11   A.   Yes, ma'am.

12   Q.   Did you talk to Mr. Atkins in the car?

13   A.   Yes, ma'am.

14   Q.   What did he say to you?

15   A.   He was talking about bringing us to his cousin that was

16   staying at a motel, and I think it was in Cutler Ridge, kind of

17   Homestead area.

18   Q.   Okay.  When he said "cousin," did you know who he was

19   referring to?

20   A.   No, ma'am.

21   Q.   And did he explain why he would be bringing you to his

22   cousin at a hotel?

23   A.   Yes, ma'am.

24   Q.   What did he say?

25   A.   He started beginning to talk about the prostitution and how

 1   it was going to work.

 2   Q.   And what did he say about how it was going to work?

 3   A.   That he'd be dropping me and L.P. off at the hotel room to

 4   start working and that his cousin would take the pictures and

 5   do the Backpage ad.

 6   Q.   Have you heard of "Backpage" before this day?

 7   A.   No, ma'am.

 8   Q.   And did he explain what "Backpage" was?

 9   A.   L.P. did.

10   Q.   And what did you understand "Backpage" to mean after they

11   explained it to you?

12   A.   A place where guys would go to find prostitutes they wanted

13   to date.

14   Q.   Did Mr. Atkins tell you about how much money you would be

15   making from the prostitution?

16   A.   No, ma'am.

17   Q.   Did he talk about money at all?

18   A.   Only that he'd be getting it.

19   Q.   And did he talk about buying anything for you from the

20   proceeds of the prostitution?

21   A.   Not for us.

22   Q.   Did he talk about buying anything for himself?

23   A.   Him and L.P. were talking about, like, a red sports car.

24   Q.   And what did he say about the red sports car?

25   A.   That it would be nice to drive around in when he got the

```
 1   money from us.

 2   Q.   Did he tell you where you would be having prostitution

 3   dates?

 4   A.   In the hotel with his cousin.

 5   Q.   And did he tell you what his cousin would be doing?

 6   A.   She'd also be doing dates.

 7   Q.   Did Mr. Atkins take you straight to the hotel?

 8   A.   No, ma'am.

 9   Q.   Where did he take you first?

10   A.   At first he took us to -- it was like a parking lot, and

11   I'm not really sure where, but we picked up another man and had

12   another car following us and then we drove to a duplex that was

13   around the same area and we were getting driven there to be

14   tested.

15   Q.   Now, let me just stop you right there.  When you say that

16   you went to the parking lot and you met up with a few friends,

17   were these friends of yours?

18   A.   No, ma'am.

19   Q.   Whose friends were these?

20   A.   Ricky's.

21   Q.   Had you ever seen them before?

22   A.   No, ma'am.

23   Q.   And were they male or female?

24   A.   Male.

25   Q.   Approximately, how old were they?
```

1   A.   Probably late 20s, early 30s.

2   Q.   And you said that some of the friends followed you.

3        Do you mean that they were in a separate car?

4   A.   Yes, ma'am.

5   Q.   And who was in Mr. Atkin's car?

6   A.   Myself, L.P., Ricky and another male.

7   Q.   Did you know that man from before?

8   A.   No, ma'am.

9   Q.   Now, you talk about Mr. Atkins telling you that you were to

10  be "tested."  When did he say that?

11  A.   When we were picking up his friend.

12  Q.   And did you understand what that meant?

13  A.   No.

14  Q.   What happened when you got to the duplex?

15  A.   When they opened the door, they started calling rooms and

16  upstairs and downstairs.

17  Q.   What did you do?

18  A.   I waited until somebody told me where to go.

19  Q.   Did someone tell you where to go?

20  A.   Yeah.  The guy that was in the car with us brought me

21  upstairs.

22  Q.   And what happened upstairs?

23  A.   We had sex.

24  Q.   Did you know this person from before?

25  A.   No, ma'am.

1   Q.   Did you want to have sex with this person?

2   A.   No, ma'am.

3   Q.   Did you feel like you had to have sex with this person?

4   A.   Yes, ma'am.

5   Q.   And was that the only person that you had sex with at the

6   house?

7   A.   No, ma'am.

8   Q.   How many other people did you have sex with at the house?

9   A.   Two.

10   Q.   And did you have any sexual contact with Mr. Atkins at the

11   house?

12   A.   I gave him oral sex.

13   Q.   And did he ask you to give him oral sex?

14   A.   Yes, ma'am.

15   Q.   Did you want to?

16   A.   No, ma'am.

17   Q.   And did you feel like you had to?

18   A.   Yes, ma'am.

19   Q.   And why?

20   A.   Because I was in the house with three older big guys.

21   Q.   After that, where did Mr. Atkins take you?

22   A.   To the hotel, where his cousin was.

23   Q.   Do you remember what area the hotel was in?

24   A.   It was in Cutler Ridge or the Homestead area.

25   Q.   Do you remember the name of the hotel?

1    A.   Motel 6.

2         MS. RUBIN-SMITH:   Now, Your Honor, I'd like to admit

3    Government's Exhibit 10A and 10B into evidence at this time

4    without defense objection.

5         THE COURT:   Any objection to 10A and B?

6         MR. MICHAELS:   No, Your Honor.

7         THE COURT:   Received.

8         (Government's Exhibits 10A and 10B received into

9    evidence.)

10   BY MS. RUBIN-SMITH:

11   Q.   G.W., I will show you what's been admitted as Government's

12   Exhibit 10A.  Do you recognize the building in this photograph?

13   A.   Yes, ma'am.

14   Q.   And what is it?

15   A.   That's the Motel 6.

16   Q.   And is that where Mr. Atkins took you that night?

17   A.   Yes, ma'am.

18   Q.   And showing you Exhibit 10B, is that the same Motel 6?

19   A.   Yes, ma'am.

20   Q.   What happened when you got to the Motel 6?

21   A.   Me and L.P. got out of the car and went to the room number

22   that Ricky told us.

23   Q.   Did Mr. Atkins go up to the room with you?

24   A.   No, ma'am.

25   Q.   Did he give you any instructions for what to do when you

1   got to the room?

2   A.   To knock on the window.

3   Q.   Did you and L.P. go to the room?

4   A.   Yes, ma'am.

5   Q.   And what happened when you got to the room?

6   A.   We knocked on the window and his cousin answered.

7   Q.   And when you say "his cousin," who was it that answered the

8   door?

9   A.   Solo or Sandra.

10   Q.   Is that how she introduced herself?

11   A.   As "Solo."

12   Q.   And did you later find out her real name?

13   A.   Yes, ma'am.

14   Q.   And what did you find out her real name to be?

15   A.   "Sandra."

16   Q.   And did you ever learn her last name?

17   A.   Yeah.  Hold on.

18   Q.   And it's okay if you don't remember.

19   A.   I don't remember at this time.

20   Q.   Okay, no problem.

21        Had you ever seen --

22   A.   I remember now.

23   Q.   Okay.

24   A.   Sandra Simonton.

25   Q.   Thank you.  Had you ever seen her before?

1    A.   No, ma'am.

2    Q.   Had you ever met her before?

3    A.   No, ma'am.

4    Q.   Did you talk to her?

5    A.   When I got to the room, yes, ma'am.

6    Q.   What did Sandra tell you?

7    A.   She started explaining how the dates were going to work,

8    and how Backpage worked to make sure I knew what was going to

9    happen, and she asked if we wanted to work tonight.  And I told

10   her no, I didn't want to.  And so she moved on to taking

11   pictures of us for the Backpage ad.

12   Q.   What did Ms. Simon say about Backpage?

13   A.   Just that the pictures that she'd be taking would be posted

14   with a fake name and the amount of money that the client would

15   be paying.

16   Q.   And did she tell you what the price would be for the

17   prostitution dates?

18   A.   For me, my price was 125 or $150, and L.P. was going to be

19   $100.

20   Q.   Is that a price that you set?

21   A.   No, ma'am.

22   Q.   Did Sandra Simon tell you who would be getting the money

23   from the dates?

24   A.   That Ricky would.

25   Q.   And did Ms. Simon tell you if you would be getting anything

1    from the dates?

2    A.   No, ma'am.

3    Q.   She didn't tell you or she told you, you wouldn't be

4    getting anything?

5    A.   She told us that she wouldn't -- she didn't tell us that we

6    wouldn't get anything.

7    Q.   And did she explain to you how customers would get in touch

8    with you after seeing the Backpage ad?

9    A.   Yes, ma'am.   She listed her own personal phone number so

10   they call her --

11         MR. MICHAELS:   I object at this point, this is hearsay.

12   I should have objected earlier, everything about Sandra.   She

13   testified what Sandra said, it's all hearsay, I move to strike

14   and ask the jury to disregard what Sandra testified.

15         THE COURT:   For the record, Mr. Michaels, there is a

16   conspiracy charge in this case and that individual is

17   considered one of the co-conspirators.   The objection is

18   overruled and, Counsel, you may continue.

19         MS. RUBIN-SMITH:   Thank you, Your Honor.

20   BY MS. RUBIN-SMITH:

21   Q.   And I'm sorry, G.W., you were saying that Sandra said she

22   would put her number on the ad?

23   A.   Yes, ma'am.

24   Q.   And do you know why that is?

25   A.   Because we didn't have our own phone to put on the ad.

```
 1   Q.  And did she explain to you how potential customers would

 2   set up a prostitution date with you?

 3   A.  They would call her and set up a time.

 4   Q.  Did she tell you where the dates would happen?

 5   A.  In our hotel room.

 6   Q.  And did she tell you what you would be doing during the

 7   dates?

 8   A.  Yeah.  That we'd be having sex unless it was a client that

 9   only wanted oral sex.

10   Q.  And G.W., you said that Sandra took pictures of you?

11   A.  Yes, ma'am.

12   Q.  And did she also take pictures of Ms. L.P.?

13   A.  Yes, ma'am.

14   Q.  And do you know what she used to take those pictures?

15   A.  Her phone.

16   Q.  And where did she take those pictures?

17   A.  In our hotel room.

18        MS. RUBIN-SMITH:  And, Your Honor, at this time, I

19   would like to move Exhibit 11 into evidence without defense

20   objection.

21        THE COURT:  Any objection to Exhibit 11?

22        MR. MICHAELS:  No, Your Honor.

23        THE COURT:  Exhibit 11 is received.

24        (Government's Exhibit 11 received into evidence.)

25
```

1    BY MS. RUBIN-SMITH:

2    Q.   Ms. W., I would like to direct you to Government's

3    Exhibit 11.  I'm showing you the second page of this exhibit.

4         Do you recognize this photograph?

5    A.   Yes, ma'am.

6    Q.   Who is this?

7    A.   Me.

8    Q.   And do you recognize the signature at the bottom?

9    A.   Yes, that's my signature.

10   Q.   And did you sign that document when you were being

11   interviewed by law enforcement?

12   A.   Yes, ma'am.

13   Q.   Do you remember where this picture was taken?

14   A.   In our hotel room.

15   Q.   Was that at Motel 6?

16   A.   Yes, ma'am.

17   Q.   And is that the picture that Sandra Simon took of you?

18   A.   Yes, ma'am.

19   Q.   I'm just briefly going to show you the third page.

20        Is it the same for that picture?

21   A.   Yes, ma'am.

22   Q.   And the next page, is that also a picture that Ms. Simon

23   took of you?

24   A.   Yes, ma'am.

25   Q.   And the next picture, is that also a picture that Ms. Simon

1   took of you?

2   A.   Yes, ma'am.

3   Q.   I'm now showing you this picture.

4        Do you recognize this picture?

5   A.   Yes, ma'am.

6   Q.   Who is that?

7   A.   L.P.

8   Q.   And is this a picture that Ms. Simon took of L.P.?

9   A.   Yes, ma'am.

10  Q.   Were you in the room at the time?

11  A.   Yes, ma'am.

12  Q.   And is this another picture that Ms. Simon took?

13  A.   Yes, ma'am.

14  Q.   And is this another picture?

15  A.   Yes, ma'am.

16  Q.   Is that L.P.?

17  A.   Yes, ma'am.

18  Q.   Now I'd like to go back to the first page of this exhibit.

19       Where it says "post by" and there's a phone number.

20       Do you recognize that phone number?

21  A.   Yes, ma'am.

22  Q.   Whose phone number is that?

23  A.   That's Sandra's phone number.

24  Q.   Now just looking at the text, it says, "Date of post,

25  Saturday, August 16th."

1   A.   Yes, ma'am.

2   Q.   And in the text, it says, "Hi, my name is Brittany, sexy,

3   hot bombshell, blonde, slim with a perfect body, 38C, 5'8",

4   130, a hundred percent real pics, unrushed.  Call me now, baby,

5   786-923-7717.

6        "My friend is Becky, sexy, redhead and very talented.  Ask

7   about our two-girl special.  She is also available 24-7.  You

8   can also find me on Adult Finder.  Text me, Hun."

9        Do you recognize this text?

10  A.   No, ma'am.

11  Q.   So you did not write this?

12  A.   No, ma'am.

13  Q.   Did you write any text for any ads for yourself?

14  A.   No, ma'am.

15  Q.   Do you know who wrote that text?

16  A.   No, ma'am.

17  Q.   Now, G.W., you said that you told Ms. Simon you didn't want

18  to have any dates on the first night.

19       Did you end up having prostitution dates at the Motel 6?

20  A.   Yes, ma'am.

21  Q.   When did you start having prostitution dates?

22  A.   The next night.

23  Q.   Approximately, how many prostitution dates did you have at

24  the Motel 6?

25  A.   At least, 15.

1    Q.   How were they arranged?

2    A.   Through Sandra.

3    Q.   And were they arranged using Sandra Simon's cell phone?

4    A.   Most of them.

5    Q.   And when you said by "most of them," what about the rest of

6    them?

7    A.   We had gotten another phone from Ricky that was a TracFone

8    that L.P. would use on her ads and some of mine.

9    Q.   Okay.  So let's talk about that TracFone.  So did

10   Mr. Atkins ever return to the Motel 6 after dropping you off

11   with Sandra on the first night?

12   A.   Yes, ma'am.

13   Q.   And how many times did he return to the Motel 6?

14   A.   Once.

15   Q.   Did he come to your room?

16   A.   No, ma'am.

17   Q.   And do you know he came to the Motel 6?

18   A.   Sandra had said that he got here and also L.P. saw him.

19   Q.   And what happened when he came to the hotel?

20   A.   L.P. went to get a phone and exchange money.

21   Q.   And so when you say L.P. --

22        MR. MICHAELS:  Objection, Judge.  Unless she has

23   knowledge of that, she's speculating and L.P. --

24        THE COURT:  Objection -- Counsel, no speaking

25   objections.  The objection is sustained as to speculation.  The

1    jury is to disregard the last answer.

2    BY MS. RUBIN-SMITH:

3    Q.   How did you know that Mr. Atkins came for money?

4    A.   Sandra told me and L.P.

5    Q.   And did Sandra also tell you that he would be dropping off

6    the phone?

7    A.   Yes, ma'am.

8    Q.   Did Sandra explain to you why he would be dropping off the

9    phone?

10   A.   For our own ads because she wanted to just have her own

11   phone for her own ads.

12   Q.   No, but you said Sandra already had a phone, is that

13   correct?

14   A.   Yes, ma'am.

15   Q.   And so did she tell you why Mr. Atkins would be dropping

16   off another phone?

17   A.   Yes, for our ads, separate from hers.

18   Q.   So that would be for you and L.P.?

19   A.   Yes, ma'am.

20   Q.   And do you know, did Ms. Simon tell you how much money L.P.

21   would be bringing down to Mr. Atkins when he got there?

22   A.   No, ma'am.

23   Q.   And did you see L.P. come up to the room with a phone?

24   A.   Yes, ma'am.

25   Q.   And what did the phone look like?

 1   A.   It was, like, a square TracFone.

 2   Q.   Did you ever use that phone?

 3   A.   Yes, ma'am.

 4   Q.   And what did you use that phone for?

 5   A.   To schedule dates.

 6   Q.   And did you ever personally talk on that phone?

 7   A.   No, ma'am.

 8   Q.   Who talked on that phone to schedule dates for you?

 9   A.   L.P.

10   Q.   Now, going back to the dates that you had at the Motel 6,

11   did you ever talk to the men directly to arrange the dates?

12   A.   No, ma'am.

13   Q.   Who talked to the men?

14   A.   Either L.P. or Sandra.

15   Q.   Where did the dates take place?

16   A.   In our hotel room.

17   Q.   And what did the dates involve?

18   A.   Either having, like, oral sex or normal sex, things like

19   that.

20   Q.   Would the men pay you?

21   A.   Yes, ma'am.

22   Q.   And how did that work?  Did they pay you up front or

23   afterwards?

24   A.   Up front.

25   Q.   What did you do with the money that they gave you?

1    A.    We gave it to Sandra.

2    Q.    And do you know what Sandra did with the money?

3    A.    She told us she'd be giving it to Ricky.

4    Q.    Do you know how much money you earned?

5    A.    No, ma'am.

6    Q.    And why don't you?

7    A.    Because I never had the money long enough to count it.

8    Q.    Did L.P. have dates while you were at the Motel 6?

9    A.    Yes, ma'am.

10   Q.    Did Ms. Simon have dates while at the Motel 6?

11   A.    Yes, ma'am.

12   Q.    While you were with Sandra Simon, were you given any drugs

13   or alcohol?

14   A.    Yes, ma'am.

15   Q.    By who?

16   A.    By Sandra.

17   Q.    And what did she give you?

18   A.    She gave me weed because that's the only drug I did.

19   Q.    At some point, did you leave the Motel 6?

20   A.    Yes, ma'am.

21   Q.    Why did you leave?

22   A.    Because the staff at the motel brought the cops up to our

23   room to have us escorted out.

24   Q.    Where did you go from there?

25   A.    L.P.'s friend that she was out with that night came and

1   picked us up and dropped us off at a, like, little run-down

2   motel that was ten minutes away.

3   Q.   Who did you go with to the motel?

4   A.   It was me, L.P. and Sandra that stayed the night at the

5   hotel.

6   Q.   And do you remember where you went after the run-down

7   motel?

8   A.   Yes, ma'am, I went to the Hampton Inn by the Homestead

9   Hospital.

10        MS. RUBIN-SMITH:  Your Honor, at this time I'd like to

11   move into evidence Exhibit 12.

12        THE COURT:  Any objection to Exhibit Number 12,

13   Mr. Michaels?

14        MR. MICHAELS:  No, Your Honor.

15        THE COURT:  Exhibit 12 is received.

16        (Government's Exhibit 12 received into evidence.)

17   BY MS. RUBIN-SMITH:

18   Q.   G.W., do you recognize the building that's in this

19   photograph?

20   A.   Yes, ma'am.

21   Q.   And what is that?

22   A.   The hotel we stayed at after our run-down hotel.

23   Q.   Is that the Hampton Inn?

24   A.   Yes, ma'am.

25   Q.   Thank you.  Did you have any prostitution dates at the

1    Hampton Inn?

2    A.  One.

3    Q.  And do you remember anything about that date?

4    A.  It was with a man who had picked us up from the run-down

5    hotel that was friends with Sandra.

6    Q.  Do you remember his name or his nickname?

7    A.  He told me to call him "Romeo."

8            MR. MICHAELS:  I'm sorry, I couldn't hear.

9            THE WITNESS:  "Romeo."

10   BY MS. RUBIN-SMITH:

11   Q.  And did he pay you for the date?

12   A.  Not me directly.

13   Q.  Do you know who he paid?

14   A.  Sandra.

15   Q.  Did L.P. have dates at the Hampton Inn?

16   A.  Yes, ma'am.

17   Q.  And at some point were you, L.P. and Sandra Simon joined by

18   another female prostitute?

19   A.  Yes, ma'am.

20   Q.  What was her name?

21   A.  C.C.

22   Q.  Is that her nickname?

23   A.  Yes.

24   Q.  Do you know her real name?

25   A.  Claudia Gomez.

```
 1   Q.   Had you ever met her before?

 2   A.   No, ma'am.

 3   Q.   Did Sandra Simon know her from before?

 4   A.   Yes, ma'am.

 5   Q.   Do you know how Sandra knew her?

 6   A.   No, ma'am.

 7   Q.   Did Ms. L.P. know her from before?

 8   A.   Yes, ma'am.

 9   Q.   Do you know how Ms L.P. knew C.C.?

10   A.   They used to be at a mental facility together.

11   Q.   Do you know why -- and I'll call her Ms. Gomez.

12        Do you know why Ms. Gomez joined you?

13   A.   No, ma'am.

14   Q.   At some point, did someone else join you?

15   A.   Yes, ma'am.

16   Q.   Who was that?

17   A.   "Eightball."

18   Q.   Is that his nickname?

19   A.   Yes, ma'am.

20   Q.   Do you know his real name?

21   A.   Robert Munoz.

22   Q.   And what was his relationship?

23   A.   He was C.C.'s boyfriend.

24   Q.   At some point, did you and L.P. decide to leave Sandra

25        Simon and go with Ms. Claudia Gomez?
```

1  A.  Yes, ma'am.

2  Q.  When was that, approximately?

3  A.  The next day.

4  Q.  After they joined you?

5  A.  Yes, ma'am.

6  Q.  Up to that point, how long had you been with Ms. Simon?

7  A.  About four days, five days.

8  Q.  Why did you decide to leave Sandra Simon?

9  A.  Because C.C. said that we'd be getting our own money if we

10 worked with her.

11 Q.  And did C.C. tell you how you'd be getting money?

12 A.  From our dates.

13 Q.  And when you were with Ms. Simon, did you keep any of the

14 money that you got from the dates?

15 A.  No, ma'am.

16 Q.  What was Ms. Simon's reaction to your decision to leave

17 her?

18 A.  She was really mad and she kept saying how mad Ricky would

19 be, and she was really trying to convince us to stay.

20 Q.  Where did you go after you left Ms. Simon?

21 A.  After we left her, we left her at the Wishes Motel and

22 after that we went to Tampa, after a night, we stayed a night

23 on South Beach but we didn't stay at a hotel, we stayed in the

24 car.

25 Q.  And were you traveling with L.P., Ms. Gomez and Mr. Munoz?

1    A.   Yes, ma'am.

2    Q.   What ended up happening while you were with Ms. Gomez and

3    Mr. Munoz?

4    A.   We had dates, and I ended up going back to the shelter

5    because we got into a car crash.

6    Q.   Who was driving the car?

7    A.   C.C.

8    Q.   Where?

9    A.   We were coming back from Tampa, so in North Port.

10   Q.   Do you know what caused the accident?

11   A.   Yes.

12   Q.   What caused it?

13   A.   Claudia was driving under the influence and we were --

14   well, yeah, we were influenced, we were drunk, and Robert got

15   mad at the car in front of us who cut us off, and so he grabbed

16   C.C.'s leg and made her slam on the gas to rear-end the car in

17   front of us.

18   Q.   Was the police called out to the car accident?

19   A.   Yes, ma'am.

20   Q.   Did you talk to the police?

21   A.   After C.C. and Robert had sped off, yes.

22   Q.   And can you explain what happened?

23   A.   When we got into the crash, everybody got out of the car.

24        C.C. and Robert started arguing with the driver of the car

25   that we hit.  While they were arguing, me and L.P. ran away and

1    ran to the back of the Walgreens that we were by to hide.

2    Q.   Why did you run away?

3    A.   Because we didn't want to be prostitutes or anything.   We

4    were done.   We wanted to go home.

5    Q.   And so you said you ran away to the Walgreens.   Did you

6    come back to the car accident scene?

7    A.   Yes, ma'am.

8    Q.   Were you hurt in the car accident?

9    A.   Yes, ma'am.

10    Q.   How were you hurt?

11    A.   I broke my left elbow and I sprained my left ankle.

12    Q.   And so when you came back and you talked to the police,

13    what did they do?

14    A.   They had us sent to a shelter that was near there for the

15    night, and then the next morning we went back to the

16    Florida Keys Children's Shelter.

17    Q.   And was that the same shelter where you met Mr. Atkins?

18    A.   Yes, ma'am.

19    Q.   And do you remember, approximately, when you were returned

20    to the Florida Keys Children's Shelter?

21    A.   I think August 24th or 25th.

22    Q.   So about ten days after you first ran away?

23    A.   Yes, ma'am.

24    Q.   When you came back to the shelter, did you see Mr. Atkins?

25    A.   Yes, ma'am.

1    Q.   Was he still working there as a mentor?

2    A.   Yes, ma'am.

3    Q.   Did he talk to you?

4    A.   Yes, ma'am.

5    Q.   What did he tell you?

6    A.   Well, I was in my room and I was, like, facing towards my

7    window and he came in and touched me inappropriately, and then

8    asked when I was going to come work for him again.

9    Q.   And when he said "work for him again," what did you

10   understand that to mean?

11   A.   As a prostitute for him again.

12   Q.   What was your reaction?

13   A.   I was quiet, but in my head, I was very uncomfortable and

14   knew I had to get out of there.

15   Q.   Did you tell him anything?

16   A.   No, ma'am.

17   Q.   Why didn't you tell him anything?

18   A.   I was uncomfortable.

19   Q.   Why were you uncomfortable?

20   A.   Because I had gone from being a sweet, innocent little

21   girl, for the most part, to being a prostitute.  That's a lot

22   to take in, and I knew that's not who I was and that's not who

23   I wanted to be.

24   Q.   And after you talked to Mr. Atkins at the shelter, what did

25   you do?

1   A.   I waited until around 10:00, and I talked to another staff

2   member there -- because I was going to run away, and that staff

3   member did not want me to run away -- so I finally broke down

4   and told him everything.

5   Q.   And do you remember the name of that staff member?

6   A.   Alvin.

7   Q.   What did you do after you talked to Alvin?

8   A.   He told me to wait until the next morning and then talk to

9   a female staff member so I could leave.

10   Q.   Did you talk to a female staff member the next morning?

11   A.   Yes, I did.

12   Q.   Do you remember her name?

13   A.   I talked to Needra and I also talked to Ms. Rousseau.

14   Q.   And at some point, was the police contacted?

15   A.   Yes, ma'am.

16   Q.   Were you interviewed by the police?

17   A.   Yes, ma'am.

18   Q.   Do you remember, approximately, when that was?

19   A.   Like the morning of the 26th or 27th.

20   Q.   Did you tell the police immediately about Mr. Atkins?

21   A.   No, ma'am.

22   Q.   Why not?

23   A.   Because I didn't want to take him away from his kids.

24   That's one thing he always talked about, was how important his

25   kids were to him; and I have had my father taken away from me,

1    and I didn't want to do that to his kids.

2    Q.  Did you talk about Sandra Simon?

3    A.  Yes, ma'am.

4    Q.  Did you talk about Robert Munoz?

5    A.  Yes, ma'am.

6    Q.  And did you talk about Claudia Gomez?

7    A.  Yes, ma'am.

8    Q.  Were you interviewed by the police again a few days later?

9    A.  Yes, ma'am.

10   Q.  And at that point, did you talk about Mr. Atkins?

11   A.  Yes, ma'am.

12   Q.  What made you change your mind?

13   A.  I had an agent talk to me about another case and how it

14   could have led to more girls being victims, and I didn't want

15   anybody else to go through what I went through.

16   Q.  And after you told the police about Mr. Atkins, were you

17   removed from the Florida Keys Children's Shelter?

18   A.  Yes, ma'am.

19          MS. RUBIN-SMITH:  Thank you.  May I have a moment,

20   Your Honor?

21          THE COURT:  Yes, you may.

22          MS. RUBIN-SMITH:  Thank you, G.W.

23          THE COURT:  Counsel for Mr. Atkins.

24          MR. MICHAELS:  Yes, Your Honor.

25

```
 1                         CROSS-EXAMINATION

 2   BY MR. MICHAELS:

 3   Q.   Good afternoon.  I said good afternoon to you.

 4   A.   Good afternoon to you.

 5   Q.   Before I start, I want to clarify something.

 6        You were a sweet, innocent girl from Iowa; right?

 7   A.   Yes, sir.

 8   Q.   And all of a sudden, you became a prostitute; right?

 9   A.   Yes, sir.

10   Q.   And that's why you decided to go on your own, to abandon

11   Sandra and go on your own, these people that you don't know to

12   prostitute yourself for money for yourself in Tampa, because

13   you're sweet and innocent; correct?

14   A.   I didn't want to leave my best friend, sir.

15   Q.   You what?

16   A.   I didn't want to leave my best friend, sir.

17   Q.   She's older than you; right?

18   A.   Yes.

19   Q.   More experienced than you; right?

20   A.   Yes.

21   Q.   Okay.  I'm going to get to that later, but let's start from

22   the beginning.

23        First of all, I still don't understand, maybe you can help

24   me and the jury, how you end up from traveling with your

25   mother -- that's what you said; right?
```

1    A.   Yes, sir.

2    Q.   By becoming, I guess, a runaway or fugitive in a shelter in

3    the Keys; how did that happen?

4    A.   My mother was very abusive so I got taken away by the

5    police and placed at the shelter, and I started running away

6    because I don't get along with other kids.

7    Q.   Your mother was abusive?

8    A.   Yes, sir.

9    Q.   In what sense?

10   A.   Physical.

11        MS. RUBIN-SMITH:  Your Honor, objection.

12        THE COURT:  Overruled.

13   BY MR. MICHAELS:

14   Q.   In what sense abusive?

15   A.   Physical, she beat me almost everyday.

16   Q.   Why was that?

17   A.   She was mainly a drunk -- but also --

18   Q.   I'm sorry?

19   A.   She was mainly a drunk.

20   Q.   She would make you a drunk?

21   A.   She was mainly a drunk.

22   Q.   She was mainly a drunk?

23   A.   But also, if I didn't feed the dogs properly, like feed

24   them on time or take them out on time, she'd beat me if they

25   went to the bathroom in the house.

1    Q.   Who did you travel with?

2    A.   It was me, my mother and my stepfather.

3    Q.   And did your stepfather abuse you?

4    A.   No.

5    Q.   He was just watching, sitting there while your mother is

6    abusing you?

7    A.   No, he'd tell her to keep going, like --

8    Q.   I'm sorry?

9    A.   He'd tell her to keep going, he wanted her to hit me.

10   Q.   Oh, so he was encouraging her?

11   A.   Yes, sir.

12        MS. RUBIN-SMITH:  Your Honor.  Objection.  This is

13   irrelevant.

14        THE COURT:  Overruled.

15   BY MR. MICHAELS:

16   Q.   Did your mother or your stepfather ask you to prostitute?

17   A.   No, sir.

18   Q.   So, how did the police got involved?  You called the

19   police?

20   A.   Yes, sir.

21   Q.   Is there a police case number?  Did you tell the Government

22   what department you called, where you were?

23   A.   No, sir.

24   Q.   They didn't ask you?  They didn't care?

25   A.   Care about what?

1    Q.   Care about the little girl being physically abused by her

2    mother.   That's supposed to be a crime, also.   These three,

3    four FBI, prosecutors, special agents, whatever they are, there

4    are many of them, did they try to find out why this happened?

5         Did they find out who your mother is?

6         Did they try to talk to her, find out why she's behaving

7    like this, why you're a runaway?

8         Did they ask you the police case number, what department

9    you called; yes or no?

10   A.   No.

11   Q.   They didn't care about you, they only care about their

12   case; correct?

13        They only ask you about how to build a case so they look

14   good, they have a great staff.

15        Did the police ever interrogate your mother?

16   A.   No, they have nothing to do with my mother's case.

17   Q.   This case has nothing to do with your mother; you don't

18   think you are here today because of your mother, also?

19   A.   No, sir.

20   Q.   No?

21   A.   No.

22   Q.   Okay.   All right.   So which shelter -- so you're telling me

23   you did not run away; the police took you away from your

24   mother?

25   A.   Yes.

1   Q.   And they filed this year a report or any kind of a report

2   about that?

3   A.   Yes.

4   Q.   Did they report your mother to authorities?

5   A.   Yes.

6   Q.   And where is this case?  There is a case you know of?

7   A.   Yes.

8        MS. RUBIN-SMITH:  Your Honor, objection.  Asked and

9   answered.

10  BY MR. MICHAELS:

11  Q.   Why don't you know the information of the case?

12       THE COURT:  The objection is sustained as to asked and

13  answered.

14       Move on, Counsel.

15       MR. MICHAELS:  All right.

16  BY MR. MICHAELS:

17  Q.   So where did they took you?

18  A.   The police brought me to the Florida Keys Children's

19  Shelter.

20  Q.   So you were in Florida, I assume, with your mother?

21  A.   Yes, at Bahia Honda.

22  Q.   I'm sorry?

23  A.   At Bahia Honda State Park.

24  Q.   I don't know where that is.  That's the Southern District,

25  here?

1  A.  It's, basically, in Marathon.

2  Q.  Oh, in Southern District of Florida.  Wow.  Okay.

3      So you end up at the shelter in March, you said?

4  A.  Yes, sir.

5  Q.  And when you get there, you became roommate immediately, or

6  soon after, with -- what's her name face, L.P.?

7  A.  L.P.

8  Q.  L.P.

9  A.  About, I'd say, seven months, six months later is when she

10  came.

11  Q.  Okay.  Let me see if I follow you.  You got to the shelter

12  on March 23rd, 2014?

13  A.  Uh-huh.

14  Q.  Yes?

15  A.  Yes, sir.

16  Q.  And L.P. came about seven months later?

17  A.  Uh-huh.  Well --

18  Q.  You need to say yes or no.

19  A.  Well, maybe six, maybe six months.

20  Q.  Do me a favor, the court reporter who writes everything

21  down cannot put "uh-huh, huh-uh," they can't do that.

22      Please say yes or no, whichever the appropriate answer may

23  be, please.  It's very hard for them to put "uh-huh."  Okay?

24      Okay, ma'am?

25  A.  Okay.

1    Q.   Thank you.  By my calculation, if you got there in March

2    and L.P. came, not seven -- let's forget about seven -- six

3    months later, that would be September?

4    A.   Yeah.

5    Q.   April, May, June, July, August, September, but you already

6    run away several times before August 15th, and you run away on

7    August 15th with L.P.; right?

8    A.   I may have miscalculated, but I know she came about a month

9    before we ran away.

10   Q.   Okay.  So this girl, either you miscalculate -- because we

11   all know that you were runaway with her; so, obviously, you

12   gave the wrong answer, not on purpose, I understand, you were

13   wrong, you misstated.

14        Your memory is not like it used to be when you were

15   younger; right?  All right.  I'm going to move on.

16        She is your best friend in two, three weeks?  I guess, at

17   your age, that may happen; I don't know, because I'm too old.

18   She became your best friend in two weeks, three weeks; right?

19   A.   Yes, sir.

20   Q.   To the point that you will not abandon your best friend,

21   you'd rather commit prostitution on your own and make money as

22   prostitute, go to Tampa, travel the state, than abandon your

23   best friend for two weeks, L.P.; right?

24   A.   Yes.

25   Q.   Okay.  Now, you're aware, were you not, that L.P. did

1    prostitution before; correct?

2    A.   Yes.

3    Q.   Okay.  And, in fact, she was the one, is she not, who

4    directed you and mentored you and encouraged you to do the

5    same; right?

6    A.   No.

7    Q.   Hold on a second.  You guys best friends; no?

8    A.   Yes, we are.

9    Q.   And you did go to do prostitution to protect L.P.,

10   according to you; right?

11   A.   After everything happened with Ricky, yes.

12   Q.   Yeah, okay.  So, I know you're trained to say that, I know

13   they talked to you in Legal?

14            MS. RUBIN-SMITH:  Your Honor, objection.

15   BY MR. MICHAELS:

16   Q.   Did you talk with the prosecutor before --

17            THE COURT:  Sustained.  Wait.  One at a time.

18            First of all, Counsel, ask a question; no commentary.

19            MR. MICHAELS:  Sure.

20            THE COURT:  Counsel, your objection is sustained.  The

21   jury is to disregard Mr. Michaels' last question.

22            Proceed, please.

23            MR. MICHAELS:  Yes, Your Honor.

24   BY MR. MICHAELS:

25   Q.   You did talk with agents and the prosecutor about your

1    testimony; correct?

2    A.   Yes.

3    Q.   Okay.  It's nothing illegal about that, but you did talk

4    with them about; right?

5    A.   Yes.

6    Q.   Okay.  And they prepare you, they didn't tell you to lie,

7    I'm sure, but they prepare you and help you with your answers,

8    correct?

9    A.   They didn't help me with my answers.

10   Q.   No.  Okay.  Now, how many times did you run away before

11   August 14th or 15th with L.P.?

12   A.   I never ran away with L.P. before.

13   Q.   But you run away from the shelter before?

14   A.   Yes, sir.

15   Q.   But not with her?

16   A.   No.

17   Q.   So your testimony is you ran by yourself or with some other

18   girls?

19   A.   Can you rephrase the question?

20   Q.   Okay.  You testified on direct examination, that means when

21   they asked you questions, you testified that you ran away from

22   the shelter before.

23   A.   Yes.

24   Q.   My question is, number one, if you remember, how many times

25   before August 14, 15, did you run away from the shelter?

1   A.   By myself?

2   Q.   I don't know.  That's my first question, is how many times

3   you run altogether.  I don't care if there's a hundred of you

4   or just you; how many times did you run away from the shelter?

5   A.   Well over 30 times.

6   Q.   How much?

7   A.   Thirty.  Over 30.

8   Q.   Over 30 times between March and August?

9   A.   Yes.

10   Q.   Wow.  And did you -- out of these 30 times, it's your

11   testimony that you never run with L.P.?

12   A.   Not until Ricky got involved.

13   Q.   Not until August 14; right?

14   A.   Yes.

15   Q.   Okay.  And did you run away with other people during these

16   certain times that you ran away?

17   A.   Sometimes, yes.

18   Q.   Who are the other girls you run away with?

19   A.   Just other kids in the shelter.

20   Q.   Well, I want to know what they are so I can ask if you guys

21   commit prostitution.  Can you give me their name, please?

22        I have the right to know their names so I can investigate

23   if you and them commit prostitution.

24             MS. RUBIN-SMITH:  Objection, Your Honor.

25             THE COURT:  Sustained.

1           Mr. Michaels, would you approach, please?

2           MR. MICHAELS:  Sure.

3           (Sidebar discussion held as follows:)

4           THE COURT:  You can ask her questions, you can't lead;

5      but there's no reason to yell at her.  There's no reason to

6      yell at anything.

7           MR. MICHAELS:  I'm not yelling.  I apologize.

8           THE COURT:  I understand you feel passionately about

9      your representation, but don't make me thrash you down in front

10     of the jury.  Calm down.

11          MR. MICHAELS:  I am very calm, actually.

12          THE COURT:  Well, one of us is going to get angry.

13          MR. MICHAELS:  I don't want you to get angry.  I

14     apologize.  It's not on purpose.  I do for 30 years.  I cannot

15     help myself.  I have a problem.

16          THE COURT:  All right.

17          MS. RUBIN-SMITH:  Thank you, Your Honor.

18         (Sidebar concluded, proceedings continued in open court:)

19          THE COURT:  Subject to our conversation at sidebar,

20     Mr. Michaels, you may continue.

21          MR. MICHAELS:  Thank you, Your Honor.

22     BY MR. MICHAELS:

23     Q.   Now, I have the right, and I'd like to know the name of the

24     girls that you run away in the past, because I want to do a

25     little work on that.

1    A.   I believe I've only ran away with one other female, and her

2    name is E.I.

3    Q.   Okay.  Last name is "I."?

4    A.   Uh-huh.

5         THE COURT:  Is that a yes or no?  Remember, I need to

6    have you say yes or no, for the record.

7         THE WITNESS:  Sorry, ma'am.  Yes, her last name is "I,"

8    and her first name is "E."

9    BY MR. MICHAELS:

10   Q.   E.?

11   A.   E. (spelling her name)

12   Q.   E.?

13   A.   E.  (Spelling her name)

14   Q.   Okay.  Now, you run now more than one time away with E.I.,

15   or no, if you remember?

16   A.   I've ran away twice with her.

17   Q.   Twice?

18   A.   Yes.

19   Q.   Okay.  Do you know where she is now?

20   A.   No, sir.

21   Q.   Do you know if she's still in the shelter or not, if you

22   know?

23   A.   She's not in the shelter.

24   Q.   She's over 18 now?

25   A.   No, I think she got adopted by a family member.

1   Q.  She went into a -- okay.  And, obviously, you don't know

2   the name of the family who adopted her, I understand that.

3       Now, you initially said that there were several girls that

4   you run away with, and then the last time you come back and

5   said, actually, I think I only run with one girl only.

6       Do you know which is what, if your memory can help you?

7   How many -- did you run away with any other girls?

8   A.  Not that I can remember.

9   Q.  Well, for how many days you were run away, when you run

10  away these 30 times?

11  A.  When I run away with E.I., was that the question?

12  Q.  I'm sorry?

13  A.  How many times -- I mean, how many days?

14  Q.  How long were you away from the shelter during these

15  runaway episodes, an hour, a day, a week?

16  A.  Usually, it just be a day.  There's been two other times

17  where I ran away and I was gone for a few weeks.

18  Q.  For a few weeks?

19  A.  Yes.

20  Q.  And how you support yourself while you run away for a few

21  weeks?

22  A.  I have friends who would help me.

23  Q.  You providing sexual favor for money?

24  A.  No.

25  Q.  Who are these friends?

1    A.   Do I have to give their name?

2    Q.   You are under oath, ma'am, and I think you should ask the

3    judge, not me, because my answer is yes, you are under oath and

4    I expect you to tell the truth.

5         THE COURT:   Answer the question, please.

6    A.   When I ran away those two times was with my boyfriend,

7    Dontavis Nesmith.

8    Q.   Your boyfriend, you have a boyfriend?

9    A.   I did at the time.

10   Q.   What's his name?

11   A.   Dontavis Nesmith, D-O-N-T-A-V-I-S.

12   Q.   Davis, Don Davis.

13   A.   Dontavis.

14   Q.   How old is Dontavis?

15   A.   Now, I would think he's 20 or 21.

16   Q.   So he was an adult at the time.   While you were a minor, he

17   was still an adult, over 18; right?

18   A.   Yes.

19   Q.   And did he make you do things?

20   A.   No.

21   Q.   Who are the other friends?

22   A.   Other friends?   I just ran away to him.

23   Q.   Run away to him.   And where did you stay?

24   A.   Where did I stay?

25   Q.   Yeah, with him.   Yeah.

```
 1   A.   At his house.

 2   Q.   I'm sorry?

 3   A.   At his house.

 4   Q.   His house.  So what's his address?

 5   A.   I do not know the address.

 6   Q.   You do not know the address?

 7   A.   No.

 8   Q.   What's his phone number?

 9   A.   I do not know his phone number.

10   Q.   Really?

11   A.   I have not talked to him in awhile.

12   Q.   Any reason why you initially refused to answer the

13   question?

14   A.   I didn't understand -- hear you.

15   Q.   Any reason why when I asked you first the names you did not

16   want to answer the questions?

17   A.   It's not that I didn't want to.  I was just making sure,

18   like, there was no other people that I ran away to, because

19   any --

20   Q.   Well, you asked the Court and me, "Do I have to answer the

21   question?"  Do you remember answering?

22   A.   Oh, his name?  Because I didn't feel like that was,

23   honestly, any of your business.

24   Q.   Right.  Do you know what my business is?

25        MS. RUBIN-SMITH:  Objection, Your Honor.
```

1          THE COURT:  Sustained.  Move on, Counsel.

2    BY MR. MICHAELS:

3    Q.  What's your business?

4          THE COURT:  Move on, Counsel.  The objection's been

5    sustained.

6    BY MR. MICHAELS:

7    Q.  It's your business to get a conviction for the Government;

8    yes or no?

9    A.  Can you rephrase the question so I can understand?

10   Q.  Is your business today to do whatever you can to get the

11   conviction for the Government?

12   A.  No.  My business is to tell the truth.

13   Q.  All right.  Perfect answer.

14         MS. RUBIN-SMITH:  Objection, Your Honor.  Defense

15   counsel --

16         MR. MICHAELS:  I withdraw the comment.  I apologize.

17         THE COURT:  Yes, but withdrawn is not the same.  Be

18   careful, Mr. Michaels.  Be very, very careful.

19         MR. MICHAELS:  Yes, ma'am.

20   BY MR. MICHAELS:

21   Q.  You start, you met Ricky at the center; right?

22   A.  Yes.

23   Q.  And he treat you nice; correct?

24   A.  Yeah, he treated me fairly to the other kids.

25   Q.  I'm sorry?

1    A.   He treated me fairly to the other kids.

2    Q.   He didn't you fairly --

3    A.   As he did to the other kids, we were all treated the same.

4    Q.   Right, okay.  Right.  He treat all the kids nice; correct?

5    A.   Yeah.

6    Q.   Okay.  He did not scream, yell, physically abuse you guys,

7    slap you, or any of these things; right?

8    A.   No.

9    Q.   But you became friendly with him?

10   A.   Yes.

11   Q.   To the point that you became, in your own words, attracted

12   to him?

13   A.   Yes.

14   Q.   So being such a sweet, innocent girl from Iowa, the first

15   time you're alone with him in the van you ended up giving him

16   oral sex in a parking lot because that's what sweet, innocent

17   girls from Iowa do, they give guys blow jobs -- I'm going to

18   use the words which is how you guys use it -- in a parking lot;

19   right?  Did you do that or not?

20   A.   Yes, I did.

21   Q.   Okay.  And he did not put a gun to your head, did he?

22   Assuming that the -- strike this.

23        Assuming what you say is true, that you had oral sex with

24   him, did he force you?

25   A.   No.

1    Q.   I'm sorry?

2    A.   No.

3    Q.   He didn't blackmail you into doing it, he didn't put a gun

4    at your head, he didn't physically grab you and force you; none

5    of this happened; right?

6    A.   No.

7    Q.   You did this on your own?

8    A.   Yes.

9    Q.   Because you're a sweet girl from Iowa, like you told the

10   jury; right?

11   A.   Because I was attracted to him and I believed he was

12   attracted to me.

13   Q.   Okay.  It was love, we are talking about now love?

14   A.   Well, I know now that it wasn't.

15   Q.   We're in a love domain now.  But you have no problem doing

16   that with Ricky because you're attracted to him; right?

17   A.   Yes.

18   Q.   Okay.  I know you're only at the time, about 15?

19   A.   At the time I was 15, yes.

20   Q.   Okay.  And assuming that what you said is true, that you

21   had oral sex with him, would it be fair to say that you are the

22   one who actually seduced him?

23   A.   No.

24   Q.   Now because you're 15 and sweet and innocent, so you

25   have -- you don't have it into you to manipulate men; right,

```
 1   you don't know how to do that at 15?

 2       You're a sweet, innocent girl from Iowa; right?

 3   A.   Right.

 4   Q.   Yeah.  Now, obviously, you're not that sweet and innocent

 5   because you already have a boyfriend, you run away weeks with

 6   him and you run away from the shelter before.

 7       I mean, you're not coming out from glass tower and you end

 8   up in a shelter in the Keys; right?

 9       That didn't happen overnight; you've been, unfortunately

10   for you, through several stages to get where you were; right?

11   A.   Yes.

12   Q.   And you still don't think that your mother has nothing to

13   do with where you are today?

14   A.   No.

15   Q.   Okay.  Did you get any counseling right now?

16   A.   I see a psychiatrist.

17   Q.   Okay.  Good.  Now, at some point in time you testified that

18   you started talking with Ricky about running away; right?

19   A.   Yes.

20   Q.   And this conversation was taking place exactly where, if

21   you remember?

22   A.   I was in the common area and he was in the office that's

23   connected to the common area.

24   Q.   And you were talking, and he was here and you were there,

25   or how?
```

1    A.    Uh-huh.

2    Q.    Oh, it's not like an intimate conversation, close to each

3    other?

4    A.    No.

5    Q.    Everybody could hear it?

6    A.    There was nobody else there.

7    Q.    How do you know that?

8    A.    Because every kid is locked down their hallway and there is

9    another staff member that went and checked on them during this

10   conversation.

11   Q.    Well, how many staff members are there?

12   A.    At the night shift, there's two.

13   Q.    Okay.  This conversation was taken during the day or

14   nighttime?

15   A.    At night.

16   Q.    He was -- by then when you came there, was he working ten

17   to six or was he working some morning shifts, too; do you know?

18   A.    No, he was working ten p.m. to six a.m.

19   Q.    So while you were there, he always worked the night shift,

20   as far as you remember?

21   A.    He was at night shift, yes.

22   Q.    Right.  Okay.  But you know he was there since 2011; right?

23   A.    I didn't know how long he'd been working there.

24   Q.    All right.  He was there for three years and worked

25   different shifts.  Did you know that?

 1              MS. RUBIN-SMITH:  Objection, Your Honor.

 2              MR. MICHAELS:  I'm asking if she knows that.

 3              MS. RUBIN-SMITH:  Asked and answered.

 4              THE COURT:  Objection sustained.

 5              MR. MICHAELS:  I didn't ask about the shift before.

 6              THE COURT:  Move on, Counsel.

 7              MR. MICHAELS:  That's fine.  I will move on.

 8  BY MR. MICHAELS:

 9  Q.  So you guys are not worried about hearing -- having your

10  conversation a little bit from distance; right?  And what was

11  the conversation about?  You guys going to start a family, you

12  are lovers, you love him, he loves you?

13  A.  At first the conversation started because he asked when I

14  was going to be his girlfriend because I was talking about my

15  relationship problems.

16  Q.  Were you having relationship problems with your boyfriend?

17  A.  Yes.

18  Q.  Okay.  And he gave you two phone numbers at some point?

19  A.  Yes.

20  Q.  This was another day, not the day you have the

21  conversation?

22  A.  No, it was the same day.

23  Q.  Same day.  So eventually you got close to each other or he

24  throw it to you?  Does he throw the candy to you?

25  A.  He came over and handed me a candy wrapper that had the

1    numbers inside.

2    Q.   Two numbers; right?

3    A.   Yes.

4    Q.   And he said one of them was -- well, let me actually

5    rephrase this.   Whose number was it?

6    A.   One of them was his and the other was a friend.

7    Q.   What friend?

8    A.   I have no idea.

9    Q.   You didn't call any of his numbers?

10   A.   Me personally, no.

11   Q.   Well, who called his numbers?

12   A.   L.P. called one of them, which was his.

13   Q.   L.P. called.   And if you have no phone call [sic], how did

14   you call the number if you have no cell phone?

15   A.   L.P. called when we were on runaway, and we used people's

16   phones.

17   Q.   So he gives you a phone number knowing that you have no

18   phone number -- you guys have no cells; right?

19   A.   No, we don't.

20   Q.   You still have the wrapper?

21   A.   Do I?   No.

22   Q.   I'm sorry?

23   A.   Did you ask if I still have the wrapper?

24   Q.   That's correct, ma'am.   I asked if you saved the wrapper.

25   There's nothing funny about that.   I mean, you can think it's

```
 1   funny, but did you save the wrapper; yes or no?

 2           MS. RUBIN-SMITH:  Objection, Your Honor, to arguing

 3   with the witness.

 4           THE COURT:  Sustained.  Mr. Michaels, ask a question.

 5           MR. MICHAELS:  I am, Judge.

 6   BY MR. MICHAELS:

 7   Q.   Is there any reason you're smiling while this man is

 8   fighting for his freedom?  Is there any reason?  Is something

 9   funny here?

10           MS. RUBIN-SMITH:  Objection, Your Honor.

11           THE COURT:  Mr. Michaels, ask a question.

12   BY MR. MICHAELS:

13   Q.   Is anything funny here?

14   A.   No, I don't find it humorous.

15   Q.   Do you think something funny's going on?

16   A.   No.

17   Q.   Listen to my question again.  Do you still have the

18   wrapper?

19   A.   At this moment, no.

20   Q.   Well, at that -- you saved it for awhile?

21   A.   I did until we ran away.

22   Q.   And then you discarded it?

23   A.   Yes.

24   Q.   So you keep it while you cannot use it because you have no

25   phone, but when you run away and you have access to phone you
```

1   throw it away; that's what you're saying; right?  I want to

2   understand.

3   A.   I threw the wrapper away after we made the phone call.

4   Q.   Okay.  Now, maybe you can help me because I am very

5   confused.

6        You claim that you have -- I'm going to get back to the

7   details but while we're on the subject with the phones, you

8   claimed that you have -- you made an arrangement with Ricky to

9   run away and for him to pick you up; right?

10  A.   Yes.

11  Q.   Well, if you make an arrangement with Ricky to come meet

12  you somewhere and pick you up, wouldn't it be easier to

13  establish the location and the time where you're going to meet

14  him rather than run around trying to find cell phone to call

15  him?

16  A.   It would have --

17  Q.   Answer my question.

18  A.   It would have been easier except for the fact we were not

19  sure which day we were going to run away, so when we kept the

20  number so when we did figure out our day we could call him.

21  Q.   Isn't it true, you ran away 30 times, you, ma'am, you can

22  run out of the shelter any time you want, there is no security;

23  correct?  There is no security; correct?

24  A.   No, there isn't.

25  Q.   There are no guards?

1    A.   No.

2    Q.   There are no dogs?

3    A.   No.

4    Q.   Right.  And you already run before the night 30 times.  You

5    telling this jury that you don't know when you can run away and

6    you have free access to the streets?

7         Why are you lying, ma'am?

8    A.   We had personal things going on that we wanted to figure

9    out before we left.

10   Q.   The truth is that you never set up a runaway plan with

11   Ricky; that you have his number probably, and you called him

12   and it took him by surprise that you're out on the streets?

13   A.   That's not true.

14   Q.   That's not true.  It's true that you cannot run away from

15   the shelter, though you can do it 30 times, and you didn't

16   think about setting up a location that you're familiar with and

17   a time; that didn't happen?

18   A.   No.

19   Q.   No.  What would have happened if you find no one nice

20   enough to give you the cell number [sic], you just stay all

21   night on the street?

22   A.   Probably would have came back and figured something out

23   another day.

24   Q.   You sure you can get out again; right, because you get out

25   any time you want; right?  These shelter are not --

1   unfortunately, they're not lock-up shelters; right?

2   A.   We're locked down our hallways, but our windows don't have

3   alarms on them.

4   Q.   Right.  You can come in and out, like you said, 30 times

5   already in four months; right?

6   A.   Yep.

7   Q.   All right.  You're proud of that, that you can get in and

8   out of the shelter 30 times?

9         MS. RUBIN-SMITH:  Objection, Your Honor.

10        THE COURT:  Overruled.

11  BY MR. MICHAELS:

12  Q.   Are you proud of that?

13  A.   Not proud of that specifically, but proud that I can take

14  care of myself and don't have to worry about them doing it.   I

15  can get out on the streets and take care of myself.

16  Q.   By doing prostitution which you just decide to do and go to

17  Tampa; right?

18  A.   No.

19  Q.   You just -- okay.

20        So did you ever go to Georgia?

21  A.   What was the question?

22  Q.   Did you ever arrive to Georgia?

23  A.   No.

24  Q.   Did you ever get to Georgia?

25  A.   No.

1    Q.   And tell me -- tell me how you and L.P., L.P., I believe,

2    L.P. planned to get away, why both of you?  You said you never

3    run away with her before.

4    A.   No.

5    Q.   Why now, you and L.P. team up?

6    A.   Because we had a close bond.

7    Q.   Okay.  But you know already, do you not, that she -- not

8    you, not you, not you, but she was a prostitute -- I mean, she

9    was doing prostitution to support herself, and you agreed to

10   run away with her; right?  Yes?

11   A.   Yes.

12   Q.   So what do you think, you believe she will do the heavy

13   lifting while you sleep and look beautiful and pamper yourself,

14   because you're sweet girl from Iowa?

15   A.   That wasn't part of the plan when we left.

16   Q.   That was the plan [sic] of the plan, she'll do the heavy

17   lifting and you'll be the princess?

18   A.   Prostituting was not part of the plan when we left the

19   shelter.

20   Q.   What was the part of the plan, to be a princess?

21   A.   That was not part of the plan.  The plan was that we were

22   just going to have Ricky pick us up and from then we'd figure

23   it out.

24   Q.   Right.  Right.  He would pick you up and for them you will

25   figure out, you on your own; right, what you were going to do?

1   A.   That's --

2   Q.   Because didn't you just told the jury that you're proud of

3   the fact that you don't need anybody to survive on the street;

4   right?

5   A.   Right.

6   Q.   Okay.  So the truth, ma'am, is that you expected to get a

7   hand from Ricky, according to your own testimony, if assuming

8   everything you say is true, and then you and L.P. will be on

9   your own, you don't need Ricky; right?

10  A.   That's what I had initially thought, yes.

11  Q.   Right, and no one stopped you from doing that.  In fact,

12  you did that, you hook up with Munoz and, whatever, C.C.,

13  getting high, drunk and driving to Tampa.

14       Was Ricky in the car with you when you were with Munoz and

15  C.C.?

16  A.   No.

17  Q.   You were -- you are a smart girl, you are pretty, and

18  you're capable of handling yourself, yes?  Is that a correct

19  assessment of you?

20  A.   What was the last thing you said?

21  Q.   I said you're a pretty girl, you're a smart girl, and you

22  are capable of taking care of yourself.

23  A.   Yes, sir.

24       MR. MICHAELS:  Okay.  Can I have a second, Judge, to

25  drink some water, please?

84

```
 1              THE COURT:  You may.

 2              MR. MICHAELS:  May I?

 3              I'm sorry.  Thank you.

 4    BY MR. MICHAELS:

 5    Q.  Ricky drop you to a house from what you said; right?

 6    A.  Yes, sir.

 7    Q.  Okay.  And did you, while you're cooperating with the state

 8    and federal authorities, did you take them and did you show

 9    them the house?

10    A.  No.

11    Q.  Why?

12    A.  They never asked me to.

13    Q.  One of these people that interrogated you, and correct me

14    if I am wrong -- I could be -- was a certain Lieutenant

15    Alfonso; correct?  Remember him?

16    A.  Yes.

17    Q.  So you met Lieutenant Alfonso; right?

18    A.  Yes.

19    Q.  Wow.  And he threatened you, correct, at some point; right?

20    A.  Threatened me?

21    Q.  Yeah, threatened you, that's correct?

22    A.  No.

23    Q.  You're not sure, yes, no, maybe, a little bit?

24    A.  In what way did he threaten me?

25    Q.  That if you don't cooperate, and if you don't do everything
```

1    they ask you to do, they're going to make sure, he's going to

2    put you in jail for many years to come.  Whether he can or not

3    is irrelevant.  That's Lieutenant Alfonso MO; correct?

4    A.  Not that I recall.

5    Q.  Not that you recall.  But you're willing to cooperate with

6    him and he never asked you where you have sex with three

7    adults; right?

8    A.  He asked me where, but did not ask me to show him the

9    house.

10   Q.  To show him, okay.  Are you aware that -- if you know, if

11   you don't know, say "I don't know" -- that Lieutenant Alfonso

12   is involved in so-called human trafficking, the special task

13   force for the State Attorney's Office in Dade County for years

14   and years, that's all he does?

15   A.  I was unaware.

16   Q.  How about the FBI people?  I mean, they're competent, much

17   more so, I guess, than state cop.  Did they take you there?

18   A.  No.

19   Q.  You know they have all these gadgets and they're going to

20   show them to the jury, machine and phone and towers and stuff

21   that I cannot even understand?

22          MS. RUBIN-SMITH:  Objection, Your Honor.

23          THE COURT:  Sustained.  Ask a question, sir.

24   BY MR. MICHAELS:

25   Q.  Do you know, if you know, why any of these federal

1   prosecutors or the federal agent did not ask you where is the

2   house?

3   A.   They asked me where but did not ask me to show them.

4   Q.   Right.  Right.  I apologize.  Why didn't they ask you to

5   take them there?

6   A.   I do not know.

7   Q.   I mean, you're 15 at the time; right?

8   A.   Yes.

9   Q.   And you're, according to your testimony today, forced in

10  having sex, you've been raped by three males; correct?  You're

11  raped, you just told the jury today that you're scared, I

12  believe your words were -- there were three -- let me see,

13  three old, big guys, that's the word that you used today, three

14  old, big guys, and you didn't think you have a choice; right?

15  A.   No.

16  Q.   No --

17  A.   I didn't think I'd have a choice.

18  Q.   I'm sorry?

19  A.   I didn't think I had a choice.

20  Q.   Right.  So you felt that you have to comply with the order

21  to have sex with them; right?

22  A.   Yes.

23  Q.   That in my book is called sexual battery or rape of a 15-

24  year-old girl; right?  That's what you're telling the jury;

25  right?

1   A.   Yes.

2   Q.   Okay.  Ah, we got him, you don't need to worry about

3   anything else; right, forget about the three guys who raped

4   you.

5        MS. RUBIN-SMITH:  Objection, Your Honor.

6        MR. MICHAELS:  Objection to what, to being raped by

7   three guys?

8        THE COURT:  Counsel...

9   BY MR. MICHAELS:

10  Q.   Do you know who these guys are?

11  A.   No.

12  Q.   Can you identify them in a photographic lineup?

13  A.   Yes.

14  Q.   Okay.  Ask them to provide this to you.  Ask them to do

15  their job.

16  A.   In all respect, sir, I would have never been there if it

17  wasn't for Ricky.

18       MR. MICHAELS:  Ma'am, there is no question asking.  I

19  know you're trained and you're trying to save your skin.  There

20  is no question asked.

21       Your Honor, I'm asking the Court respectful please

22  direct the witness to respond when there's a question pending,

23  not to talk whether she feels like.

24       THE COURT:  She was answering your question, Counsel.

25       MR. MICHAELS:  She was not.

```
 1            THE COURT:  Sir, continue.

 2            MR. MICHAELS:  Yes, Your Honor.

 3   BY MR. MICHAELS:

 4   Q.  Well, if you believe, as you told this jury today that you

 5   had been raped, sexually abused, when you get dropped at the

 6   motel, whoever dropped you, you're on your own now, you walk to

 7   the door of Motel 6; right?

 8   A.  Yes, sir.

 9   Q.  Eventually, you go in a motel room; right?

10   A.  Yes, sir.

11   Q.  And it's only one female there?

12   A.  Yes, sir.

13   Q.  When everybody leaves, it's just you, L.P., your best

14   friend, and another woman which we know now her name is Sandra

15   Simon, Simon, whatever; right?

16   A.  Yes, sir.

17   Q.  Are you scared of her, too?  Did she put a gun at your

18   head?

19   A.  No.

20   Q.  Did she tie you up?

21   A.  No.

22   Q.  When she took these pictures of you, and I'm going to save

23   you the embarrassment, I'm not going to show them again, but

24   you know the picture the Government show you; right?  Yes?

25   A.  Yes.
```

1   Q.   Okay.  Did she force you to take this picture?

2   A.   No.

3   Q.   There are no more three, big, old guys there anymore;

4   right?

5   A.   No.

6   Q.   There is a phone in the room?

7   A.   Yes.

8   Q.   You have chance and opportunity to use the phone, I'm sure,

9   at some point?

10  A.   Yes.

11  Q.   Did you call 9-1-1?

12  A.   No.

13  Q.   Did you call the people at the front desk?

14  A.   No.

15  Q.   Did you leave the motel room?

16  A.   No.

17  Q.   Was Ricky there at the hotel room during the night to hold

18  you there, to force you to stay there?

19  A.   No.

20  Q.   Now, you start with the picture and you start with

21  Backpage; right?

22  A.   Yes, sir.

23  Q.   You know now what Backpage is; right?

24  A.   Yes, sir.

25  Q.   You claim that you had no idea what Backpage was back then?

1   A.   No, I didn't.

2   Q.   But now you know, it's a prostitution advertisement?

3   A.   Yes, sir.

4   Q.   I mean, whatever it is.  It's a -- is it an internet and

5   newspaper or just one, because I'm not really familiar with

6   Backpage?

7   A.   I believe it's just internet, sir.

8   Q.   Just internet service, okay.

9        Did you tell anybody who was put in the ad, whoever,

10  Sandra, most likely, hey, I don't want to be there, I'm a

11  sweet, innocent girl from Iowa, I don't want to see my face and

12  my body exposed on the internet; did you say that?

13  A.   No.

14  Q.   I believe -- not that I'm the one to judge, but I believe

15  the one line there is you can have two of us; right, there's

16  something in this nature in the ad?

17  A.   I guess that's what it said.

18  Q.   Can I see the number, please?  That would you be when you

19  say, "Hi, my name" -- I don't know if it's clear enough, I

20  don't know if the jury can read it, I think they can.

21       If you want to inquire, Judge.  I don't see it clear here.

22  I'm not sure if it's clear here.

23            MR. SCHLESSINGER:  Zoom in.

24            MR. MICHAELS:  I don't know how to do that.  Thank you,

25  sir.

1    BY MR. MICHAELS:

2    Q.  Government is good sometime.

3        "Hi, my name is Brittany.  Sexy, hot, bombshell blonde.

4    Slim, always perfect body"; right, that would be you?

5    A.  I guess that's what that is referring to.

6    Q.  Well, those were your pictures; right?

7    A.  Yes.

8    Q.  Okay.  What unrushed means?  I really don't understand this

9    word.

10   A.  I don't know, I didn't write it.

11   Q.  You don't know what unrushed means?

12   A.  No.

13   Q.  "Call me now, baby" and the phone number.  What is this

14   phone number coming from?

15   A.  That's Sandra's phone number.

16   Q.  Okay.  Sandra.

17   A.  Yeah.

18   Q.  Here she is again.  And you claiming -- oh, I see.

19       And then you put, "My friend is Becky, sexy redhead."

20       L.P. is redhead, red hair, redhead, whatever?

21   A.  If that's what the ad's referring to.

22   Q.  "She's very talented."

23       And now you offer, "Ask about two girl special."

24   A.  I don't offer.  I didn't write that.

25   Q.  You agreed with it, you agreed to do two girl specials?

1    A.  I didn't know that was part of the ad.  I didn't ever see

2    the ad.

3    Q.  No, they didn't tell you, hey, how about this?  How does

4    this -- are you guys okay with this ad?

5    A.  No, I'm guessing she --

6    Q.  They didn't ask you?

7    A.  No.

8    Q.  So if they offered two girl special and a guy comes and

9    want a two girl special and you say, hey, hey, I don't agree to

10   two girl special, the guy is going to leave; right, because you

11   don't agree to that; right?

12   A.  I would imagine so.

13   Q.  Yeah.  Did you have -- perform a two girl special during

14   this prostitution --

15   A.  No.

16   Q.  -- run of 30 days or whatever you have?

17   A.  No.

18   Q.  You never slept with L.P. or have intimate relationship,

19   sex, intercourse, however you want to call it, with Sandra

20   and/or L.P. and/or C.C.?

21   A.  No.

22   Q.  Okay.  Now, did you, yourself, did you handle any money to

23   Ricky?

24   A.  No.

25   Q.  And I know later on, I guess I'm going to get to that in a

1    second, but did you testify today that in reality you never got

2    paid?

3    A.   No.

4    Q.   So you're telling the jury that you agreed to all of this

5    because at this point -- correct me if I'm wrong -- you agreed

6    to do that without being forced anymore; right, you're not

7    scared anymore, no one forces you anymore; right?

8    A.   I was scared, I believe that --

9    Q.   You said you were not scared.

10   A.   I wasn't scared because Ricky wasn't there, but I knew he

11   had people so I felt like if I left they would come after me.

12   Q.   Ricky has people.  Did he do anything to anybody like this

13   in the shelter?  Did you have any talk about him being a pimp

14   and recruiting girls in the shelter?

15   A.   No.

16   Q.   Did you ever see him with a weapon or threaten anybody or

17   hitting anybody?

18   A.   No.

19   Q.   Then why say that?  Why you make up stories to get along?

20   You have no evidence of that.

21   A.   I don't make up stories.

22   Q.   You, ma'am, were prostituting yourself on your own in Motel

23   6, Hampton Inn and you were on your way to Tampa with a new

24   pimp/boss, not Sandra.

25        Sandra is your boss first time and then you got C.C. and

1    Munoz to be your pimp/boss and they're going to pay you and you

2    want to make money; isn't that a fact?

3    A.   No, they never paid me.

4    Q.   Sandra didn't pay you?

5    A.   And C.C. didn't pay me either.

6    Q.   Who?

7    A.   C.C. didn't pay me either.

8    Q.   Okay.  Did you tell this jury earlier today, did you tell

9    this jury that you decided to go with Munoz and C.C. because

10   they tell you they're going to pay you money?

11   A.   No, I said I'd go with them because I'd get my own money.

12   Q.   Okay.  What does it mean -- that?  That means you get paid

13   and you get your money?

14   A.   Not from them, though.  C.C. and Robert never gave me

15   money.

16   Q.   No, right, so you get your money from prostitution, taking

17   from the johns and you get to keep the money, that's what

18   you're saying?

19   A.   With C.C., yes.

20   Q.   Okay.  So you go -- correct me if I'm wrong here because I

21   want to know if it's clear -- you go on your own with Munoz and

22   C.C. because they will allow you, according to you, to keep the

23   proceeds of prostitution?

24   A.   Yes.

25   Q.   You don't have to share this with them?

1    A.   I don't have to, I did.

2    Q.   Correct.

3    A.   But I didn't have to.

4    Q.   You don't have to.  So when you do that, you do it on your

5    own; right?

6    A.   Yes.

7    Q.   You're not scared of Ricky that is going to send people

8    after you; right?

9    A.   No, because I knew I had Robert and C.C. protecting me.

10   Q.   But you're -- right.  But you're doing it.  My point is

11   this:  At some point no one forces you, you can turn around and

12   go home, go to your mother, go to the police, go shelter, you

13   chose at this point freely, voluntary to continue with the

14   prostitution, to this road to perdition that you chose on your

15   own.  There is not anyone who is forcing you in any way, shape

16   or form to commit prostitution after this point; is it true?

17   A.   No, I did it on my own to stay with my friend.

18   Q.   Thank you.  The same as what?

19   A.   To stay with my friend because she was --

20   Q.   The same as -- I got it.  Thank you.

21        And you and your friend could not overcome Sandra and

22   leave?  You stayed with Sandra for the first three, four days

23   while she keeps all the money; right?

24   A.   Yes.

25   Q.   So you work on your own in Motel 6 for Ms. Sandra, and then

1   eventually you guys go across the street, or how far is the

2   Hampton Inn from Motel 6?

3   A.   Obviously, I have no idea.   Probably like 20 minutes away.

4   Q.   But that was the second motel you moved; right?

5   A.   No, there was a run-down motel in between, like I had said

6   earlier.

7   Q.   Okay.   I probably missed that.   I'm sorry.   You went to

8   Motel 6 first?

9   A.   Yes.

10   Q.   Then you went to a run-down motel?

11   A.   Yes.

12   Q.   But you don't know the name?

13   A.   No.

14   Q.   And then you moved to Hampton?

15   A.   Yes.

16   Q.   Okay.   That's over the period of four, five days?

17   A.   Yes.

18   Q.   You're having contact with the people at the reception, you

19   come in contact with security, you go out and eat; right?

20   A.   Yes.

21   Q.   I mean, you're not locked up in a room?

22   A.   No.

23   Q.   And forced to perform sex acts while you're -- you know,

24   high or locked up or handcuffed, you're going in and out at

25   some point; right?

1    A.   Yes.

2    Q.   Okay.  And so is L.P.; right?

3    A.   Yes.

4    Q.   And so is Sandra, I guess, or maybe not?

5    A.   At first she wasn't because she had an ankle bracelet on.

6    Q.   Oh.  So --

7    A.   But when she got that off, then we did.

8    Q.   I'm sorry, let me see if I understand that.  She was --

9    wow -- I want to get -- I want to ask.

10        So she was on probation at the time?

11   A.   Yeah, I think, because it had something to do with

12   prostituting and other girls.

13   Q.   Oh, okay.  So -- so you know that Sandra is on probation

14   and even has an ankle monitor, because she prostituted other

15   girls; right?

16   A.   Yeah, I found that out when I got to the hotel.

17   Q.   So she told you straight, that?

18   A.   Yeah.

19   Q.   I mean, you guys talked pretty freely about that; right?

20   A.   Yeah.

21   Q.   And now you know that you and/or L.P., all you have to do

22   is call the cops or probation officer, she'll be history, she

23   cannot even deny anything because she cannot be, correct me if

24   I am wrong, she told you that --

25        MS. RUBIN-SMITH:  Objection, Your Honor.

 1          MR. MICHAELS:  If --

 2          MS. RUBIN-SMITH:  No question pending.

 3          THE COURT:  There is no question, you're just talking,

 4    Mr. Michaels.

 5          MR. MICHAELS:  I'm trying to get to the question.

 6          THE COURT:  Ask the question.

 7    BY MR. MICHAELS:

 8    Q.  She cannot, correct me if I'm wrong, be around minors?

 9    A.  No, she couldn't.

10    Q.  She could not; right?

11    A.  Correct.

12    Q.  And you know that?

13    A.  Yes.

14    Q.  Drop a dime on her, you know, the expression drop a dime?

15    A.  Yes.

16    Q.  Okay.  Drop a dime on her.  She's gone, she's history.  My

17    point is this:  You're free to do whatever you want these

18    three, four, five days and you choose not to.  You choose to

19    stay there and make money by doing prostitution; correct?

20    A.  Sir, if I had left I truly believe Ricky would have had

21    people come after me and my life would be in danger.

22    Q.  Because he threatened you in the past, he put a gun at your

23    head, he cut your ears, he put a knife to your throat; right?

24    A.  No.

25    Q.  Oh, okay.  Did you ever talk on the phone to Ricky during

1   this week or ten days you were on the run?

2   A.   I talked on the phone to him to explain that we were

3   leaving Sandra and going with C.C.

4   Q.   You called him on the phone?

5   A.   Yes.

6   Q.   So you have a phone now?

7   A.   Yes, I explained that earlier.

8   Q.   And you called him to tell him you're going away with Ricky

9   and C.C.?

10  A.   "I'm going with C.C. and Eightball, away from Sandra," is

11  what I told him.

12  Q.   You're going where?

13  A.   With C.C. and Eightball.  Like, okay, when I left Sandra --

14  Q.   C.C. and Munoz?

15  A.   Yes.  When I left Sandra and went with C.C. and Eightball,

16  I called him because Sandra was upset about it, and I told him

17  that's what we were doing.

18  Q.   Okay.  So the man that you believe is going to kill you,

19  the man that you believe threatened your life, you want to make

20  sure he knows, you call him to make sure you tell him where

21  you're going, who you're going with, because you're so scared

22  of him; right?

23  A.   Correct.

24  Q.   What do you mean, "correct"?  That makes no sense, ma'am.

25  If --

```
 1              MS. RUBIN-SMITH:  Objection, Your Honor.

 2              MR. MICHAELS:  I'm going to ask questions, sure.

 3              THE COURT:  Thank you.

 4    BY MR. MICHAELS:

 5    Q.   Now, you get -- you get -- I believe -- strike that.

 6         You also testified that you don't know how much money you

 7    were making for Sandra; right?

 8    A.   No, I don't know.

 9    Q.   I mean, this guy -- these jerks who come and do this to

10    you, they don't talk about money to you, they don't tell how

11    much they pay?  They give you the money; right?

12    A.   They would set the money down on the table.

13    Q.   Okay.  So you knew how much you were getting paid?

14    A.   Yes.

15    Q.   Okay.  And the one that took the picture, this picture that

16    they were showing, were taken by Sandra; right?

17    A.   Correct.

18    Q.   Not by Ricky?

19    A.   No.

20    Q.   He was not there; right?

21    A.   No, he wasn't.

22    Q.   I saw in the picture that the Government showed the jury of

23    yourself, people can see your face?

24    A.   Uh-huh.

25    Q.   Right.  I also saw that L.P.'s picture, her face is
```

1  covered?

2  A.  Correct.

3  Q.  Okay.  I'm going to do what the old school said not to do.

4  Why?

5  A.  Because of her prostituting before, she had been on

6  Backpage and I believe she had said she had gotten in trouble

7  before so this time she didn't want to show her face so she

8  wouldn't get in trouble.

9  Q.  So you are a new talent, so no one knew about you yet, so

10  you have no fear showing your picture; that's how it goes?

11  A.  Correct.

12  Q.  Did you ever complain on the next night Sandra forces you,

13  according to you, forces you, to have sex with 15 guys; isn't

14  that an enormous amount of men for one night?  I don't know.

15  I'm asking.

16  A.  Sir, 15 was not for one night.  It was my whole stay at

17  Motel 6.

18  Q.  Oh, okay, that means I stand corrected.  Okay.

19      Still it's a lot of dates, so to speak; right?

20  A.  I guess, I wouldn't know what the normal prostitute -- how

21  many dates she has.

22  Q.  But you're doing it and you're not -- according to you

23  you're not even getting paid, you didn't complain, you didn't

24  ask, "Where is my cut," huh?

25  A.  No.

```
 1   Q.  All right.  I'm going to move on.
 2       So you only talk with Ricky during this one time when you
 3   call him to let him know basically who you're going with, where
 4   you're going; correct?
 5   A.  Correct.
 6   Q.  You didn't see Ricky at the Motel 6, though, correct?
 7   A.  Correct.
 8   Q.  You told this jury that Sandra told you this money is for
 9   Ricky?
10   A.  Yes.
11   Q.  Okay.  Who give you drugs and alcohol, Sandra?
12   A.  Yes.
13   Q.  Did I hear you correctly -- if I'm wrong, please say so --
14   did you, at some point in time, go in a bar and did coke inside
15   the bar?  Did I hear you saying that or not?
16   A.  Did I what?
17   Q.  Did you do cocaine in the bar during these few days?
18   A.  In the bar?
19   Q.  Yeah, in a bar.
20   A.  No.
21   Q.  Yeah, in a bar.  Go in a bar and people sometimes do that
22   in bars.
23   A.  No.
24   Q.  Okay.  I'm just asking, I don't know why I misunderstood
25   you.  No problem.
```

1      But you did participate in an armed robbery, did you not?

2   A.   Yes, I did.

3   Q.   And who is Romeo?

4   A.   Romeo was the one date that I had at the Hampton Inn.

5   Q.   That's one that Sandra knew?

6   A.   Yes.

7   Q.   So Sandra brought Romeo in?

8   A.   Yes.

9   Q.   I'm not going to state the obvious, you're supposed to be

10  Juliet, so...

11     Did you also say this C.C. met L.P. at the mental facility,

12  whatever institution?

13  A.   Yes.

14  Q.   Now on the way to Tampa, the car accident happened?

15  A.   Yes.  On the way back from Tampa.

16  Q.   On the way back from Tampa?

17  A.   Yes.

18  Q.   Oh, okay.  What happened in Tampa when you were there with

19  C.C. and Munoz, how many acts of prostitution did you do?

20  A.   Honestly, I didn't do any because I was on my period then,

21  too, so...

22  Q.   Okay.  How about L.P.?

23  A.   Probably about maybe five.  We weren't up there for that

24  long.

25  Q.   And C.C.?  Approximately, I don't --

1    A.   Maybe three.

2    Q.   Okay.  Did you -- I mean, I know you hesitate for awhile

3    before you said you were on your period.  Are you sure you

4    didn't do any, like just oral sex?

5    A.   No, I didn't.

6    Q.   Huh?

7    A.   I didn't.

8    Q.   Okay.  Now, on the way back the accident, did you talk with

9    the police -- I'm sorry, strike it.

10        Where -- do you know the county where you were where the

11   accident happened?

12   A.   In North Port.  North Port.

13   Q.   North Port, okay.  And that's where you came in touch with

14   the police department?

15   A.   Yes.

16   Q.   And that's where you -- they figure out, however you guys

17   talk, figure out that you are a runaway?

18   A.   Yes.

19   Q.   And what did they do?  They called the shelter?  Explain to

20   me how you got back to Tavernier or Monroe County.

21   A.   They brought us to a shelter near that county and then from

22   there one of our caseworkers came and picked us up and brought

23   us back.

24   Q.   Okay.  So someone came from your shelter with a van,

25   shelter van, I guess, or no?

1    A.   No, one of our caseworkers, they work for Wesley House, not

2    at the shelter, like they're our legal guardians.

3    Q.   Okay.  They are not involved with the shelter, these

4    people?

5    A.   No.

6    Q.   They are -- it's a legal guardian program.  They watch you

7    because you're a minor?

8    A.   Yes.

9    Q.   And someone from this legal guardian program came to pick

10   you up?

11   A.   Yes.

12   Q.   And they took you to the shelter?

13   A.   Yes.

14   Q.   Was it male or female?

15   A.   It was a female.

16   Q.   Did you talk -- what's her name, do you remember?

17   A.   Michael.

18   Q.   Michael?

19   A.   Yes.

20   Q.   But it was a female you said?

21   A.   Yes.

22   Q.   Okay.  And did you talk with her about what happened?

23   A.   No.

24   Q.   Or no?

25   A.   No.

```
 1    Q.   You didn't tell her the truth?

 2    A.   We didn't talk to her about anything.

 3    Q.   Anything.  You just -- we run away, that's it, to have fun

 4    and that's basically it?

 5    A.   We just told her we ran away.

 6    Q.   Right.  So now you get to the shelter; right?

 7    A.   Correct.

 8    Q.   Who did you meet first at the shelter, if you remember?

 9    A.   I don't remember.

10    Q.   Did you talk -- the first person you meet at the shelter,

11    did you tell them that you're raped the night we run away by

12    Ricky and his goons who you think is going to kill you?

13         Did you say anything?

14    A.   No, I was still scared.

15    Q.   You were still scared?

16    A.   Yes.

17    Q.   Okay.  And you're not squared today; right?

18    A.   No.

19    Q.   Okay.  I'll make sure.  Did you talk with anybody at the

20    shelter about what transpired at this point, the first day, the

21    second day?

22    A.   No.

23    Q.   How did you come in touch with the police once you get to

24    the shelter on the 24th of August?  They came to you?

25    A.   Yes, I called them and they came.
```

1   Q.   You called them?

2   A.   Well, the staff member did, but I was sitting there with

3   her.

4   Q.   Okay.  So there's a difference.  The staff member called

5   the cops?

6   A.   Yes.

7   Q.   Okay.  Why, if you know, why does the staff member call the

8   cops?

9   A.   Because I asked her to.

10  Q.   Okay.  And what did -- so you want to talk to the cops and

11  the cops came there?

12  A.   Yes.

13  Q.   Who came, do you remember?

14  A.   I don't.

15  Q.   But it's not Alfonso?

16  A.   No.

17  Q.   So they came, and you told them -- the interview happened

18  at the shelter or at the police station -- the first interview?

19  A.   I told them at the -- like, when the first police officer

20  came --

21  Q.   Yeah --

22  A.   -- when the police officer came I told him what happened

23  and then he called some detectives, I guess, and then I went

24  over to the sheriff's office, which is across the street.

25  Q.   Oh.  But of the first police officers who came was the

1    Monroe cop?

2    A.   Yes.

3    Q.   Monroe uniformed cop?

4    A.   Yes.

5    Q.   Not specialized?

6    A.   No.

7    Q.   Not task force, no nothing.  You talk with them and you

8    talk with them about the prostitution, or what exactly did you

9    tell them?

10   A.   I told them about the prostitution, but also about the

11   robbery.

12   Q.   Oh, okay.  So you talked about robbery, you talked about

13   prostitution, but you did not mention, correct me if I'm wrong,

14   Ricky at this point, that he did anything to you?

15   A.   No.

16   Q.   Then you get the detective -- by the way, were you arrested

17   for the robbery?

18   A.   No.

19   Q.   You -- then a detective comes and takes you to the

20   Monroe -- across the street; right?

21   A.   Yes.

22   Q.   He interviews you; right?

23   A.   Yes.

24   Q.   Does this genius ask you where the rape took place where

25   the three big, bad men rape you?

1    A.   Yes.

2    Q.   Did you take them to the house?

3    A.   No.

4    Q.   I mean -- apparently, I keep asking the same questions, the

5    wrong question.

6         What I meant is did they ask you to show them, that's --

7    A.   No.

8    Q.   They asked you what happened, you tell them about the house

9    but they never said, "Okay, can you show me the house?"

10   A.   No, they only asked me to describe where the house was.

11   Q.   But you could have taken them to the house; right?

12   A.   Yes.

13   Q.   As far as you know, if you know, is anybody from Monroe

14   County, any of these locals got arrested for anything, the

15   rapes, this stuff?  If you know.

16        If you don't know, say "I don't know."

17   A.   Can you rephrase the question?

18   Q.   Any of these three guys, any of the people that did the

19   robbery that you were with, did any of these people got

20   arrested, if you know, up to today?

21   A.   I knew Eightball was arrested.

22   Q.   Who is "Eightball?"

23   A.   The driver -- I mean, not the driver -- the passenger that

24   was in the car crash.

25   Q.   That was in the car crash with Munoz?

1   A.   Yes.

2   Q.   Is Eightball Munoz?

3   A.   Yes.

4   Q.   So Eightball is Munoz?

5   A.   Yes.

6   Q.   Well, he's transporting you to Tampa to commit perjury --

7   prostitution -- sorry -- and he was arrested right then and

8   there; so he was busted.

9        And so was C.C., probably; no?

10  A.   They were both arrested for child endangerment.

11  Q.   But what I asked you is -- actually, I knew that.  But what

12  I ask is, is any of the guys who raped you allegedly, the

13  alleged rape that happened in the house, and, you know,

14  whatever, Romeo or any of these people that you have sex with,

15  did any of them got arrested?

16  A.   I have no idea.

17  Q.   Any of the Johns -- you know what the "John" is; right?

18  Any of the Johns, the people you prostitution with, any of the

19  people that pay to have sex with you, did any of them got

20  arrested?

21  A.   I have no idea.

22  Q.   But now when you meet with this detective, you give him a

23  version of how all this came about and, again, you did not

24  mention Ricky Atkins; correct?

25  A.   During the first interview with him, I didn't mention

1    Ricky.

2    Q.   Right.   You basically, let's call it as it is, you lie?

3    A.   Yes.

4    Q.   But when you arrive at the shelter on the 24th of August,

5    you eventually see Ricky the same day or the next day, correct,

6    he was still -- he obviously worked there?

7    A.   Yeah.

8    Q.   Did you confront him?

9    A.   No.

10   Q.   You said you felt -- I believe your word you used today on

11   direct was uncomfortable, I felt uncomfortable in my head;

12   right?   Yes?

13   A.   Yes.

14        MR. MICHAELS:   If I can have a second, Your Honor.

15        May I have a second, please?

16        THE COURT:   You may.

17        MR. MICHAELS:   Thank you.

18   BY MR. MICHAELS:

19   Q.   To summarize my last question, I guess, would be to you is,

20   you -- correct me if I am wrong -- you did commit act of

21   prostitution, you admit getting involved in the robbery, you

22   admitted to this jury lying.   There's any reason these people

23   have to believe you?

24   A.   Yes.

25        MR. MICHAELS:   Thank you, Your Honor.

1           THE COURT:  Thank you very much.

2           Ladies and gentlemen, we're going to take an afternoon

3    break at this time.  It's about 3:45, 3:45.  We're going to

4    come back at 4:00.

5           Remember, you know a lot more than when you walked in

6    today, so no discussing the case amongst yourselves or with

7    anyone else.  I will see you all back in 15 minutes.

8           COURT SECURITY OFFICER:  All rise.

9           (Jury exited courtroom at 3:42 p.m.)

10          THE COURT:  Ladies and gentlemen, since I have allowed

11   the jurors to leave the jury room so we can go a little bit

12   faster in terms of the restroom, I'm going to remind all of the

13   participants to make sure that they use the restrooms on the

14   floor above and the floor below.

15          Ma'am, I'm going to remind you that you remain under

16   oath.  You're not discuss the substance of your testimony with

17   anyone until you return.

18          I'm going to ask that you be seated outside the

19   courtroom ready to start at 4:00, at 4:00.

20          Anything else, Counsel?  Mr. Schlessinger?

21          MR. SCHLESSINGER:  Yes, Your Honor.  There's a

22   scheduling issue that I wanted to raise with the Court.  Our

23   next witness after G.W., this cross-examination has taken a lot

24   longer than we expected.  We expected the second witness to

25   start and really finish testimony earlier.  That witness has a

1    conflict starting at 4:15 this afternoon.

2         I also concede it's partially our fault because having

3    tried cases before Your Honor before, I know in other cases

4    Your Honor has not held court on Wednesday and so before

5    calendar call we advised the witness of that and scheduled a

6    meeting for 4:15 at this time.

7         THE COURT:  Is there anyone else that we can use in the

8    time that we have remaining, Counsel?

9         MR. SCHLESSINGER:  He's the only witness we have and

10   his testimony would go into, and is conflicted by, even if he

11   could testify, would go into our next trial period and I

12   apologize to the Court for that, but I would ask if the Court

13   could indulge us and allow us to accommodate.

14        If the Court cannot accommodate us in that regard, I

15   will tell that witness that, but if the Court can --

16        THE COURT:  Well, at least let us try to get in until

17   4:30.  If you can, let us know because it is my issue -- you

18   haven't obviously even had redirect with this witness.  It's my

19   issue, I know that we have this truncated schedule, but I knew

20   if we didn't begin this trial it was going to be a

21   scheduling -- a worse scheduling problem for the Court.

22        MR. SCHLESSINGER:  I understand Your Honor completely,

23   so I will instruct the witness if it's appropriate to at least

24   be available to be here until 4:30.

25        THE COURT:  I appreciate that very much.

 1          MR. SCHLESSINGER:  Yes, Your Honor.

 2          THE COURT:  Thank you, Counsel.

 3          MR. MICHAELS:  If I could give my two cents, don't mean

 4   nothing; right?

 5          THE COURT:  I wouldn't say it doesn't mean anything,

 6   but on this issue related to another attorney's witness, no.

 7          MR. MICHAELS:  Thank you, Your Honor.

 8          THE COURT:  We will be back in 15 minutes.

 9          COURT SECURITY OFFICER:  Please remain standing.  Okay,

10   down.

11          (Witness steps down.)

12          (Recess taken from 3:45 p.m. to 4:02 p.m.)

13          THE COURT:  Mr. Schlessinger.

14          MR. SCHLESSINGER:  Yes, Your Honor.

15          THE COURT:  Mr. Michaels is concerned that you were

16   having conversations with the witness while we were on the

17   break; is that correct?

18          MR. SCHLESSINGER:  That's not correct.  I had heard, of

19   course, the Court's instruction that the witness is not to

20   discuss the substance of her testimony with any person, and, of

21   course, that's the rule as for every witness.

22          And I took the witness with several other people, in

23   the presence of five or six other people, and instructed the

24   witness that we were going to do redirect examination and she

25   could use the bathroom and should use a restroom on another

1   floor.

2          THE COURT:  So you were merely informing her certain

3   ministerial things, not discussing the substance of her

4   testimony?

5          MR. SCHLESSINGER:  That's absolutely correct.

6          THE COURT:  All right.  Mr. Michaels.

7          MR. MICHAELS:  All I know is that you give an order and

8   there's no need for two prosecutors, two federal agents and

9   another two people -- I know who they are -- to lock themselves

10  into a room.

11         I tried to remind them the Court order, they bang the

12  door in my face.  I have to push the door to stop the door from

13  hitting me in my face, and then they remind me that my cross is

14  over, and whatever else.  I did not appreciate this behavior.

15  I'm shocked, I'm surprised, because I always respected --

16         THE COURT:  I think everyone.  I think everyone.

17         Now, one thing I have to say, Mr. Michaels, neither

18  Ms. Rubin-Smith or Mr. Schlessinger have raised their voice one

19  time.

20         On the other hand, I am constantly cautioning you to

21  roll it back.  Now I understand you have a right to zealously

22  represent your client, but the ranting has got to stop.

23         Now, based upon Mr. Schlessinger and Ms. Rubin-Smith's

24  performance in this Court before, I have know them to be honest

25  officers of the court, maybe five of them couldn't go in a

1    room, but I don't have no reason to believe --

2         MR. MICHAELS:  Okay.

3         THE COURT:  Now, maybe they didn't treat you as nice as

4    they should.

5         MR. MICHAELS:  I don't care about that.

6         THE COURT:  Let's just try to roll it back and move

7    forward for today; okay?

8         MR. MICHAELS:  I want to make this point that I hold

9    Mr. Schlessinger, I know him for awhile now, in the highest

10   regard.  I never, ever suspect that he'll do anything out of

11   the normal rules.  I don't accuse him of that.  I don't know

12   what they talk about.

13        I know that, that was a highly unusual procedure; and

14   if he tells me that he didn't talk, I believe him, I don't have

15   a problem with that.

16        THE COURT:  So can we go ahead --

17        MR. MICHAELS:  But my voice is what my voice is,

18   Judge.  I can't help my voice sometimes.

19        THE COURT:  Then I'm going to have keep reminding you.

20   I am trying not do it in front of the jury, just dial it back.

21        MR. MICHAELS:  Yes, Your Honor.

22        THE COURT:  So while we're off for the next couple of

23   days, I want you to practice your inside voice.

24        MR. MICHAELS:  I will try to do that, Judge.  I

25   promise.

 1          THE COURT:  Thank you.  The witness, please, for

 2  redirect, and jurors as well.

 3          COURT SECURITY OFFICER:  Yes, Your Honor.

 4          THE COURT:  Let's make the most of the time that we

 5  have left for this afternoon.

 6          MR. SCHLESSINGER:  Thank you, Your Honor.

 7          (Witness resumes stand.)

 8          (Jury entered courtroom at 4:05 p.m.)

 9          THE COURT:  Welcome back, ladies and gentlemen, please

10  take your same seat.

11          Thank you very much, ladies and gentlemen.  You may be

12  seated.

13          Counsel, you may inquire.

14          MS. RUBIN-SMITH:  Thank you, Your Honor.

15                      REDIRECT EXAMINATION

16  BY MS. RUBIN-SMITH:

17  Q.  G.W., I just have a few follow-up questions with you based

18  on the cross-examination.

19          Now Mr. Michaels asked if you met with the United States

20  before.  And have you met with FBI Special Agent Amanda

21  Detterline before?

22  A.  Before what?

23  Q.  Before today.

24  A.  Yes.

25  Q.  And have you met with AUSA Schlessinger before today?

```
 1   A.   Yes.

 2   Q.   Have you met with me before today?

 3   A.   Yes.

 4   Q.   Did we tell you how you needed to answer questions on the

 5   stand?

 6   A.   Only truthfully.

 7   Q.   Other than telling you to tell the truth, did we ever give

 8   you any instructions on telling you how to answer the question?

 9   A.   No.

10   Q.   Did we ever tell you to blame Mr. Atkins?

11   A.   No.

12   Q.   Did we ever tell you to blame Ms. Simon?

13   A.   No.

14   Q.   Now defense counsel asked you about your friend, L.P.?

15   A.   Yes.

16   Q.   When you and L.P. ran away and met up with Mr. Atkins, how

17   old was L.P.?

18   A.   She was 16 at the time.

19   Q.   And at that time, how long did you know her for?

20   A.   About three weeks, a month maybe.

21   Q.   Now, when you ran away and met up with Mr. Atkins, did L.P.

22   ever rent any hotel rooms for you?

23   A.   No.

24   Q.   Did L.P. ever give you a phone?

25   A.   No.
```

1  Q.  Did L.P. ever tell you that you needed to have sex with

2  men?

3  A.  No.

4      MR. MICHAELS:  Judge, I'm going to object to the

5  leading nature of these.

6      THE COURT:  Sustained.

7  BY MS. RUBIN-SMITH:

8  Q.  What did L.P. do?

9  A.  She was there for me when I needed somebody to talk to.

10  Q.  Did L.P. prostitute?

11  A.  Yes.

12  Q.  Who did she give her money to that she earned from

13  prostitution?

14  A.  She gave it to Sandra.

15  Q.  And, again, do you know who Sandra gave it to?

16      MR. MICHAELS:  Objection.  Ask for speculation.

17      THE COURT:  Overruled.

18  BY MS. RUBIN-SMITH:

19  Q.  You may answer.

20  A.  Sandra told me and L.P. she was giving the money to Ricky.

21  Q.  Now you were asked by Mr. Michaels if you had ran away

22  before from the shelter and you said you had run away 30 times.

23  A.  Correct.

24  Q.  In the previous times that you had run away, where did you

25  go, typically?

1    A.   Either to my boyfriend's house or to the park.

2    Q.   And how long did you run away for?

3    A.   Typically, the day.

4    Q.   And after you ran away for the day, where would you go?

5    A.   I'd come back to the shelter.

6    Q.   During those times that you ran away, did you ever

7    prostitute?

8    A.   No.

9    Q.   Did your boyfriend ever tell you to prostitute?

10   A.   No.

11   Q.   Now, before you ran away from Mr. Atkins, did he ever talk

12   to you about providing a telephone for you?

13   A.   Yes.

14   Q.   What did he tell you about that?

15   A.   That he didn't know for sure but he was going to try to get

16   a cell phone before we ran away for us to use to contact him.

17   Q.   And did he tell you why he would be getting you a cell

18   phone before you ran away?

19   A.   To try to set up a time.

20   Q.   Did he ever provide you with a cell phone before you ran

21   away?

22   A.   No, he did not.

23   Q.   I think you told defense counsel that Ricky was going to

24   pick you up and then you would figure it out?

25   A.   Correct.

1    Q.   And when you say "figure it out," when you said that, what

2    did you mean by "figure it out"?

3    A.   Like, where I was going to say, what I was going to do.

4    Q.   And as part of figuring it out, did you ever plan to

5    prostitute before you ran away with Mr. Atkins?

6    A.   No.

7    Q.   Now, defense counsel also asked you about the several men

8    that you had sex with at the house before you went to the Motel

9    6.   Did you know the names of any of those men?

10   A.   No.

11   Q.   Was Ricky Atkins at that house?

12   A.   Yes.

13   Q.   Who drove you to the house?

14   A.   Ricky.

15   Q.   Now, defense counsel also asked you about a robbery.

16   A.   Correct.

17   Q.   As best as you can remember, what happened?

18   A.   I was supposed to be going on an out-call date, which is

19   when we go the client's house, and on our way there it was me,

20   Eightball and one of Eightball's friends that I had just met

21   that day.

22        When we were going to the out-call, his friend said we had

23   to make a quick stop, and then when we got out Eightball

24   explained to me that they were going to be robbing this older

25   man.   And he said there wasn't going to be any violence, that

1   the gun was just for show and that I was to keep watch for the

2   cops.  And it was like in an old, abandoned concrete building.

3        And when I was looking out for the cops, I was just

4   watching the roads and everything, and I heard a shot.  And

5   when I turned around I saw the man fall to the ground and

6   Eightball and his friend told me to hurry up and get in the

7   car, and so I did.

8   Q.  And G.W., after seeing that happen, did you tell law

9   enforcement about it?

10  A.  When we got back to the shelter, that's the whole reason

11  why I started talking to the cops.

12  Q.  And when you got back to the shelter, did Ricky talk to

13  you, Ricky Atkins?

14  A.  Yes.

15  Q.  How soon after you got back to the shelter did he talk to

16  you?

17  A.  On his next shift.

18  Q.  What did he talk to you about?

19  A.  Coming and working for him again.

20        MR. MICHAELS:  I can't hear, Your Honor.  I couldn't

21  hear.

22        THE COURT:  Ma'am, I need you to speak up.

23        THE WITNESS:  He talked to me about coming and working

24  for him again.

25  BY MS. RUBIN-SMITH:

1   Q.   And when you say "working," what do you mean by that?

2   A.   Prostituting.

3        MS. RUBIN-SMITH:  May I have a moment, Your Honor?

4        THE COURT:  You may.

5        MS. RUBIN-SMITH:  Thank you, nothing further.

6        THE COURT:  One moment, please.  Counsel, would you

7   approach?

8        (Sidebar discussion held as follows:)

9        MR. MICHAELS:  He said he should nothing, it's with

10  your permission.

11       MR. SCHLESSINGER:  I didn't know what she would say.  I

12  asked about it because he said did you participate in a robbery

13  and she said yes and --

14       THE COURT:  But you knew that we have limited

15  circumstances on the inquiry of the robbery?

16       MR. SCHLESSINGER:  Right, but I didn't tell her.  I'm

17  sorry.  After you ruled I didn't tell her but before she

18  started her testimony.

19       THE COURT:  That means that she deliberately ignored

20  what you cautioned her not to discuss again in open court.

21       MS. RUBIN-SMITH:  I said the defense attorney is

22  allowed to ask you about the robbery but he's not allowed to

23  ask you about the shooting.

24       THE COURT:  So she talked about the shooting.

25       MS. RUBIN-SMITH:  But I told her the defense attorney

1    so I think she misunderstood and I never told her now that I

2    asked you about it don't mention the shooting either and,

3    obviously, I didn't tell her that.

4         THE COURT:  So, in other words, I'm going to have to

5    just go home and then in an area where we deliberately kept

6    away from cross-examination you had to pitch hit a softball.

7         MR. MICHAELS:  And I'm inquiring respectfully with the

8    Judge, the Court will give me permission very limited to

9    recross on only this area that they opened the door that was

10   not allowed to get into, in addition to that, she also

11   basically lied because she said in her debriefing with the cops

12   that she did nothing, she didn't know nothing.

13        Now she's being lookout, you know.  You can't have the

14   cake and eat it, too, Judge.

15        MS. RUBIN-SMITH:  In the reports that I read she says

16   that they instructed her to look for drugs.

17        MR. MICHAELS:  She said the cops.

18        THE COURT:  That's a different thing, and it might have

19   been a very different answer that Mr. Michaels crossed on it.

20        MS. RUBIN-SMITH:  I didn't direct on it, I only

21   redirected.

22        THE COURT:  Well --

23        MS. RUBIN-SMITH:  Because he asked her if she

24   participated in a robbery, and she said yes, and I think she

25   was just being -- because, you know, when we talked to her and

1   we asked her about it, we said, you have to tell the truth, you

2   have to tell the truth.

3           So, I think, in her overcautious approach to be

4   truthful, she said that she participated by, you know, she

5   didn't take anything.  She saw the shooting, I mean.

6           THE COURT:  You don't have to take anything when you

7   shoot a guy in the stomach.

8           MS. RUBIN-SMITH:  No.  She explained she was not the

9   one that shot.  She saw it, you know.  And, Your Honor, we

10  looked at the motion to ex -- which we wanted to exclude the

11  robbery and the shooting.

12          THE COURT:  So just because you don't get the whole

13  piece of cake, you don't share any of it?

14          MS. RUBIN-SMITH:  No, Your Honor.  It came out, it came

15  out on the cross.

16          MR. MICHAELS:  You look at me?

17          THE COURT:  What will you go into, Mr. Michaels?

18          MR. MICHAELS:  Well, I'm asking you.

19          THE COURT:  What more do you want to go into?

20          MR. MICHAELS:  Let me say that I, respectful, have to

21  keep my record.  I'm asking the Court to either strike her

22  entire testimony because it's not allowed to cross, and then

23  they, like you said --

24          THE COURT:  Don't think about the pink elephant in the

25  room.

1          MR. MICHAELS:  No, no.  The fact that -- the fact that

2    this comes in, it helps me.  I'm not going to be a hypocrite

3    and stand here and say a mistrial, because it would be stupid

4    of me to say that.

5          THE COURT:  It's been -- I'm not going to allow you

6    redirect, but it's now available for you, for whatever purpose

7    you deem appropriate.

8          MR. MICHAELS:  I only mention to the Court when I think

9    it's really fair, because what they did, they file motion, you

10   grant it partially and you preclude me, and I follow the Court.

11         THE COURT:  You did.

12         MR. MICHAELS:  Asked one question because I was afraid

13   to get, "robbery" and get blamed for it.  The robbery, number

14   one, you remember I asked exactly in the record -- you heard

15   me -- one question, nothing good could come from this, you

16   should have asked me to question on the area alone.

17         THE COURT:  I think we've got enough on her

18   credibility, but I -- I heard it.

19         MS. RUBIN-SMITH:  Thank you.

20         THE COURT:  And you can use it.

21         MR. MICHAELS:  Thank you.

22      (Sidebar concluded, proceedings continued in open court:)

23         THE COURT:  Thank you very much, ma'am, you're excused.

24         (Witness excused.)

25         THE COURT:  Counsel for the United States, your next

  1    witness, please.

  2              MS. RUBIN-SMITH:  Commander Jose Alfonso.

  3              THE COURT:  Sir, come to the front of the courtroom,

  4    please, to be sworn by the court reporter.

  5              THE COURT REPORTER:  Do you solemnly swear or affirm to

  6    tell the truth, the whole truth, and nothing but the truth, so

  7    help you God?

  8              THE WITNESS:  I do.

  9              THE COURT:  Thank you very much, sir.  If you would

 10    take your seat, tell us your full name and spell your last

 11    name.

 12              THE WITNESS:  Jose Antonio Alfonso.  Last name is

 13    A-L-F-O-N-S-O.

 14              THE COURT:  Counsel, you may inquire.

 15              (COMMANDER JOSE ALFONSO, after having been first duly

 16    sworn, was examined and testified as follows:)

 17                         DIRECT EXAMINATION

 18    BY MS. RUBIN-SMITH:

 19    Q.   Good afternoon.  Where do you work?

 20    A.   I'm employed by the City of Miami Police Department.

 21    Q.   How long have you worked for the City of Miami Police

 22    Department?

 23    A.   28 years, since 1988.

 24    Q.   What is your current title?

 25    A.   I'm currently a police commander.

1    Q.   What where your duties as a commander?

2    A.   I'm currently assigned by the chief of police as the

3    commander in charge of the downtown area which encompasses this

4    area here where the courthouse is basically from the river to

5    about 17th Street from the bay to about Miami Avenue, I'm

6    responsible for all the police functions within that area.   I

7    have approximately 60 officers that report under my command.

8    Q.   Prior to being a commander, have you held other positions

9    with the City of Miami Police Department?

10   A.   Yes.   As a police -- when I was hired, I was hired as a

11   police officer.   I was in patrol for about six years.   Then I

12   was assigned to our North District Robbery Investigations.

13   There I investigated robberies, kidnappings, burglaries and

14   other general crimes.   I worked on a special investigation

15   section for several years.

16       There I worked in our vice squad, our dignitary

17   intelligence squad.   I worked in our money laundering task

18   force and I also worked in our smuggling unit which deals with

19   mid to high level narcotic cases with the FBI, DEA and other

20   state and federal jurisdictions.

21       I was also -- then I got promoted to sergeant.   As a

22   sergeant, I was assigned to the Little Havana neighborhood

23   where I supervised approximately six officers, and within a

24   year they assigned me in charge of a -- what is called a

25   problem-solving team.

1      Basically, as a supervisor, I supervised officers that were

2   in charge of -- they reported to the commander, and whatever

3   the problems were, if it was a traffic, a drug problem, the

4   officers and myself were tasked to deal with specific different

5   types of issues that were affecting the neighborhood.

6      I then was promoted to lieutenant and, again, I was patrol

7   lieutenant for awhile.  I was in charge of the midnight shift

8   in patrol, basically, for all the patrol function in the city

9   during the night as shift commander.

10      I then was assigned as a lieutenant in charge of the Child

11   Abuse Sexual Battery Unit for about a year, and then I went to

12   Internal Affairs where I was -- our internal affairs section is

13   divided in two sections, general investigation and a proactive,

14   which is more for anticorruption and stuff like that.

15      I first was in charge of the general investigation side for

16   awhile and then I was moved over to the anticorruption side,

17   where we basically investigated police misconduct, corruption,

18   things like that.  From there, I was promoted to commander.

19      I actually stayed in internal affairs now in charge as

20   deputy commander for internal affairs for a few years.  Then I

21   was back in patrol, or I was assigned as a commander for Little

22   Havana, Flagami.

23      Most recently when this case came about, I was assigned to

24   the Miami-Dade State Attorney's Human Trafficking Task Force.

25   There I was about -- I served there for about three years doing

1   human trafficking investigations detached to the State

2   Attorney, and depending on the circumstances some of the cases

3   we worked jointly with some of the federal agencies.

4        Since then, I've been reassigned now to the downtown areas

5   as the commander there for the downtown areas, I started to say

6   at the beginning.

7   Q.   When you said that you worked on human trafficking

8   investigations, how many years did you work those

9   investigations for?

10  A.   I was there for about three years.

11  Q.   And can you describe what that position entitled?

12  A.   As I mentioned, I was detached, the chief of police

13  detached me to the State Attorney's Office, basically as still

14  a Miami policeman but I'm sworn in and deputized as a state

15  attorney investigator which gives me jurisdiction throughout

16  all Miami-Dade County, and as a task force member we

17  investigated allegations of human trafficking, which normally

18  encompassed -- we focused on the commercial sexual exploitation

19  of women that were, as they say in general terms, that were

20  being pimped by some of these men.

21       I also, we worked some of -- very seldom do we get any type

22  of labor trafficking where people are being exploited for

23  labor.  The majority of our cases focus around commercial

24  sexual exploitation of women and prostitution.

25  Q.   And as part of your work on human trafficking

1    investigations, did you become involved in the investigation

2    with Mr. Atkins?

3    A.   Yes, ma'am.

4    Q.   Please take a look in the courtroom and tell me if you can

5    recognize Mr. Atkins here today.

6    A.   He's the gentleman in the blue tie sitting next to Mr. Alex

7    Michaels.

8         MS. RUBIN-SMITH:  Please let the record reflect that

9    Commander Alfonso identified the defendant.

10        THE COURT:  The record will reflect that the commander

11   has indicated the defendant.

12   BY MS. RUBIN-SMITH:

13   Q.   When did you become involved in this investigation?

14   A.   I believe it was on or about September of 2014, I was -- I

15   received, I believe it was via e-mail, a be on the lookout or

16   looking for information from a bulletin that the Monroe County

17   Sheriff's Office had put out stating that there was -- they had

18   come across a couple of runaway females that were alleging that

19   they witnessed a robbery somewhere in the little Havana,

20   Allapattah or Hialeah area, and also that the girls were

21   alleging that they had commercially sexually exploited by a

22   group of individuals.

23   Q.   Did you interview any minors in connection with this case?

24   A.   Yes.  As a result of the follow-up, I had one of the

25   investigators that works with the task force reach out to

1    Monroe County.  We made arrangements and a few days later, I

2    believe it was like September 4th or 5th, we went to Monroe

3    County and we spoke to one of the girls.

4    Q.  And which girl was that?

5    A.  I believe it was G.W.

6    Q.  Do you remember when that interview took place?

7    A.  I believe it was on the 5th of September.

8    Q.  2014?

9    A.  Correct.

10   Q.  Who did you conduct that interview with?

11   A.  It was at the -- it was at a -- one of the facilities of

12   the program that was in charge of taking care of the girls.  I

13   don't know if it was a DCF program, but it was a facility next

14   to the school where she attended.

15       It was myself, Detective Jessica Letizia, that's a task

16   force member with us, and whoever -- somebody that was

17   representing the DCF or whoever her caretaker was, was also

18   present for the interview.

19   Q.  Did you interview G.W. again?

20   A.  Later on, yes.

21   Q.  And when was that?

22   A.  Well, after interviewing her we tried to find the second

23   female that we had identified, which was L.P., and we

24   subsequently made arrangements and we ended up going all the

25   way to Key West this time to interview Ms. L.P.

1     This time one of the FBI agents accompanied us to Key West

2     and where we obtained a recorded interview from L.P.

3     Q.   Who was the FBI agent that accompanied you to that

4     interview?

5     A.   Amanda Detterline.

6     Q.   After you interviewed L.P., did you interview G.W. again?

7     A.   Yes.  On the way back from Key West, we stopped -- I guess,

8     it's near Key Largo, Plantation -- where G.W. was at, and we,

9     again, re-interviewed her and addressed some of the

10    inconsistencies of her first story.

11    Q.   What was the reason for interviewing her several days

12    later?

13    A.   Well, on her first -- it's not uncommon when you deal --

14         MR. MICHAELS:  Your Honor, I am going to object, and I

15    would like a sidebar, please.

16         THE COURT:  Approach, please.

17         (Sidebar discussion held as follows:)

18         MR. MICHAELS:  She's obviously got a case, and he's

19    started professing -- unfortunately, it's "not uncommon" to

20    Your Honor.

21         THE COURT:  If you want to caution him, again, he's a

22    fact witness, he's not been qualified as an expert to have him

23    talk about what he actually saw, observed, or did in connection

24    with.

25         MR. MICHAELS:  And in addition to that, right,

1   everything he's going to testify to is hearsay.  I mean,

2   whatever things she told him, it's still hearsay.

3          MS. RUBIN-SMITH:  I can withdraw the question.

4          THE COURT:  Be cautious.

5          MR. SCHLESSINGER:  Your Honor, I want to draw the Court

6   to the time as well.  I apologize.

7          MR. MICHAELS:  I would like to withdraw the question

8   first before you start.

9          THE COURT:  I'm going to do that, and then I will --

10          MR. MICHAELS:  Thank you.

11   (Sidebar concluded, proceedings continued in open court:)

12          THE COURT:  Ladies and gentlemen, the last question and

13   answer are stricken.  The answer to the question has been ruled

14   objectionable and the witness's answer is stricken.

15          Ladies and gentlemen, we are going to adjourn at this

16   time.  Now, listen to me very carefully, because you will not

17   hear me for a couple of days bugging you; so just think of me

18   bugging you.

19          Next Wednesday, 12:45, in the jury room, we'll start up

20   this matter again.  You can leave your notebooks on your

21   chairs, no one will sit there, other than you.

22          Once again, look around the courtroom, if you see the

23   people in the snack bar, the elevator, the parking lot, they're

24   going to ignore you and you are to ignore them.

25          Other than telling your employers or educational

1    institutions that you're on jury duty, do not discuss the

2    substance of your testimony with anyone.

3            Again, thank you for your service.  I will see you back

4    a week from today.

5            COURT SECURITY OFFICER:  All rise for the jury.

6            (Jury exited courtroom at 4:30 p.m.)

7            THE COURT:  Sir, you remain under oath in connection

8    with this matter.  You're not to discuss the substance of your

9    testimony with anyone.  I ask that you be back outside this

10   courtroom one week from today at 1:00 p.m.

11           Thank you very much.

12           (Witness steps down.)

13           THE COURT:  The Court officer will lock the courtroom

14   in about ten minutes.

15           (Proceedings adjourned at 4:32 p.m.)

16

17                    C E R T I F I C A T E

18            I hereby certify that the foregoing is an

19           accurate transcription of the proceedings in the

20           above-entitled matter.

21

     June 10, 2016        /s/Glenda M. Powers
22   DATE                 GLENDA M. POWERS, RPR, CRR, FPR
                          Official Federal Court Reporter
23                        United States District Court
                          400 North Miami Avenue, 08S33
24                        Miami, Florida 33128

25